## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF PENNSYLVANIA

HDH GROUP, INC.,         )
                 )
     Plaintiff,        )
                 )     **Case No.: 2:24-cv-00988-WSS**
vs.                )
                 )
UNITED STATES OF AMERICA, )
                 )
     Defendant.      )
                 )
_____ )
                 )
UNITED STATES OF AMERICA, )
                 )
     Counterclaim Plaintiff, )
                 )
     vs.            )
                 )
HDH GROUP, INC.,         )
                 )
     Counterclaim Defendant. )

## MEMORANDUM OF LAW OF HDH GROUP, INC. IN REPLY TO UNITED STATES' OPPOSITION TO HDH GROUP, INC.'S MOTION FOR SUMMARY JUDGMENT AND MOTION TO DISMISS COUNTERCLAIM

## I.    INTRODUCTION

In the Conclusion of its Opposition Memorandum, the United States makes the bold and incorrect statement that the landmark case of *SEC v. Jarkesy,* 603 U.S. 109 (2024), decided by the Supreme Court of the United States on June 27, 2024, "has no application here." Def.'s Mem. of Law in Opp'n to HDH's Mot. for Summ. J. and Mot. to Dismiss Countercl. 26, ECF No. 35 (hereinafter "Response"). On the contrary, *Jarkesy* demands that the court make the initial

determination of whether a tax assessment should be made, even if that change upends the way it has been done historically.

*Jarkesy* brings to a screeching halt the heretofore unchecked and unconstitutional ability of the Internal Revenue Service to mete out punishment in the form of fraud penalties against private taxpayers without regard to such taxpayer's Seventh Amendment right to an initial finding of fraud by a jury in a trial presided over by an Article III court. U.S. Const. amend. XII; U.S. Const. art. III.

## II.    ARGUMENT

### A. *Jarkesy* is factually on point with the instant case because both cases question an agency's ability to assess a civil fraud penalty without a jury trial.

The United States' Response is permeated with meandering arguments that *Jarkesy* does not apply in the instant case because *Jarkesy* was decided under a completely different set of circumstances, that the IRS has always been able to assess certain penalties such as the Promoter Penalty without initial judicial interference, and that HDH eventually can have a jury trial even though *Jarkesy* clearly holds that the jury has to make the initial determination of penalty liability, i.e., pre-assessment. In more basic terms, the United States argues that the IRS is within its statutory right to proceed just because it can, even though it has no constitutional right to do so. *Jarkesy* disagrees.

The United States Supreme Court in *Jarkesy* answered one straightforward question: whether the Seventh Amendment entitles a defendant to a jury trial when the SEC seeks civil penalties against him for securities fraud. *Jarkesy,* 603 U.S. at 120. In determining that a jury trial was required, the Supreme Court followed the approach of two cases, *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33 (1989) and *Tull v. United States*, 481 U.S. 412 (1987). In *Jarkesy,* the Supreme Court found that the SEC antifraud provisions replicate common law fraud and stated

2

that it is well-established that common law claims must be heard by a jury.  603 U.S. at 120. Substitute one government agency, the IRS, seeking to impose civil fraud penalties against HDH without an initial jury determination, for another government agency, the SEC, seeking to impose civil fraud penalties against Mr. Jarkesy without an initial jury determination, and the circumstances are exactly the same.   The only difference is the identity of the government agency.

Regardless of this exact fit between *Jarkesy* and the present case, the United States contends that at "first glance" there are only "some superficial similarities" between the two matters. Def.'s Mem. 10. For example, the United States says that the assessment by the IRS of the penalty against HDH parallels the decision of the SEC to charge Mr. Jarkesy with a civil penalty because both involve an administrative conclusion by the agency that a person owes a penalty, and an administrative calculation by the agency of the amount owed. Def.'s Mem. 10. But those facts are at the very epicenter of the *Jarkesy* holding that a jury trial is necessary to establish penalty liability rather than a simple in-house administrative finding of penalty liability.

The United States incorrectly states facts that were not contained in *Jarkesy* "that there were *two avenues to obtain judicial review* of penalty liability, only one of which provided the opportunity for a jury trial".  (emphasis added). Def.'s Mem. 10. (citing *Jarkesy*, 603 U.S. 109).  It is not clear what the United States means by "two avenues to obtain judicial review", but the SEC could unilaterally decide to prosecute the penalty liability only through an in-house administrative proceeding or it could bring suit against the alleged perpetrator in federal court which was the only avenue to a jury trial.  The United States again tries to make the point that HDH had two main avenues to judicial review, only one of which (filing a refund action) provided for a jury trial.  This point is irrelevant because neither Mr. Jarkesy nor HDH had a pre-assessment right to have their alleged penalty liabilities initially decided by a jury.

The United States then asserts that the most important factor from which *Jarkesy* differs from HDH is that the SEC, rather than the party facing liability for penalties, chose the path for judicial review, and in this case HDH was able to choose its own path to a jury trial by filing this refund action. Def.'s Mem. 10-11. The United States' contention is without merit because neither Mr. Jarkesy nor HDH had the opportunity to choose *any* path to a pre-assessment jury determination. They both had to sit back and watch their fates be unconstitutionally decided by an administrative agency. HDH was caught in the worse situation because the IRS could go straight to assessment of the penalty against HDH without any sort of administrative hearing as at least was required in *Jarkesy*.  More importantly, neither party had the opportunity to present a defense prior to assessment of the penalty by the respective administrative agencies.

