**IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

HDH GROUP, INC.,

Plaintiff,

v.

UNITED STATES OF AMERICA,

Defendant.

Case No. 2:24-CV-00988-WSS

UNITED STATES OF AMERICA,

Counter-Claimant,

v.

HDH GROUP, INC.,

Counterclaim Defendant.

**UNITED STATES' SUR-REPLY IN OPPOSITION TO HDH GROUP, INC.'S MOTION FOR SUMMARY JUDGMENT AND MOTION TO DISMISS COUNTERCLAIM**

HDH Group, Inc. ("HDH") faces penalties under 26 U.S.C. § 6700 for promoting abusive tax shelters that cost the Treasury millions of dollars while generating millions of dollars in income for HDH. Should this case proceed to trial, a jury will determine whether HDH is liable for those penalties. HDH argues that the Supreme Court's decision in *SEC v. Jarkesy*, 603 U.S. 109 (2024), which held that a defendant facing SEC fraud penalties has the right to be tried by a jury of his peers before a neutral adjudicator, required the IRS to empanel a jury *before* making the penalty assessment that was a preliminary step in reaching this district court suit. HDH is wrong. HDH has the relief *Jarkesy* granted: the right to be tried by a jury of its peers before a neutral adjudicator.

The tax assessment that preceded this suit is not comparable to the SEC adjudication in *Jarkesy*, which replaced—rather than preceded—district court review. And *Jarkesy* did not overrule earlier Supreme Court decisions, like *Flora v. United States*, 362 U.S. 145 (1960), which recognized that Congress requires payment of taxes, including penalties, before allowing taxpayers to access Article III review.

HDH's supporting arguments fare no better. Even if an IRS determination and assessment of tax penalty liability were to be considered an adjudication, tax penalties are a matter of public, not private, rights and are thus exempt from Article III jurisdiction absent a statutory directive from Congress. Nor can HDH's late argument that the tax refund suit procedures violate its right to due process overcome binding precedent to the contrary.

This Court should deny HDH's motions for summary judgment and to dismiss the United States' Counterclaim.

## I. *Jarkesy* does not require a jury trial to take place before the IRS can make a penalty assessment.

HDH asserts that, in the wake of *Jarkesy*, the IRS cannot assess tax penalties before a jury trial has taken place.[1] Its argument that *Jarkesy* requires a pre-assessment jury trial to impose § 6700 promoter penalties rests on two flawed premises: that "[t]iming of the jury trial was

[1] In the beginning of its brief, HDH seems to advocate for an even more radical rule, saying *Jarkesy* "demands that the court make the initial determination of whether a tax assessment should be made." HDH Reply Brief at 1-2. The United States understands from the remainder of its brief that HDH does not actually intend its argument to apply to *all* tax assessments, but instead to a more limited subset of tax penalty assessments. Were HDH to be taken at its initial word that courts must determine all tax assessments, that would excuse the entire country from paying federal income taxes until after the government took each person to court to have a jury establish what the person owed for the prior year. This exercise would have to be repeated annually for every company and individual in the country.

paramount in *Jarkesy*," and that a tax assessment is "an act of judgment with the force and effect of a judicial judgment." *See Memorandum of Law of HDH Group, Inc. in Reply to United States' Opposition to HDH Group Inc.'s Motion for Summary Judgment and Motion to Dismiss Counterclaim*, ECF No. 38 ("HDH Reply Brief") at 9 and 7, respectively. HDH's argument fails because it is built on these two faulty conclusions.

First, HDH argues that "[t]iming of the jury trial was paramount in *Jarkesy*," and that *Jarkesy* therefore requires a jury make the "initial" penalty determination, (*see* HDH Reply Brief at 9), but it cannot support this statement. Indeed, it admits that timing was not part of the "one straightforward question" the Court considered (*see* HDH Reply Brief at 2, recognizing that the question was "whether the Seventh Amendment entitles a defendant to a jury trial when the SEC seeks civil penalties against him for securities fraud"). To be sure, HDH repeats the word "initial" throughout its brief as if using the word so many times will make its analysis ring true. But HDH's refrain cannot change the fact that it only identifies a single sentence in *Jarkesy* that refers to timing in any context. And that sentence does not even address jury trials. Instead, it reiterates the broad and noncontroversial principle that no involvement by an Article III court in the initial adjudication of public rights claims is necessary. *See Jarkesy* at 128. HDH frames this one sentence as though it is a novel holding setting forth a new rule that "upends" historical practice and forces previously acceptable administrative procedures "to a screeching halt" by providing new guidance on the timing of jury trials in civil penalty cases. But this sentence merely summarizes an established aspect of Seventh Amendment jurisprudence. Further, the majority is clear that *Jarkesy* was not intended to introduce a sea-change in Seventh Amendment analysis or a drastic break with precedent. *See, e.g.*, *Jarkesy* at 134 ("*Granfinanciera* effectively decides this case.") (referring to

*Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33 (1989)); and *Jarkesy* at 160-67 (countering the dissent's argument that the majority opinion is contrary to precedent) (Gorsuch, J., concurring).