## B. Access to a jury trial *after* determination of liability does not adequately protect HDH's Seventh Amendment right as required by *Jarkesy*.

Based upon *Jarkesy*, which requires that HDH should have had the opportunity for a jury trial prior to the assessment of a fraud penalty, the United States correctly states that HDH takes issue with what the United States describes as the "long-established" statutory avenue to a jury trial which required HDH to (1) submit partial payment for the fraud penalty unilaterally assessed by the Internal Revenue Service,  (2) file an administrative refund claim with the IRS, and (3) wait until the refund claim was denied by the IRS (or the IRS takes no timely action), before it could access a jury trial. Def.'s Mem. 3 (citing 26 U.S.C. § 7422(a) and 26 U.S.C. § 6703(c)(1). This "long-established" procedure pursuant to Internal Revenue Code §§ 7422(a) and 6703(c)(1) is a refund procedure and is not a procedure for an initial determination by a jury of whether the fraud penalty should even be assessed.

Regardless of how, as the United States puts it, "long-established" these requirements are, *Jarkesy* instructs that this assessment against HDH should not have been made without HDH being

allowed its Constitutional right pursuant to the Seventh Amendment to an initial determination by a jury in an Article III court. Therefore, HDH should not be in a refund procedure at all.

1. ***Jarkesy* requires that a party facing potential civil fraud penalties be given a jury trial to determine whether that party is liable.**

The United States contends that *Jarkesy* was concerned only that the party facing liability for penalties has access to a jury trial at some point and that Jarkesy was not concerned about the timing of when the trial might take place.

However, the United States concedes that its argument lacks merit when it stated: "that case [*Jarkesy*] held only that the party facing penalties was entitled to a jury trial *to determine its liability*." Def. Mem. 12 (emphasis added).  A determination of liability is the primary issue in this case, and, as evidenced by its own words, the United States admits that it knows that only a **jury** can determine liability.

 HDH did not have any right to challenge the initial determination of liability by the IRS. The United States makes several attempts in its Response to obscure the very potent fact that the determination of liability has already taken place.  HDH should not be in a position of having to mount a refund claim nor of having to file a counterclaim against the IRS to avoid liability for the Promoter Penalty in order to place this entire matter before a jury.  Liability for the Promoter Penalty should have been adjudicated via jury trial at the outset.

The United States correctly states the Seventh Amendment right to a jury trial does not apply to actions against the Federal Government and that the right of HDH to a jury trial in its refund claim flows from the waiver of Sovereign immunity for refund claims granted via statue in 28 U.S.C. § 2402. Def.'s Mem. 12. However, the United States raises these facts in a misguided attempt to take this case outside of the Seventh Amendment, while completely missing an important point. As the party facing liability for penalties, HDH had a Seventh Amendment right

to a trial by jury for an initial determination of liability.  That would have been a matter brought by the United States against HDH, not a matter brought by HDH against the Sovereign United States. Sovereign immunity would have been irrelevant in that scenario, and it remains irrelevant in the instant case.

HDH had no other choice but to follow the procedures in place at the time of filing the instant case.  But, according to the United States Supreme Court in *Jarkesy*, those procedures are unconstitutional. *Jarkesy*, 603 U.S. 109.

**2.  26 U.S.C. §§ 7422(a) and 6703(c)(1) unconstitutionally deprive parties of their Seventh Amendment right by requiring partial payment of the Promoter Penalty before accessing an Article III Court.**

The United States also maintains that both the refund action and the counterclaim by the United States for the unpaid portion of the fraud penalty will be covered by a jury trial because HDH has invoked its statutory right to a jury trial in the refund action and HDH also can demand a jury trial (and the United States will not oppose that demand) in the counterclaim.  This position conveniently ignores the fact that HDH had a Constitutional right to a jury trial prior to the assessment of the fraud penalty. The United States misses the point of *Jarkesy* by taking the position that a post-assessment jury trial can cure the unconstitutional assessment of the fraud penalty in the first place. HDH complains not that it does not have access to a jury trial after the assessment of the penalty, but that it should have had access to a jury trial for the initial determination of whether there actually should have been such an assessment.

In its Response, the United States accurately describes the general tax assessment and collection process of the IRS and the general refund process of the IRS. HDH does not dispute those descriptions, nor does it dispute that those processes make up the tax administration process currently being used by the IRS. HDH agrees that under the current system, the Internal Revenue

Code ("IRC") § 6201(a) authorizes the IRS to assess "all taxes (including interest, additional amounts, additions to the tax, and assessable penalties) imposed by this title [26]", of which the Promoter Penalty is one. Pursuant to IRC § 6203, the assessment is the simple recording by the IRS of the taxpayer's liability on the books of the IRS. 26 U.S.C § 6203. However, in this case, the assessment by the IRS of the alleged Promoter Penalty liability of HDH was more than a mere recording, it was an act of judgment with the force and effect of a judicial judgment without any judicial interaction. The IRS served as prosecutor, judge, and jury, which is distinctly prohibited by *Jarkesy*. 603 U.S. at 140.

In its Response, the United States recklessly characterized the requirement of only partial payment of the unconstitutionally assessed Promoter Penalty as a "reprieve" from the full payment requirement giving HDH the "rare opportunity" to obtain district court review of the alleged "tax" liability without full payment. Def.'s Mem. 6. Being forced to pay any part of an unconstitutionally assessed penalty without an initial determination in a jury trial of whether any amount of penalty is actually owed is hardly a reprieve or rare opportunity to get district court intervention without full payment.