It would be strange if, as HDH suggests, the timing of a jury trial was "paramount" in *Jarkesy* (a case where Mr. Jarkesy contested his lack of jury trial, not its timing), when HDH cannot point to a single sentence addressing the timing of a jury trial and can only identify one sentence discussing timing of a court's "involvement" more broadly. HDH's mistaken reading of that single sentence underpins its flawed argument that the Supreme Court "clearly" held that a jury must make the initial determination before assessment of a tax shelter penalty (*see* HDH Reply Brief at 2). The Court said no such thing. To be sure, the Court also didn't refer to timing at all—with respect to a jury trial or otherwise—in its conclusion or while laying out its plain holding: that a defendant facing SEC fraud charges has the right to a jury trial before a neutral adjudicator. *See Jarkesy* at 140-41. HDH's argument that *Jarkesy* requires a jury trial *before* any agency determination takes place—and that the timing of the jury trial, not its existence, is the crux of the matter—is thus not supported by the decision itself.

HDH's argument also fails because a tax assessment is not an "initial adjudication." A tax assessment made by the IRS simply is not comparable to a district court's entry of judgment. Similarly, HDH's argument that a tax assessment is equivalent to the SEC in-house adjudication of liability before a member or an Administrative Law Judge ("ALJ") in *Jarkesy* completely misconstrues both the nature and role of a tax assessment and the SEC's determination of liability.

An assessment is "little more than the calculation or recording of a tax liability." *United States v. Galletti*, 541 U.S. 114, 122 (2004). It is essentially a bookkeeping notation; an assessment occurs when the IRS establishes an agency record reflecting that a taxpayer owes a certain tax in a certain amount. *Id.* As the Supreme Court has stated, "the fact that the act of assessment has

consequences does not change the function of the assessment: to calculate and record a tax liability." *Id.* at 123. Indeed, most tax assessments are "self-assessments," meaning the IRS is simply recording the amount of tax liability that a taxpayer self-reports owing on his tax return. *Id.* at 122. As HDH acknowledges, the same statute (26 U.S.C. § 6201) provides the IRS with its assessment power for all tax liabilities, including the promoter penalty. HDH Reply Brief at 6-7. If an assessment were "an act of judgment with the force and effect of a judicial judgment," as HDH alleges (HDH Reply Brief at 7), there would be no need for the elaborate procedures Congress created to allow taxpayers to challenge an assessed tax liability through a refund action in federal court, or for the government to ever enforce an assessed tax liability by obtaining a judgment. Applying HDH's definition of an assessment would greatly simplify tax litigation: if IRS determinations of liability and assessments thereof had the power of a court judgment, the principle of *res judicata* could decide every court case involving taxes (including this one). Fortunately for taxpayers, HDH is incorrect, and neither an IRS determination nor an assessment has such power.

Most importantly for purposes of this case, HDH's assessed tax liability is subject to *de novo* review in a district court jury trial (albeit after payment has been made). *See "United States' Opposition to HDH Group Inc.'s Motion for Summary Judgment and Motion to Dismiss Counterclaim*," ECF No. 35 ("U.S. Opposition Brief") at 7, 12-13. The SEC adjudication of liability at issue in *Jarkesy* was much different, and was in fact treated similarly to a district court's entry of judgment. The SEC adjudication took place in a proceeding that specifically replaced a district court jury trial. While a penalized party could appeal to a circuit court, that circuit court was required to "treat the agency's factual findings as 'conclusive' if sufficiently supported by the record, even when they rest on evidence that could not have been admitted in federal court."

*Jarkesy* at 117 (internal citations omitted). In practice, therefore, Article III appellate courts treated SEC adjudications as at least as powerful as (and arguably subject to less scrutiny and more deference than) district court judgments.