The United States points out that HDH also could have refrained from paying any amount of the alleged penalty amount due, waited for the IRS to begin the collection process, waited for the IRS to issue an intent to levy HDH property, and finally invoke its right to a Collection Due Process ("CDP") hearing—which would have been held before an IRS appeals officer. A challenge to liability for the penalty at the CDP hearing would be available only if HDH had not had any previous opportunity to dispute the liability. The United States obviously thinks that this is an appropriate alternative because any negative determination could be appealed to the United States Tax Court (again, an Article I court), and then to a district court. Def.'s Mem. 6-7. On the contrary,

this avenue would not have been appropriate because this process does not include an initial determination through a jury trial of whether any amount of penalty is actually owed.

The United States next points out that pursuant to IRC § 6532, HDH could have paid 100% of the alleged Promoter Penalty due and then followed the "well-established" historical refund procedures set forth above. Again, this path would not have been appropriate under *Jarkesy* because it does not include an initial determination in a jury trial of whether any amount of penalty is actually owed.

The United States relied on *Flora v. United States*, 362 U.S. 145 (1960), to support its assertion that the traditional refund procedure of "pay first, litigate later" is appropriate. *Flora* considered whether a Federal District Court has jurisdiction under 28 U.S.C. § 1346(a)(1) of a suit by a taxpayer for the refund of income tax payments which did not discharge the entire amount of his assessment. *Flora* held that full payment was necessary in order for such court to have jurisdiction. The United States asserts that HDH asks this Court to reach a conclusion that would overrule *Flora.* Def.'s Mem. 4.

On the contrary, HDH is not asking this Court to overrule *Flora* because the issue in *Flora* is not applicable to the instant case, nor would such an action be necessary in order for the Court to rule in favor of HDH.  The instant case is not about whether full payment of the assessment (or 15% of the Promoter Penalty assessed) is required for jurisdictional purposes. HDH does not dispute that Federal District Courts have jurisdiction over refund matters and that under 28 U.S.C. § 1346 (a)(1) full payment (or 15% of the Promoter Penalty assessed) is required to obtain that jurisdiction. The instant case is about whether HDH is entitled to a jury trial before the assessment takes place pursuant to the holding in *Jarkesy*.

### 3. Any subsequent jury trial will only serve to determine whether HDH is entitled to a refund instead of whether HDH was liable as required under *Jarkesy* and the Seventh Amendment.

The United States contends that the Supreme Court in *Jarkesy* was concerned only with providing the party facing liability for penalties with a jury trial, but that it was not concerned with the timing of the jury trial. Def.'s Mem. 11. However, the language of *Jarkesy* totally repudiates Defendant's point. **Timing of the jury trial was paramount in *Jarkesy*.** The Supreme Court confirmed pursuant to the Seventh Amendment the right of the party facing liability for penalties to a jury trial to determine liability for the penalties. *Jarkesy*, 603 U.S. at 109. *Jarkesy* did not hold that the jury trial could constitutionally take place after the liability had already been determined and imposed. The Court determined that the Seventh Amendment right to a jury trial of the party facing liability for penalties is violated if a jury trial is available only after the liability has been determined and imposed by someone other than a jury. *Id.*

The United States Supreme Court in *Jarkesy* specifically confirmed that it was concerned with timing of the jury trial when it stated with reference to cases in which the public rights exception applies: "In contrast to common law claims, no involvement by an Article III court in the *initial adjudication* is necessary in such a case [public rights exception case]". *Jarkesy*, 603 U.S. at 128 (emphasis added). Therefore, it is the initial determination during which a penalty should be assessed that is protected.

However, in the instant case, the IRS has already made the initial determination of liability against HDH through its assessment of the Promoter Penalty, and it did so without a jury trial in violation of HDH's Seventh Amendment rights. This violation cannot be cured just because HDH has a statutory right to a jury trial in a refund action or because it has the right to a jury trial in its

counterclaim because a jury trial in either circumstance will not be the initial determination of whether the Promoter Penalty should be imposed.

**C.** **The post-assessment judicial review process utilized by the IRS for Promoter Penalty assessment is inadequate under the Seventh Amendment because the Promoter Penalty requires a determination of knowledge.**

Although the United States correctly notes that HDH is neither the first, nor likely the last, litigant to challenge the constitutionality of the tax framework created by Congress (Def.'s Mem. 22), HDH is the first to make that challenge subsequent to *Jarkesy*. *Jarkesy* changed the constitutional landscape when the IRS inflicts a penalty on a taxpayer, not to collect revenue for the good of citizens or for remedial purposes, but simply to punish the alleged wrongdoer with a claim known at common law. In that instance, the Seventh Amendment provides for an Article III jury trial for the initial adjudication of the penalty. *Jarkesy*, 603 U.S. at 109. The United States cites no case that holds otherwise or even addresses this issue.

Three types of penalties covered under IRC § 6703 can be assessed by the IRS without following the normal deficiency procedures set forth in IRC § 7422(e) as described above: (1) the Promoter Penalty under IRC § 6700; (2) the penalty for aiding and abetting understatement of tax liability under IRC § 6701 (the "Aiding and Abetting Penalty"); and (3) the penalty for filing a frivolous tax submission under IRC § 6702 (the "Frivolous Tax Penalty").