In contrast, assessed tax liabilities are generally subject to review by an independent judge and jury in district court. A party disputing an assessed tax liability has access to the full procedural protections the courts supply, including the right to seek discovery and the protections of the Federal Rules of Evidence. None of the facts asserted by the IRS to support its administrative determination of liability carry over into the court proceeding; when the government has the burden of proof, as in this case, it must establish the liability. *See* 26 U.S.C. § 6703(a). If the case is appealed, a circuit court reviews the district court's rulings, not the IRS' conclusions. SEC adjudication deprived Mr. Jarkesy of the rights listed above. *See Jarkesy* at 143-44 (Gorsuch, J., concurring). HDH has all those rights in this case; the IRS' determination and assessment of penalty liability has not taken away any of them. Any comparison between SEC in-house adjudications of liability and IRS assessments is, at best, inapt.

As the United States noted in its first brief, an assessment is more comparable to the SEC's decision to bring civil penalty charges against Jarkesy, rather than the adjudication of the penalty charges themselves. *See* U.S. Opposition Brief at 10. And while the Supreme Court required that the SEC provide Mr. Jarkesy a jury trial to adjudicate his liability for the penalties he faced, that could only occur *after* the SEC decided to bring the penalty charges in the first place—a step the Court took no issue with and did not consider to be an adjudication. *Accord. Jarkesy* at 119 (referring to the ALJ 's decision as the "initial decision"). The SEC's decision to "initiat[e] an enforcement action" (*Jarkesy* at 115), or in other words, to "approv[e] charges" against him (*Jarkesy* at 141 (Gorsuch, J., concurring)) did not require a jury; only the ultimate adjudication of

those charges did. The decision to pursue penalty charges assuredly required the SEC to first make an internal determination that Mr. Jarkesy was liable for the penalties, and in what amounts. *That* step is a closer match to an IRS assessment. As Justice Gorsuch stated in his concurrence, the SEC remains "free to pursue all of its charges against Mr. Jarkesy" in a court case. *Jarkesy* at 167 (Gorsuch, J., concurring). That would not be the case if a jury trial were required before *any* agency determination, such as the determination to approve SEC penalty charges, or to assess promoter penalties. The ruling HDH seeks—that an agency cannot make an initial internal determination that an individual should face civil penalties, and in what amount, without the participation of a jury—would be akin to requiring a grand jury to endorse proposed civil penalties before an agency could even bring a district court case. Such a requirement is nowhere to be found in *Jarkesy*.

And for good reason. Requiring a district court judgment before tax penalties could be assessed would be disruptive not only to the government but to the many taxpayers who successfully resolve disputes about their liabilities at the administrative level or in the Tax Court every year.[2] Currently, taxpayers have the option of pursuing resolution of their liabilities through various processes that offer more privacy than a district court case, often at a lower cost. They can

---

[2] The ruling HDH proposes would strip the Tax Court (which is not an Article III court and does not offer jury trials) of its jurisdiction over any proceedings involving civil tax penalties, further upending the carefully articulated tax scheme created by Congress. Thus, though not directly argued in HDH's motion or briefs, the relief sought by HDH would necessitate a holding that IRC §§ 6213 and 6214, two statutes providing the Tax Court with jurisdiction to redetermine the correct amount of a deficiency without a jury, are unconstitutional. There is no precedent supporting this.

Indeed, following submission of the United States' opposition brief, the Eleventh Circuit decided a case involving two petitions for writs of mandamus compelling the Tax Court to grant jury trials in cases involving tax fraud penalties determined by the IRS in light of *Jarkesy*. *In re: Herbert Hirsch et al.*, No. 25-10420, Docket Entry No. 25-2, 11th Cir. (May 30, 2025). The court ruled that petitioners were not entitled to the writs of mandamus, sending the cases back to the Tax Court to be tried without a jury. *Id*.

also place the matter before a jury through a refund suit. HDH would take that choice away from them, as HDH's argument that a "jury has to make the initial determination of penalty liability, i.e., pre-assessment," HDH Reply Brief at 2, would require all tax penalty disputes to be resolved exclusively in a district court proceeding. This would needlessly increase district court dockets, force countless taxpayers into court (and their private financial information onto the public dockets), and seriously compromise the government's ability to collect the revenue it needs to function.

Fortunately for the courts, taxpayers, and the government, neither *Jarkesy* nor the Constitution requires the drastic solution HDH proposes.