None of these three penalties is related to the amount of the tax due or any tax deficiency that links the penalties to the collection of revenue. None of these penalties have any remedial purpose. Rather, each of these penalties is designed to punish an alleged wrongdoer who, as in the case of the Promoter Penalty and of the aiding and abetting penalty, is not even an actual taxpayer. The penalty amount under each of the three statutes is either a specified amount or it can be calculated without reference to any tax deficiency caused by the actions of the alleged wrongdoer.

10

Both the Promoter Penalty and the Aiding and Abetting Penalty require actual or constructive knowledge that the action taken is "wrong". IRC §§ 6700, 6701. The Frivolous Return Penalty does not have a knowledge requirement; such penalty is assessed based solely upon the face of the tax return. IRC § 6702.

The United States relies on a forty-year old Third Circuit case, *Kahn v. United States*, 753 F.2d 1208 (3d Cir. 1985), to maintain that only a post-assessment judicial review pursuant to the IRS refund procedures is adequate. However, the United States fails to acknowledge the stark factual and legal differences between *Kahn* and the instant case nor does the United States present the reasoning of the Third Circuit, which if considered after *Jarkesy*, would result in the same outcome as *Jarkesy*.

In *Kahn*, the IRS assessed the Frivolous Return Penalty against the taxpayer as a result of her claim of a "war tax refusal" credit on her federal income tax return. The taxpayer followed the refund procedures of IRC § 6703 and requested a refund based upon the taxpayer's assertion that the tax return as filed was not frivolous in violation of IRC § 6702; alternatively, even if IRC § 6703 was applicable, it is unconstitutional because it had the purpose and effect of violating the taxpayer's First Amendment right to free speech. The Third Circuit Court held that the taxpayer's return was frivolous and that IRC § 6702 did not violate her First Amendment rights. *Kahn*, 753 F.2d at 1208.

*Kahn* then considered whether pursuant to the Fifth Amendment right to due process, the taxpayer was entitled to an administrative hearing (not a jury trial) prior to the imposition of a penalty under a claim that was not known at common law. *Id.* Importantly, the case was not litigated on the right to a jury trial pursuant to the Seventh Amendment and did not include a claim known at common law, making *Kahn* distinguishable from the instant case. At the same time, *Kahn*

provided useful guidance via its examination of whether the Fifth Amendment right to due process requires an administrative hearing prior to the imposition of the penalty (i.e., the deprivation of some type of property interest such as money) in addition to the post-imposition judicial review provided by the IRC § 6703 refund statute.

*Kahn* took note of the fact that in prior reviews of due process objections to tax collection, the United States Supreme Court gave special deference to the manner in which the IRS collected the revenues of the government. *Kahn,* 753 F.2d at 1218. However, the Court thought it important to consider "the extent to which due process requires an evidentiary hearing *prior* to the deprivation of some type of property interest *even if* such a hearing is provided thereafter" and adopted the approach set forth in *Mathews v. Eldridge,* 424 U.S. 319 (1976). *Kahn*, 753 F.2d at 1219 (emphasis added).

In *Mathews,* the United States Supreme Court established three factors to consider in determining whether the Fifth Amendment has been satisfied when the government is alleged to have denied due process:  (1) the private interest that will be affected by the official action; (2) the risk of erroneous deprivation of such interest through additional procedural safeguards, and (3) the government's interest in additional adjudicative process. *Mathews*, 424 U.S. at 335.

The *Kahn* Court also considered dictum in *Commissioner v. Shapiro,* 424 U.S. 614, 629 (1976), which suggested that summary seizure of assets in tax proceedings when such seizure will result in irreparable injury, is a denial of due process. The *Kahn* Court read the Supreme Court decisions in *Mathews* and *Shapiro* to mean that a showing of the likelihood of irreparable harm resulting from the lack of a pre-deprivation hearing is a private interest which countervails *any* public interest in streamlined administration and specifically held that even if there is no likelihood of irreparable harm, a court must, in accordance with *Mathews,* balance the

governmental interest in the existing process against the private interest that will be affected and the probability of erroneous deprivation associated with that process. *Kahn,* 753 F.2d at 1219-1220. Further, the private interest affected is significant in terms of both time and money. *Kahn*, 753 F.2d at 1220 (citing *Betts v. United States,* 84-1 U.S.T.C. ¶ 9432 at 84,077 (D. Or. 1984)).

HDH has suffered irreparable harm. It has been forced to defend itself with both time and money to fend off allegations that have yet to be proven by the IRS in a jury trial or even reviewed by an administrative body. HDH paid $989,000 (15% of the alleged penalties for tax years 2013-2018) just to gain entry into the refund process (hardly a "reprieve" as characterized by the United States). Substantial Legal fees have been paid and continue to mount. Exorbitant hours of time have been spent and continue to be spent by HDH in order to provide information to the IRS as requested during the audit and to defend itself against the unfounded allegations that it promoted a tax shelter.