## II. This Court cannot grant HDH the relief it seeks without rejecting *Flora*.

Despite HDH's avowal that this case does not implicate *Flora v. United States*, 362 U.S. 145 (1960), actual consideration of the remedy sought by HDH confirms that it seeks the very relief that the Supreme Court rejected in *Flora*—the ability to litigate a tax assessment in district court prior to full payment (or, here, the Congressionally authorized partial payment) of the tax. HDH already has the broad relief it claims to seek: a jury trial determining its liability for the penalties at issue. HDH argues that the present trial will not determine its liability for the penalties, HDH Reply Brief at 9, but that assertion is belied by the plain language of the statute providing for this suit. 26 U.S.C. § 6703 provides that a district court suit like this one is a suit "for the determination of [the taxpayer's] liability for [a § 6700] penalty." 26 U.S.C. § 6703(c)(2).

Practically speaking, there is one notable difference between the current proceedings and the procedures HDH insists are required: under HDH's proposal, they would not be required to make any payment before accessing district court review. HDH interprets *Jarkesy* to require that

a jury impose a tax penalty before the IRS can assess it—and thus before HDH can face any collection or payment requirement.

In this alternative scenario, all the following would be the same as in the present case: Prior to the suit, the IRS would still need to determine whether to pursue a penalty against HDH, and in what amount. For the § 6700 penalties at issue, the IRS would still need to investigate HDH to make these determinations. The IRS would still have its summons power to compel production of documents and testimony. HDH would presumably still have expended time and money in responding to the investigation and presenting arguments to the IRS about why it was not liable. Once in court, HDH would still be litigating against the United States, the United States would have the burden of proof, and HDH would have its liability determined by a jury. HDH would still have access to all the protections, like the Federal Rules of Evidence, that Mr. Jarkesy was deprived of by the SEC's in-house adjudication. The only material difference would be that HDH would not have had to make any payments, either by paying 15% of the penalty amount, or by facing administrative collection, during the time between the IRS' internal decision-making and the conclusion of a lawsuit. Thus, what HDH is *actually* challenging is the "pay first, litigate later" nature of tax proceedings. And while many Supreme Court cases have endorsed those tax procedures, *see* U.S. Opposition Brief at Section III.E, *Flora* is the seminal case that confirmed that the tax framework created by Congress requires taxpayers to pay before they can litigate their tax liabilities in a district court before a jury.

HDH presents a narrow view of *Flora* and argues that because HDH does not dispute the Court's jurisdiction to hear refund cases, *Flora* is "not applicable to the instant case." HDH Reply Brief at 8. Not so. First, the *Flora* opinion makes clear that the case was not limited to a narrow question about one jurisdictional statute, writing that: "We are not here concerned with a single

sentence in an isolated statute, but rather with a jurisdictional provision which is a keystone in a carefully articulated and quite complicated structure of tax laws." *Flora*, 362 U.S. at 157. The Supreme Court recognized the interconnected nature of the tax laws and the ways various statutes interact, noting that accepting the taxpayer's argument about one statute "would sacrifice the harmony of our carefully structured twentieth century system of tax litigation." *Id.* at 176. It is also clear that *Flora* applies to this case, because an entire section of the opinion is dedicated to discussing 26 U.S.C. § 7422, one of the statutes that HDH argues is unconstitutional. *See id.* at 165-67. And while HDH does not directly challenge 28 U.S.C. § 1346, a key statute providing district court jurisdiction for tax refund cases, its argument implicates that statute. If, as HDH alleges, it is unconstitutional for the IRS to collect any disputed tax penalty payment before an Article III court has entered judgment following a jury trial, there could never be a tax penalty refund case. The provision of the statute providing jurisdiction for refund cases for "any penalty claimed to have been collected without authority . . . under the internal-revenue laws" would not only be superfluous but would explicitly endorse an unconstitutional procedure. *See* 28 U.S.C. § 1346(a)(1). Yet the Supreme Court closely examined 28 U.S.C. § 1346 in *Flora* and made no such findings; nor did the Court carve out an exception to the full-payment rule for the tax penalties that existed at the time.

Instead, *Flora* made clear that Congress can (and does) require payment before providing district court review to taxpayers, and that the judiciary should decline taxpayer invitations to unilaterally upend the tax framework created by Congress. *See Flora*, 362 U.S. at 162-63 (noting that "bills to permit the same type of prepayment litigation in the District Courts as is possible in the Tax Court have been introduced several times, but none has ever been adopted") and 164-65 (declining to endorse taxpayer's request to allow prepayment litigation in the district courts and

referring to the request as a "frustration of congressional intent" which "could hardly be more glaring"). *Flora* also pointed out that allowing prepayment tax suits in District Court would "in effect" allow taxpayers to bring "declaratory judgment" tax suits, overturning the statutory exemption to the Federal Declaratory Judgment Act (today codified at 28 U.S.C. § 2201). *Flora*, 362 U.S. at 164-65. HDH asks this Court to create the same remedy. Just as the Supreme Court rejected that request in *Flora*, this Court should reject it here.