Even if there is no irreparable harm, HDH's private interest far outweighs the government's interest in the refund process because there is a high probability of erroneous deprivation associated with the refund process. In *Kahn,* the Third Circuit Court followed the reasoning of the Supreme Court in *Mathews*. *Kahn*, 753 F.2d 1208. The Court determined that the imposition of the Frivolous Return Penalty carried only a small probability of depravation associated with the refund process because the penalty is imposed when a tax return *on its face* indicates that a taxpayer's self-assessment is substantially incorrect and that it is due to a frivolous position. *Kahn*, 753 F.2d at 1212. The Court reasoned that people reviewing returns to impose the penalty would not be aided by a person-to-person discussion because the investigation required is facial. *Id.*

In the instant case, it is the opposite. The Promoter Penalty requires a determination that the alleged promoter knew or should have known that statements made were false or fraudulent.

That determination is not facial and cannot be made by an IRS auditor without so much as an administrative hearing. Instead, it must be made by a trier of fact in a jury trial where the jury can consider the testimony of the alleged promoter regarding required knowledge.

**D. The public rights exception is inapplicable because the Promoter Penalty is in the nature of a common law suit and invokes a punitive remedy.**

The United States incorrectly contends that regardless of whether HDH is entitled to a jury trial pursuant to the Seventh Amendment, the public rights exception overrides that conclusion. In its Response, the United States accurately describes the public rights exception and its historic application to the collection of revenue, and HDH does not dispute those descriptions.

However, the United States unintentionally supports HDH's argument by pinpointing the central issue challenging this historic application after *Jarkesy*:

> Thus, the public rights doctrine is derived from the fact that Congress has the authority to assign enforcement of certain matters to the Executive Branch such that there would be no right, under the Seventh Amendment or otherwise, to a proceeding before an Article III judge *as long as due process is otherwise provided.*

Def.'s Mem. 16. (emphasis added).

The United States does not provide any ideas, nor does it cite any case law to illustrate how due process could ever be "otherwise provided" when the constitutional right to a jury trial of a party facing liability for penalties is being trampled because it would be impossible to provide due process under that scenario.

Under the public rights exception, Congress may assign the matter for decision to a governmental agency without a jury, consistent with the Seventh Amendment. *Jarkesy*, 603 U.S. at 127. But, if a case does not fall within the exception, Congress may not avoid a jury trial by preventing the case from being heard before an Article III tribunal. *Id.* The United States Supreme Court in *Murray's Lessee* v. *Hoboken Land & Improvement Co.*, 59 U.S. (18 How.) 272, 284

(1856), held that the Constitution prohibits Congress from "withdraw[ing] from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law." Further, in *Stern* v. *Marshall*, 564 U. S. 462, 484 (2011), the Court held that if a suit is in the nature of an action at common law, then the matter presumptively concerns private rights, and adjudication by an Article III court is mandatory.  Finally, the United States Supreme Court has consistently held that matters concerning private rights may not be removed from Article III courts. *Murray's Lessee*, 59 U.S. (18 How.) at 284; *Granfinanciera*, 492 U.S. at 51–52; *Stern*, 564 U.S. at 484.

Historically, Congress, not the judicial branch of government, has maintained exclusive control over internal revenue and taxation, so much so that the public rights exception has been treated as if it is a "rule" that cannot be broken or revised. *Jarkesy* makes it clear that the public rights exception is not the rule; it is an exception to the actual rule that a defendant is entitled to a jury trial if the defendant would have been entitled to a jury trial at common law in 1789 at the First Continental Congress. *Jarkesy*, 603 U.S. at 121 (citing 1 Journals of the Continental Congress, 1774–1789, p. 69 (Oct. 14, 1774)).

Moreover, *Jarkesy* reasoned that: (1) the public rights exception "has no textual basis in the Constitution and must therefore derive instead from background legal principles" *Id*. at 131.; (2) the public rights exception is an "area of frequently arcane distinctions and confusing precedents," *Id.* (citing *Thomas* v. *Union Carbide Agricultural Products Co.*, 473 U.S. 568, 583 (1985)); (3) the Court's opinions on it have not always spoken in precise terms, *Jarkesy* 603 U.S. at 130.; and (4) the Court has not definitively explained the distinction between public and private rights. Id. at 131 (citing *Oil States Energy Services, LLC* v. *Greene's Energy Group, LLC*, 584 U.S. 325, 334 (2018)). *Jarkesy* specifically declined to definitively explain the distinction. *Jarkesy*, 603 U.S. at 131.

As developed over the years, public rights are a narrow class of matters, including the collection of revenue, which have been defined and limited by history. *Jarkesy*, 603 U.S. at 129-30. Federal courts, including this Court and the Third Circuit Court of Appeals, have consistently followed the traditional public rights "rule" that imposition of a penalty in matters including the collection of revenue can be assigned by Congress by an executive officer. *McDowell v. Heiner*, 9 F.2d 120, 123 (W.D. Pa. 1925), *aff'd*, 15 F.2d 1015 (3d. Cir. 1926). But, there is no clear explanation anywhere as to how those matters have become categorized as public rights. *Jarkesy*, 603 U.S. at 153 (Gorsuch, J. concurring). Perhaps most importantly, in its entire opinion, the *Jarkesy* Court recognized that "even with respect to matters that arguably fall within the scope of the 'public rights' doctrine, the presumption is in favor of Article III courts." *Jarkesy*, 603 U.S. at 112 (citing *Northern Pipeline Constr. Co.*, 458 U.S. 50, 69, n. 23 (plurality opinion))