**III. Even if a tax assessment were considered an adjudication, *Jarkesy* affirmed that internal revenue matters like this one fall under the public rights exception to Article III jurisdiction.**

As the United States argued previously, *Jarkesy* cannot provide HDH with further relief because, through this case, HDH will have access to a jury trial in an Article III court "for the determination of [its] liability for [a § 6700] penalty." 26 U.S.C. § 6703(c)(2). This case, not the IRS' assessment, is the initial adjudication of HDH's liability. But even if this Court does not agree that the very existence of this *de novo* jury trial case to determine HDH's liability settles the matter, *Jarkesy* does not change HDH's entitlements in this case. That is because *Jarkesy* repeatedly affirmed that internal revenue matters fall under the public rights exception, exempting them from Article III jurisdiction in the first instance.

HDH and the United States appear to agree that this Court should analyze the issue under the "two-part test" used in *Jarkesy* (itself following in the footsteps of *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33 (1989) and *Tull v. United States*, 481 U.S. 412 (1987)). *See Jarkesy* at 119-20; HDH Reply Brief at 16. Thus, for HDH to prevail, HDH would need to establish both that this is an action at common law and that it is not subject to the public rights exception. *See, e.g., Granfinanciera*, 492 U.S. at 42, n.4 ("The Seventh Amendment protects a litigant's right to a jury trial only if a cause of action is legal in nature and it involves a matter of 'private right.'"). The

analysis begins with the "threshold issue" of whether this action implicates the Seventh Amendment, or in other words, whether this is a suit in the nature of a claim at common law. *Jarkesy* at 120. If the answer is no, the analysis ends, and no jury trial is required. If the answer is yes, the Court "next consider[s] whether the 'public rights' exception to Article III jurisdiction applies." *Id.* If the answer to this second question is no, the Seventh Amendment requires a jury trial. *Id.* at 120-21. If the answer is yes, however, Congress can assign the matter to an agency for adjudication "even though such proceedings would not afford the right to a jury trial." *Id.* at 120.

HDH argues that the penalties at issue here are in the nature of a suit at common law and finds some support for that argument in parts of *Jarkesy*'s text. But other parts of *Jarkesy*'s text point in the other direction. For example, the Court discussed *Atlas Roofing Co. v. Occupational Safety and Health Review Comm'n*, 430 U.S. 447 (1977) in detail, noting that many of the cases it relied upon involved "actions that were not suits at common law or in the nature of such suits." *See Jarkesy* at 137-38 (cleaned up). In that discussion, the Court listed specific examples of cases discussed by *Atlas Roofing* that did *not* involve suits at common law: *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. 272 (1855); *Helvering v. Mitchell*, 303 U.S. 391 (1938); and *Oceanic Steam Nav. Co. v. Stranahan*, 214 U.S. 320 (1909). *Id. Murray's Lessee* and *Helvering v. Mitchell* are both internal revenue cases, and *Oceanic Steam* involved a monetary penalty in other areas over which Congress has plenary power (foreign commerce and immigration). The statement in *Jarkesy* that those examples were not suits at common law supports the argument that this case—involving internal revenue, a matter over which Congress has plenary authority, and a monetary penalty in that area of law—also may not even pass the "threshold" question of implicating the Seventh Amendment at all.

Moreover, addressing this threshold question is unnecessary in this case because the answer to the second question– does the public rights exception apply? – is yes. While HDH provides several arguments about the first step of the analysis, its largely conclusory argument that the public rights exception does not apply is simply inaccurate. While the Court did not claim to "definitively explain" the distinction between public and private rights, *Jarkesy* at 131, it did discuss the distinction at length. The Court provided lower courts with significant guidance as to what constitutes a public right, and in so doing, both the majority and the concurrence repeatedly endorsed the application of the public rights exception to internal revenue matters. *See id.* at 128-29 (acknowledging that the public rights exception extends "beyond cases involving the collection of revenue," which was its original application); at 131 (endorsing the application of the exception to revenue matters based on "centuries-old rules concerning revenue collection by a sovereign"); at 160-61 (criticizing the dissent for failing to mention that public rights, including "internal revenue" and "taxation," are limited to matters over which "from the beginning[,] Congress has exercised a plenary power" and which relate to "subjects peculiarly within the authority of the legislative department") (Gorsuch, J., concurring) (quoting *Oceanic Steamship*, 214 U.S. at 334, 339); at 161 (noting the relationship between the public rights exception and "Congress's peculiar powers when it comes to revenue") (Gorsuch, J., concurring).