The United States spends almost the entirety of pages 13-19 of its Response expounding on the historical aspect of the public rights exception and relies solely upon that historical aspect to conclude that it applies in the instant case. After *Jarkesy*, blind adherence to the historical "rule" is no longer appropriate. Instead, as in *Jarkesy*, the appropriate analysis is the two-part test established in *Granfinanciera* and *Tull*: (1) does the action resemble a traditional common law claim which historically would have required a jury trial; and (2) does the public rights exception apply because the action involves a "public right" rather than a "private right". In its Response, the United States ignores *Granfinanciera* and mentions *Tull* only in a tangential footnote. Def.'s Mem. 7 fn. 3. Instead, the United States clings to *Atlas Roofing* which *Jarkesy* found did not apply and even derided it as a case that lacks substance. *Jarkesy*, 603 U.S. at 113, citing *Atlas Roofing Co.* v. *Occupational Safety and Health Review Commission*, 430 U.S. 442 (1977).

*Granfinanciera* involved a statutory action for fraudulent conveyance which was a well-known action at common law. *Granfinanciera,* 492 U.S. at 43. As codified in the Bankruptcy Code, the claim permitted a trustee to void certain transfers or obligations made by the debtor before bankruptcy. 11 U. S. C. §548(a)(2)(A) (1982 ed., Supp. V). Although Congress designated fraudulent conveyance actions "core [bankruptcy] proceedings" and authorized non-Article III bankruptcy judges to hear them without juries, *Granfinanciera* held that this was not permissible under the public rights exception and that such assignment was not dispositive because Congress cannot "conjure away the Seventh Amendment by mandating that traditional legal claims be . . . taken to an administrative tribunal." *Granfinanciera,* 492 U. S. at 50, 52.

*Granfinanciera* examined the substance of the statutory claim for fraudulent conveyance and whether under the principles of *Tull,* the claim implicated the right to a jury trial under the Seventh Amendment, specifically whether the nature of the claim was suit at common law and found that it was. *Id*. at 56. *Granfinanciera* also considered whether fraudulent conveyance actions were so "closely intertwined" with the bankruptcy process that they are highly interdependent and require coordination with fair resolution possible only with a single adjudicator and found that they were not. *Id.* at 54. Accordingly, *Granfinanciera* concluded that fraudulent conveyance actions were "suits at common law" and were not inseparable from the bankruptcy process. Therefore, the public rights exception did not apply and a jury was required even though a claim for fraudulent conveyance had statutory origins. *Id*. at 54, 56.

The cases cited by the United States are distinguishable from the instant case and do not allow administrative agencies to enforce tax penalties under the Public Rights Exception.

Like the SEC in *Jarkesy*, the United States relies on *Atlas Roofing* which the *Jarkesy* Court determined did not control its decision because *Atlas Roofing* held that that Congress could assign

Occupational Safety and Health Act of 1970 (OSHA) adjudications to the governmental agency (Secretary of Labor) because the claims for violations of safety regulations were "unknown to the common law." 603 U.S. at 25; 430 U.S. at 461. To support its position in the instant case, the United States inexplicably quotes from *Jarkesy* that:

> The cases that *Atlas Roofing* relied upon did not extend the public rights exception to "traditional legal claims." *Granfinanciera*, 492 U. S. at 52. Instead, they applied the exception to actions that were "not . . . suit[s] at common law or in the nature of such . . . suit[s]." *Atlas Roofing*, 430 U. S. at 453 (quoting *Jones & Laughlin Steel Corp.*, 301 U. S., at 48); see *Atlas Roofing*, 430 U. S. at 450–451 (discussing, *e.g.*, *Murray's Lessee*, *Ex parte Bakelite Corp.*, *Helvering* v. *Mitchell*, 303 U. S. 391 (1938), and *Oceanic Steam Navigation Co.*).

Def.'s Mem. 18 (quoting *Jarkesy*, 603 U.S. at 137-138).

Rather than supporting the position of the United States, this quote does just the opposite by underscoring the *Jarkesy* holding that the public rights exception applies only to actions that are not traditional legal clams based upon common law. The claim against HDH for fraudulent conduct, like the claim against Mr. Jarkesy, is a civil penalty that invokes a punitive remedy that J*arkesy* and *Tull* have recognized "could only be enforced in courts of law." *Tull*, 481 U. S. at 422, and which Congress may not withdraw from judicial cognizance. *Murray's Lessee*, 59 U.S. (18 How.) at 284.

The United States correctly points out that *Jarkesy* and cases cited in *Jarkesy* recognize that the public rights exception applies to revenue collection, i.e. collection of public funds, so that the government can promptly secure its funds. Def.'s Mem. 17. However, the analysis in *Jarkesy*, which included consideration of *Granfinanciera* and *Tull* and soundly rejected *Atlas Roofing*, makes clear that the Seventh Amendment right to a jury trial applies in the instant case because the Promoter Penalty is not the collection of revenue which is covered by the public rights exception, but rather is a legal remedy, as defined under common law, being assessed solely to

punish HDH. *Jarkesy*, 603 U.S. at 136-7. The Third Circuit has recognized that the civil fraud penalty bears a close resemblance to criminal liability because its purpose is not to compensate for loss, but to punish and deter wrongful conduct. *Asphalt Industries, Inc. v. C.I.R.*, 384 F.2d 229, 234-5 (3rd Cir. 1967). This is private right which is outside the authority of the IRS to collect revenue, including the authority of the IRS to collect penalties as part of its revenue collection authority, and cannot be removed from judicial review by Congress.