HDH attempts to paint the application of the public rights exception to this cause of action as an expansion of the exception. But internal revenue matters have always been the heart of the public rights exception. HDH correctly notes that a large portion of the United States' Opposition Brief is dedicated to recounting that history. That is because, while there is no precise definition for public rights, the guidance available provides that they are "defined and limited by history." *Jarkesy* at 152-53 (Gorsuch, J., concurring) (citing to majority opinion). History is therefore

paramount to the analysis of whether a matter falls under the public rights exception. And the "narrow class" of public rights, defined by history, has always included internal revenue matters. *Id.* A long and unbroken line of cases dating back to the founding show that the Constitution vested in Congress "plenary authority in all cases of taxation," *Hylton v. United States*, 3 U.S. 171, 176 (1796), and that such authority includes "the right to prescribe the conditions on which it will subject itself to the judgment of the courts in the collection of its revenues," *Cheatham v. United States*, 92 U.S. 85, 88-89 (1875). *See generally* U.S. Opposition Brief, Sections III.B, III.C, and III.E. This "serious and unbroken historical pedigree" is exactly the type of "'deeply rooted' tradition of nonjudicial adjudication" that can overcome the "presumption" in favor of Article III courts. *See Jarkesy* at 153-54 (Gorsuch, J., concurring) (internal citations omitted).

The Supreme Court recognized that this historical pedigree pre-dated even the nation's founding when, in *Murray's Lessee*, it completed the "extended historical inquiry that led [it] to conclude the collection of revenue concerned a public right." *Jarkesy* at 160 (Gorsuch, J., concurring); *see generally Murray's Lessee* at 277-84. The historical inquiry in *Murray's Lessee* revealed that rather than permitting "claims for public taxes, either on the citizen or the officer employed for their collection or disbursement, to become subjects of judicial controversy," such claims were instead "carried out by summary methods of proceeding, and sometimes by systems of *fines and penalties*." *Murray's Lessee*, 59 U.S. at 281-82 (emphasis added). Thus, from the first recognition of the public rights exception, the Supreme Court recognized that collection of public taxes, including their enforcement by "systems of fines and penalties," were not traditionally matters for the judiciary to decide.

Even HDH admits that "[h]istorically, Congress, not the judicial branch of government, has maintained exclusive control over internal revenue and taxation," HDH Reply Brief at 15.

HDH also acknowledges that the "United States accurately describes the public rights exception and its historic application to the collection of revenue, and HDH does not dispute those descriptions." HDH Reply Brief at 14. Nonetheless, HDH argues that the lack of a precise definition for public rights means that this Court should ignore the Supreme Court's consistent recognition of internal revenue matters as matters of public rights. HDH would instead have this Court narrow the established rights of Congress with respect to revenue collection by requiring judicial involvement in matters which it admits have historically been under the "exclusive control" of Congress, HDH Reply Brief at 15, and which the Constitution expressly assigned to the legislature, U.S. Const. Art. I § 8, cl. 1.

This Court should instead follow the lead of the Supreme Court by looking "to original meaning and historical practice," both of which place internal revenue matters in the hands of the legislature, not the judiciary. *Jarkesy* at 163 (Gorsuch, J., concurring). Accepting HDH's arguments, which HDH admits are contrary to historical practice pre-dating the founding, would eviscerate the existence of the public rights exception and its application to internal revenue, both of which were reaffirmed in *Jarkesy*.

Following the examples the Supreme Court provided in *Jarkesy*, this case is likely not an action at common law and, in any case, is clearly subject to the public rights exception. Either way, the outcome is the same: "no involvement by an Article III court in the initial adjudication is necessary in such a case." *Id.* at 128.

## IV. The existing tax procedures provide all the due process the Constitution requires.

Finally, HDH uses its reply to raise a new constitutional challenge, arguing that the existing tax refund procedures do not provide the due process the Constitution requires. Again, HDH is wrong.

The Supreme Court has established several times over that the tax procedures Congress created are constitutional. *See* U.S. Opposition Brief, Section III.E. This includes specific findings that the tax procedures provide all the due process which is required. *See, e.g.*, *Dodge v. Osborn*, 240 U.S. 118, 122 (1916) (noting the "entire want of merit" in the contention that the tax refund procedures "are wanting in due process"); *Phillips v. Comm'r of Internal Revenue*, 283 U.S. 589, 594-95 (1931).