Next, the United States essentially argues that the public rights exception allows Congress to impose through an administrative agency appropriate obligations and enforce them through reasonable monetary penalties without judicial review. However, the United States does not cite any case that holds that the IRS, or any other administrative agency, is exempt from compliance with the Constitution. Rather, the United States relies on *McDowell v. Heiner*, which is easily distinguishable from the instant case, and *Oceanic Steam Navigation Co.* v. *Stranahan*, 214 U. S. 320 (1909), which dealt only with the power of Congress over foreign commerce, but nonetheless on which the dissent in *Jarkesy* relied to urge that the public rights exception applies to any exercise of power granted to Congress. The dissent was questioned by the *Jarkesy* majority that "[the dissent] must be reading from a different case than we are." *Jarkesy*, 603 U.S. at 129 fn 1.

*McDowell* was a collection case in which the taxpayer asserted that he was entitled to a jury trial prior to the collection of civil penalties assessed by the commissioner or internal revenue for filing intentionally false and fraudulent tax returns. While basically the same premise as the instant case, *McDowell* is factually distinct from the instant case in at least two important ways and therefore is not applicable here.  First, the original action brought by the taxpayer was for abatement of the tax and penalties.  The taxpayer was accorded an administrative hearing by the commissioner to make that determination. *McDowell*, 9 F.2d at 121. In holding that the taxpayer

19

did not have the right to a jury trial, the Court in *McDowell* specifically pointed out that McDowell had already had a hearing on the merits of imposition of the tax and penalties and the Court carefully distinguished cases in which the taxpayer was not accorded a hearing at all. *Id.* In the instant case, HDH did not have any opportunity for any hearing, administrative or otherwise, prior to the assessment of the penalty. Additionally, *Jarkesy* takes this review requirement one step further because in that case, the Supreme Court did not care that Mr. Jarkesy had an administrative hearing; it found that the imposition of penalties by the SEC without a jury trial was unconstitutional. *Jarkesy*, 603 U.S. at 109.

Second, in the *McDowell* collection action, the taxpayer admitted that he had filed false and fraudulent tax returns and his goal was to prevent collection of the tax and penalties without a jury trial. *McDowell,* 9 F.2d at 121. HDH has always strongly denied any violation of the provisions of IRC § 6700. HDH is not in this case trying to prevent collection of the penalty because if determined in a manner that does not violate the Constitution, this case would be far from being at the collection stage. HDH is protecting its right to a jury trial prior to the initial imposition of a penalty that is designed to punish, as required by *Jarkesy*.

*McDowell* does not apply to the instant case, and *Jarkesy* takes the requirement of a jury trial several steps beyond what was even considered by *McDowell. Jarkesy s*ets a new precedent for constitutional review of the imposition of penalties such as the Promoter Penalty. HDH respectfully asserts that this Court is now bound by that precedent.

### E.  <u>The purpose of the Promoter Penalty is to punish wrongdoers and the inclusion of the words "false or fraudulent" does not change the Penalty's punitive purpose.</u>

The United States urges that the § 6700 penalty is not a fraud penalty, despite that fact that the text of § 6700 specifically uses that term "fraudulent" to describe the behavior that it punishes. The reasoning of the United States for this position is that the *primary* purpose of the § 6700

penalty "is to protect the public fisc". Def.'s Mem. 20. The United States relies on a Senate Report that states: "[t]he widespread marketing and use of tax shelters undermines public confidence in the fairness of the tax system and in the effectiveness of existing enforcement provisions. These tax schemes place a disproportionate burden on the internal revenue service resources" and on the Supreme Court's dictum in *Mitchell* for this conclusion. S. REP. 97-494(I), 266-67; *Helvering v. Mitchell*, 303 U.S. 391 at 401. Def.'s Mem. 20.

Reliance on these two sources is misplaced because the United States is not addressing the paramount issue that the § 6700 penalty is a legal remedy because its *sole* purpose is *not* remedial. *Jarkesy* stated that "a civil sanction that cannot fairly be said solely to serve a remedial purpose, but rather can only be explained as also serving *either* retributive or deterrent purposes, is punishment." (emphasis added). *Jarkesy*, 603 U.S. at 123 (citing *Austin v. United States*, 509 U.S. 602, 610 (1993)). *Mitchell* did not present a Seventh Amendment question. It was a double-jeopardy case that held that a prior acquittal for criminal tax fraud would not preclude a later assertion of the fraud penalty. It did not discuss the issues of the instant case.

By its own use of the word "primarily", the United States recognizes that even if "protection of the public fisc" is one of the purposes of the Promoter Penalty, is not the sole purpose. Protection of the public fisc requires that the Promoter Penalty be remedial. However, it is impossible to conclude that the Promoter Penalty seeks to reimburse the government for any loss of tax sustained because HDH is not a taxpayer in this instance. Further, it is impossible to conclude that the Promoter Penalty seeks to reimburse any alleged victim because a violation of IRC § 6700 does not even require that an alleged victim relied on the alleged false or fraudulent statement. Therefore, it follows that the "public fisc" is not involved at all. There is no remedial element in the Promoter Penalty.