The Third Circuit, in *Kahn v. United States*, 753 F.2d 1208 (3d. Cir. 1985), both recognized this Supreme Court precedent *and* separately analyzed § 6703's procedures using the due process framework laid out by the Supreme Court in *Mathews v. Eldridge*, 424 U.S. 319 (1976). The Third Circuit concluded that § 6703, which provides the procedures for the present suit, "satisf[ies] the requirements of the fifth amendment." *Kahn* at 1222. Any analysis of § 6703 in this case is bound to reach the same conclusion.

The Third Circuit in *Kahn* considered whether the taxpayer was likely to suffer irreparable injury under the existing procedures, and, if not, whether governmental interests outweighed private interests and whether the likelihood of erroneous deprivation was minimal. *Id.* at 1220. Like the taxpayer in *Kahn*, HDH argues that it has suffered irreparable harm. HDH Reply Brief at 13. But *Kahn* concluded otherwise: "it cannot be seriously contended" that a tax penalty threatens irreparable harm that would require additional process without any other considerations. *Id.* at 1220-21. This Court should follow *Kahn*'s reasoning, and find that HDH does not face irreparable harm under the current procedures.

Satisfied that no one could seriously contend that facing tax penalties constitutes irreparable harm, the *Kahn* opinion continues with a comparative analysis. In *Kahn*, the taxpayer faced a penalty for including or omitting certain information on the face of her tax return. The

court found that for Ms. Kahn, the "private interest affected is significant in terms of both time and money." *Id.* at 1221. But in that case, the taxpayer had to pay the penalty amounts out of her own pocket. The § 6700 penalty applied here is different, because it only seeks to recover money that HDH collected in exchange for allegedly helping taxpayers avoid paying (presumably much higher amounts of) taxes into the Treasury.[3] While the amount of the penalty HDH was required to pay before filing suit is not small in absolute terms, its significance is tempered by the fact that it is only a small fraction—7.5%—of the income that HDH received from promoting tax shelters.[4] Unlike Ms. Kahn, who did not receive any new income by way of her penalized conduct, HDH is only being asked to pay over a portion of the additional income it gained through its own penalized conduct.

In any case, even if the Court does consider HDH as having a significant interest at stake, that interest is still outweighed by the government interests in protecting the public fisc and maintaining functioning tax administration. The Supreme Court considered this in *Flora*, finding that "the Government has a substantial interest in protecting the public purse, an interest which would be substantially impaired if a taxpayer could sue in a District Court without paying his tax

---

[3] Generally speaking, it is unlikely that the IRS will be able to recover all unpaid taxes from all a promoter's customers in any given case. Additionally, the government incurs costs in investigating abusive promoter schemes, and penalties help to reimburse the government for those costs. As the United States previously stated, the primary purpose of the § 6700 penalty is to protect the public fisc. *See* U.S. Opposition Brief at 20. This is a remedial purpose. *Accord. Reiserer v. United States*, 479 F.3d 1160, 1164 (9th Cir. 2007) (noting section 6700 serves "the remedial goal of reimbursing the government for the costs in investigating tax fraud and for possible lost tax revenue"); *United States v. Noske*, 117 F.3d 1053, 1056 (8th Cir. 1997) (agreeing that the § 6700 penalty "serves the remedial goal of reimbursing the Government").

[4] The penalty itself is 50% of gross income, and taxpayers must pay 15% of the penalty amount to bring suit. Thus the prepaid portion of the penalty is 15% * 50% = 7.5% of the promoter's gross income from the scheme.

in full." *Flora*, 362 U.S. at 175. *Kahn* agreed, pointing to the government's "powerful interest in the prompt collection of revenue." *Kahn*, 753 F.2d at 1222 (internal citations omitted).