The purpose of the Promoter Penalty is to punish.  In the instant case, as in *Jarkesy*, the remedy sought is the most important factor.  The IRS seeks civil penalties, in the form of money damages which are the "prototypical common law remedy".  *Jarkesy*, 603 U.S. at 123. The statutory language of IRC § 6700 addresses only the culpability of the alleged promoter and it does not require restitution.  Because the statutory language ties the availability of civil penalties to the perceived need to punish the promoter rather than to restore the victim, such considerations are legal rather than equitable. According to *Tull*, only courts of law issue monetary penalties to "punish culpable individuals." *Tull*, 481 U. S. at 422.The United States does not explain how the Promoter Penalty is not a fraud penalty when on its face IRC § 6700 seeks to punish alleged promoters for making false or fraudulent statements. The concern of IRC § 6700 is with the culpability of the alleged promoter and with deterring the alleged promoter from promoting abusive tax shelters by extracting a monetary penalty.  Staff of Joint Comm. on Tax'n, 97th Cong. 2d Sess., General Explanation of the Revenue Provisions of the Tax Equity and Fiscal Responsibility Act of 1982 ("Bluebook"), at 210–12 (Comm. Print 1982).

The IRS recognizes this in its own Internal Revenue Manual ("IRM") which outlines its polices. The IRM states in pertinent part:

> Consistent development and proper application of the…fraud penalties in abusive transaction cases will help curb this activity by imposing tangible economic consequences on taxpayers who engage in those transactions. In addition, consistent development and proper application of the promoter…penalties in abusive transaction cases will help curb this activity by providing an economic deterrent for promoting abusive transactions…An abusive transaction is one where a significant purpose of the transaction is the avoidance or evasion of Federal tax.

IRM 1.2.1.12.1(5); Policy Statement 20-1.

The United States contends that because the IRC § 6700 penalty can punish an alleged promoter for making a false or fraudulent statement, such penalty is not a fraud penalty. Def.'s Mem. 21. The United States cites cases supporting the position that the terms are not synonymous and that they have a separate meaning. Def.'s Mem. 21. However, the United States does not cite any authority to support its position that inclusion of the word "false" negates or removes the fraud aspect of the penalty, nor that it removes the penalty from common law fraud which requires determination of liability by a jury trial. In *Asphalt Industries,* the Third Circuit Court of Appeals clarified that "there is no distinction in the meaning of fraud under 6501(c)(1), which speaks of 'a false or fraudulent return with the intent to evade tax' and 6653(b), which speaks of 'any underpayment… of tax …due to fraud'.  384 F.2d at 232.[1]

This juxtaposition of "false" and "fraudulent" also is found in other comparable provisions of the IRC, namely IRC § 7206, the criminal fraud penalty which punishes various acts of making false or fraudulent statements and IRC § 6501 (discussed above in *Asphalt Industries*) which provides for an unlimited statute of limitations on assessment in cases dealing with false or fraudulent returns with the intent to evade tax. This same unlimited statute of limitations applies to the assessment of the Promoter Penalty. The concepts of false and fraudulent are used together to enlarge the tools available to the IRS for enforcement of the provisions.  Outside of the IRC, the 18 USC § 1001 criminally punishes the act of making false or fraudulent statement in any matter within the jurisdiction of the government. There simply is no authority cited by the United States to suggest that a fraud penalty cannot encompass both false and fraudulent statements.

---

[1] IRC § 6653(b) is now codified at IRC § 6663(a).

The United States contends that the scienter requirement of IRC § 6700 removes it from common law fraud because the requirements are much broader than those found in common law and the "reason to know" standard is more consistent with negligence.  The United States cites no authority for either of those theories. Instead, it relies on the fact that the gross valuation understatement imposed by IRC § 6700(a)(2)(b) has no scienter element because it is a strict liability standard.

The "knows or has reason to know" standard appears in IRC § 6700 to "clarif[y] that the [IRS] may rely on objective evidence of the knowledge of a promoter or salesperson (for example) to prove that he deliberately furnished a false or fraudulent statement" such that  "[a] salesman would ordinarily be deemed to have knowledge of the facts revealed in the sales materials which are furnished to him by the promoter."  Bluebook, at 211. Nowhere is it stated that Congress meant for the "knows or has reason to know" standard is to be equated to a negligence standard.

There are some tax penalties (such as accuracy related penalties) which focus on a negligence standard.  That is not the case with the Promoter Penalty, which focuses on the *deliberate action* taken by an individual to furnish statements which he knows or has reason to know are false or fraudulent. This was the standard set by Congress in enacting the Promoter Penalty.

### III. CONCLUSION

Sections 7422(a) and 6703(c)(1) do not provide the Plaintiff with a trial by jury before a penalty is imposed as mandated by the Seventh Amendment to the United States Constitution and the United States Supreme Court in *SEC v. Jarkesy*, 603 U.S. 109 (2024). Accordingly, application of these statutes in the instant matter is unconstitutional and the Plaintiff's Motion to

Dismiss under Rule 12(b)(6) and Motion for Summary Judgment under Rule 56 should both be granted.

Respectfully Submitted,

/s/ Ralph Minto, Jr.
Ralph Minto, Jr.
PA Id. No. 51746

David B. Spear
PA Id. No. 62133

Michelle L. Kopnski
PA Id. No. 52096

Minto Law Group, LLC
Stone Quarry Crossing
811 Camp Horne Road, Suite 320
Pittsburgh, PA 15237
412-201-5525
rminto@mintolaw.com
dspear@mintolaw.com
mkopnski@mintolaw.com

Counsel for Plaintiff