The next factor *Kahn* considered was the "fairness and reliability of the existing … procedures, and the probable value, if any, of additional procedural safeguards." *Id.* at 1221 (quoting *Mathews*, 424 U.S. at 343). The *Kahn* court noted that in Ms. Kahn's case, the risk of erroneous deprivation appeared low because she took a frivolous position on the face of her tax return, such that under §6702(a)(1)(B) a penalty can be imposed without looking beyond the face of the tax return. *Id.* at 1221. But the court then found that the whole of § 6702 was constitutionally valid and satisfied the requirements of the Fifth Amendment. The court made this finding even though other subsections of § 6702 *do* require investigation beyond the face of the tax return. *See, e.g.*, § 6702(a)(1)(A) (imposing a penalty based on a failure to include necessary information on a tax return) and § 6702(a)(2)(B) (requiring a determination of whether the taxpayer's actions "reflec[t] a desire to delay or impede the administration of Federal tax laws."). The court's application of its ruling to § 6702 as a whole demonstrates that the facial determination of penalty liability under § 6702(a)(1)(B) was not the decisive factor as to its constitutionality. Rather, the court's conclusion was that "the compelling interest in the collection of revenue coupled with the congressionally expressed concern for maintaining the integrity of the revenue system and discouraging frivolous claims create a strong mandate" for the statute's constitutional validity. *Kahn*, 753 F.2d at 1222. In short, "the public interest outweighs the private interest." *Id.*

Like the other subsections of § 6702, the § 6700 penalty cannot be determined from a facial review of a single tax return. Just as that did not prevent the *Kahn* court from opining that all of § 6702 was constitutional, it does not affect the constitutionality of § 6700 here. *Kahn's* conclusion was based in part on the "congressionally expressed concern for . . . discouraging frivolous

claims." *Kahn*, 753 F.2d at 1222. The court cited legislative history for § 6702 in which the Senate Finance Committee expressed concern with the "rapid growth in deliberate defiance of the tax laws by tax protestors," exemplified by the **13,600** illegal protest returns the IRS then had. *Id.* at 1214, n.3. The legislative history regarding the § 6700 penalty shows an even greater government interest at stake in combatting the "growing phenomenon of abusive tax shelters," which was exemplified by the **248,828** returns with tax shelter issues the IRS then had. S. REP. 97-494(I), 266-67. Together with the compelling government interest in revenue collection, this creates a "strong mandate" for the constitutional validity of the promoter penalty and the existing procedures implementing it. *Kahn*, 753 F.2d at 1222. The *Kahn* court also noted that the government already provides additional procedural safeguards for these penalties via § 6703 by allowing judicial review after paying only 15% of the penalty (vs. 100%) and placing the burden of proof on the government, rather than the taxpayer. *Id.* at 1221. Other existing procedures further safeguard taxpayers against erroneous penalty assessments, including 26 U.S.C. § 6751, which requires that no penalty shall be assessed "unless the initial determination of such assessment is personally approved (in writing) by the immediate supervisor of the individual making such determination or such high level official as the Secretary may designate." 26 U.S.C. § 6751(b)(1).

The many Supreme Court cases affirming the constitutionality of providing only post-deprivation judicial review in tax cases and the balancing approach laid out in *Kahn* all lead to the same conclusion: the existing procedures for § 6700 penalties provide all the process which is due under the Constitution. *See also Interior Glass Sys., Inc. v. United States*, 927 F.3d 1081, 1086-87 (9th Cir. 2019), *cert denied*, 140 S. Ct. 606 (2019); *Larson v. United States*, 888 F.3d 578, 585-87 (2d Cir. 2018) (citing *Kahn*).

## CONCLUSION

Any right HDH has to a jury trial determining its liability for § 6700 penalties will be satisfied by permitting this case to proceed to a jury determination of HDH's liability for § 6700 penalties. A tax penalty assessment is not equivalent to a district court judgment or to the SEC adjudication at issue in *Jarkesy*. And even if the post-assessment, post-payment jury trial afforded the taxpayer in this case could be considered insufficient with respect to a non-tax penalty, the public rights exception caselaw confirms that no jury trial is required before a tax assessment takes place. The existing procedures that allow a jury to determine HDH's liability via this refund suit are constitutionally sound under the Seventh Amendment, the Fifth Amendment, and the Constitution as a whole.

//

Dated: July 3, 2025

Respectfully submitted,

*/s/ Elisabeth K. Kryska*
ELISABETH K. KRYSKA
Maryland Bar No. 2211280290
CHRISTOPHER RAJOTTE
Florida Bar No. 107742
ALAN D. BAILEY
Kentucky Bar No. 100427
Trial Attorneys, Tax Division
U.S. Department of Justice
P.O. Box 7238, Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 305-6717 (Kryska)
(202) 514-6491 (Rajotte)
(202) 514-6075 (Bailey)
Fax: (202) 514-6770
Elisabeth.K.Kryska@usdoj.gov
Christopher.Rajotte@usdoj.gov
Alan.Bailey@usdoj.gov