## IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **HDH GROUP, INC.,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **Case No.: 2:24-cv-00988-WSS** |
| **vs.** ) | |
| ) | |
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |
| _____ ) | |
| ) | |
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| **Counterclaim Plaintiff,** ) | |
| ) | |
| **vs.** ) | |
| ) | |
| **HDH GROUP, INC.,** ) | |
| ) | |
| **Counterclaim Defendant.** ) | |

## HDH GROUP, INC.'S NOTICE OF SUPPLEMENTAL AUTHORITY

HDH Group, Inc., submits this Notice of Supplemental Authority notifying the Court of two recently decided cases that are pertinent to the issues addressed in HDH Group, Inc.'s Motion for Summary Judgment and Motion to Dismiss Counterclaim and the corresponding briefing. The cases are *Sun Valley Orchards, LLC v. U.S. Dep't of Lab.*, No. 23-2608 --- F.4th ----, 2025 WL 2112927 (3d Cir. July 29, 2025) and *Wulferic, LLC v. U.S. Food & Drug Admin.*, No. 4:24-CV-01183-O, --- F. Supp. 3d ----, 2025 WL 2200923 (N.D. Tex. Aug. 1, 2025). Copies of these cases are attached.

Respectfully Submitted,

/s/ *David B. Spear*
David B. Spear
PA Id. No. 62133

Ralph Minto, Jr.
PA Id. No. 51746

Michelle L. Kopnski
PA Id. No. 52096

Minto Law Group, LLC
Stone Quarry Crossing
811 Camp Horne Road, Suite 320
Pittsburgh, PA 15237
412-201-5525
dspear@mintolaw.com
rminto@mintolaw.com
mkopnski@mintolaw.com
Counsel for Plaintiff

2025 WL 2112927
Only the Westlaw citation is currently available.
United States Court of Appeals, Third Circuit.

SUN VALLEY ORCHARDS, LLC, Appellant

v.

U.S. DEPARTMENT OF LABOR; United States
Secretary of Labor

No. 23-2608
|
Argued on April 10, 2025
|
(Filed: July 29, 2025)

**Synopsis**
**Background:** Agricultural employer sought, under
Administrative Procedure Act, declaratory and injunctive
relief from Department of Labor's (DOL) imposition of civil
penalties and back wages through in-house administrative
proceedings against employer for employer's alleged breach
of an employment agreement formed under the H-2A
nonimmigrant visa program. The United States District Court
for the District of New Jersey, Joseph H. Rodriguez, J., 2023
WL 4784204, granted DOL's motion to dismiss. Employer
appealed.

**Holdings:** The Court of Appeals, Hardiman, Circuit Judge,
held that:

[1] DOL's enforcement action concerned private rights, as
would presumptively entitle employer, pursuant to Article
III's clause that vested judicial power in the courts, to have
enforcement action decided in an Article III court rather than
an in-house administrative proceeding through DOL;

[2] argument that immigration was traditionally a matter of
public rights did not preclude finding that the action
concerned private rights; and

[3] employer did not consent to have ALJ adjudicate
enforcement action.

Reversed and remanded with instruction.

**Procedural Posture(s):** On Appeal; Review of
Administrative Decision; Motion to Dismiss.

West Headnotes (10)

[1]  **Federal Courts** ⚖️ Dismissal or nonsuit in
      general
      A district court's order dismissing a complaint is
      subject to plenary review.

[2]  **Federal Courts** ⚖️ Power of Congress to reduce
      or withdraw jurisdiction; statutory restrictions in
      general
      Congress may not withdraw from judicial
      cognizance any matter which, from its nature, is
      subject of suit at common law, or in equity, or
      admiralty. U.S. Const. art. 3, § 1.

[3]  **Federal Courts** ⚖️ Persons or bodies who may
      exercise judicial power
      In evaluating whether a given case fits within the
      public-rights exception to constitutional principle
      that Congress may not withdraw from judicial
      cognizance any matter which, from its nature, is
      subject of suit at common law, or in equity, or
      admiralty, courts look for a serious and unbroken
      history of non-Article-III resolution; the public-
      rights exception captures only matters that
      historically could have been determined
      exclusively by the executive and legislative
      branches. U.S. Const. art. 3, § 1.

[4]  **Federal Courts** ⚖️ Persons or bodies who may
      exercise judicial power
      Department of Labor's (DOL) enforcement
      action against agricultural employer over claims
      that employer breached employment agreement
      formed under H-2A nonimmigrant visa program
      concerned private rights, i.e., action was in
      nature of a common-law suit, as would
      presumptively entitle employer, pursuant to
      Article III's clause that vested judicial power in
      the courts, to have enforcement action decided in
      an Article III court rather than an in-house
      administrative proceeding through DOL; DOL
      framed enforcement action in contractual terms,

sought common-law remedies of civil penalties and back wages, and sought back wages at least in part to deter harm from occurring in the future. U.S. Const. art. 3, § 1; Immigration and Nationality Act §§ 101, 218, 8 U.S.C.A. §§ 1101(a)(15)(H)(ii)(a), 1188(a)(1)(B); 20 C.F.R. § 655.122; 29 C.F.R. § 501.0.

1 Case that cites this headnote
More cases on this issue

[5]    **Federal Courts** 🔑 Persons or bodies who may exercise judicial power

A party challenging agency enforcement under Article III need not match the agency's action to an exact historical comparator, as is relevant to rule that courts look for a serious and unbroken history of non-Article-III resolution when evaluating whether a given agency-enforcement case fits within the public-rights exception to constitutional principle that Congress may not withdraw from judicial cognizance any matter which, from its nature, is subject of suit at common law, or in equity, or admiralty. U.S. Const. art. 3, § 1.

[6]    **Federal Courts** 🔑 Persons or bodies who may exercise judicial power

Back wages are legal in nature to the extent that they are designed to punish or deter the wrongdoer, as is relevant to rule that courts look for a serious and unbroken history of non-Article-III resolution when evaluating whether a given agency-enforcement case fits within the public-rights exception to constitutional principle that Congress may not withdraw from judicial cognizance any matter which, from its nature, is subject of suit at common law, or in equity, or admiralty. U.S. Const. art. 3, § 1.

[7]    **Federal Courts** 🔑 Persons or bodies who may exercise judicial power

Argument that immigration was traditionally a matter of public rights did not preclude finding that Department of Labor's (DOL) enforcement action against agricultural employer over claims that employer breached employment agreement formed under H-2A nonimmigrant visa program concerned private rights, i.e., that action was in

nature of a common-law suit, as would presumptively entitle employer, pursuant to Article III's clause that vested judicial power in the courts, to have enforcement action decided in an Article III court rather than an in-house administrative proceeding through DOL; H-2A labor-certification process at issue was designed to vindicate the domestic national policy goal of preserving the wages and working conditions of workers in the United States. U.S. Const. art. 3, § 1; Immigration and Nationality Act §§ 101, 218, 8 U.S.C.A. §§ 1101(a)(15)(H)(ii)(a), 1188(a)(1)(B); 20 C.F.R. § 655.122; 29 C.F.R. § 501.0.

1 Case that cites this headnote
More cases on this issue

[8]    **Labor and Employment** 🔑 Presentation and reservation of grounds for review

Agricultural employer did not consent to have Department of Labor (DOL) ALJ adjudicate DOL's enforcement action against employer over claims that employer breached employment agreement formed under H-2A nonimmigrant visa program, and thus consent could not be basis to find that employer failed to preserve during administrative proceedings its argument that, pursuant to Article III's clause that vested judicial power in courts, it was entitled to have Article III court, rather than DOL's in-house administrative process, decide enforcement action; DOL's letter assessing civil penalties provided that determination would become final and unappealable if request for hearing before ALJ was not timely received, so employer lacked any real choice about where to challenge DOL's action. U.S. Const. art. 3, § 1; Immigration and Nationality Act §§ 101, 218, 8 U.S.C.A. §§ 1101(a)(15)(H)(ii)(a), 1188(a)(1)(B); 20 C.F.R. § 655.122; 29 C.F.R. § 501.0.

1 Case that cites this headnote

[9]    **Labor and Employment** 🔑 Further review

Department of Labor (DOL), which was pursuing enforcement action against agricultural employer over claims that employer breached employment agreement formed under H-2A

nonimmigrant visa program, forfeited in Court of Appeals its argument that employer failed to exhaust its administrative remedies as to its argument that, pursuant to Article III's clause that vested judicial power in courts, it was entitled to have Article III court, rather than DOL's in-house administrative process, decide enforcement action; DOL did not raise a failure-to-exhaust defense before the district court, and DOL did not offer any exceptional circumstances to excuse the forfeiture. U.S. Const. art. 3, § 1; Immigration and Nationality Act §§ 101, 218, 8 U.S.C.A. §§ 1101(a)(15)(H)(ii)(a), 1188(a)(1)(B); 20 C.F.R. § 655.122; 29 C.F.R. § 501.0.

[10]  **Administrative Law and Procedure**⚖
Determination of Exhaustion
**Administrative Law and Procedure**⚖Estoppel and waiver

A nonjurisdictional, mandatory exhaustion requirement in administrative proceedings functions as an affirmative defense, and thus can be waived or forfeited by the government's failure to raise it.

On Appeal from the United States District Court for the District of New Jersey (D.C. No. 1:21-cv-16625), District Judge: Hon. Joseph H. Rodriguez

**Attorneys and Law Firms**

Robert M. Belden, Institute for Justice, 901 N. Glebe Road, Suite 900, Arlington, VA 22203, Robert E. Johnson [Argued], Institute for Justice, 16781 Chagrin Boulevard, Suite 256, Shaker Heights, OH 44120, Counsel for Appellant

Daniel J. Aguilar [Argued], U.S. Department of Justice, Civil Division, 950 Pennsylvania Avenue NW, Room 7266, Washington, D.C. 20530, Counsel for Appellees

Adina H. Rosenbaum, Nicolas A. Sansone, Allison M. Zieve, Public Citizen Litigation Group, 1600 20th Street NW, Washington, D.C. 20009, Counsel for Amicus Curiae Public Citizen in Support of Appellees
Before: HARDIMAN, PORTER, and SMITH, Circuit Judges.

OPINION OF THE COURT

HARDIMAN, Circuit Judge.

**\*1** The United States Department of Labor (DOL) alleged that Sun Valley Orchards, a New Jersey farm, breached an employment agreement formed under the H-2A nonimmigrant visa program. Instead of pursuing its case in a federal district court, DOL imposed hundreds of thousands of dollars in civil penalties and back wages through in-house administrative proceedings. Sun Valley challenged this order under the Administrative Procedure Act, but the District Court dismissed its claims. Following the Supreme Court's recent decision in *SEC v. Jarkesy*, 603 U.S. 109, 144 S.Ct. 2117, 219 L.Ed.2d 650 (2024), we hold that Sun Valley was entitled to have its case decided by an Article III court. We will reverse.

I

A

Under the H-2A nonimmigrant visa program, domestic employers may temporarily hire foreign laborers to perform seasonal agricultural work. *See* 8 U.S.C. § 1101(a)(15)(H)(ii)(a). Because the program exists at the intersection of labor and immigration law, it is administered jointly by DOL and the Department of Homeland Security (DHS). Prospective H-2A employers must obtain two forms of authorization: a labor certification from DOL and a visa petition approval from DHS. *See id.* § 1188(a).

This case arises from regulations under the labor certification process. The Immigration and Nationality Act (INA) requires prospective H-2A employers to demonstrate that:

(A) there are not sufficient workers who are able, willing, and qualified, and who will be available at the time and place needed, to perform the labor or services involved in the petition, and

(B) the employment of the alien in such labor or services will not adversely affect the wages and working conditions of workers in the United States similarly employed.

*Id.* § 1188(a)(1).

To satisfy that statutory requirement, employers must first attempt to recruit U.S. workers. *See id.* § 1188(b)(4); 20 C.F.R. § 655.121(f). To that end, employers must offer U.S. workers "no less than the same benefits, wages, and working conditions" that the employer offers H-2A workers. 20 C.F.R. § 655.122(a). Regulations dictate what benefits H-2A workers—and therefore, corresponding U.S. workers—must receive. *See generally id.* § 655.122. Relevant here, employers must provide no-cost housing, *see id.* § 655.122(d)(1), access to a kitchen or meal plan, *see id.* § 655.122(g), and transportation to the work site. *See id.* § 655.122(h). These conditions are incorporated into a "job order," which is posted domestically before it is circulated to foreign workers. *Id.* § 655.121(f).

The job order functions as a work contract absent a written agreement, and DOL may enforce its terms. *See id.* § 655.122(q). Federal law authorizes the Secretary of Labor "to take such actions, including imposing appropriate penalties and seeking appropriate injunctive relief and specific performance of contractual obligations, as may be necessary to assure employer compliance with terms and conditions of employment under" the H-2A program. 8 U.S.C. § 1188(g)(2). Relying on that language, DOL has promulgated regulations authorizing its Wage and Hour Division to impose civil penalties and back wages on participating employers.[1] *See* 29 C.F.R. § 501.16; 20 C.F.R. § 655.101(b).

**\*2** An employer targeted for enforcement may request a hearing before an Administrative Law Judge (ALJ). *See* 29 C.F.R. § 501.33. ALJs are removeable by the Secretary of Labor for cause, *see* 5 U.S.C. § 7521(a), and the Federal Rules of Evidence do not apply to their proceedings, *see* 29 C.F.R. § 501.34. ALJ decisions become final unless review is taken by the Administrative Review Board. *See id.* § 501.42.

## B

Sun Valley is a farm in New Jersey. The farm grows fruits and vegetables, including asparagus, zucchini, cucumber, eggplant, peppers, and peaches. Sun Valley relies on seasonal workers hired through the H-2A program.

Sun Valley first participated in the program in 2015, hiring 96 foreign workers and 51 corresponding domestic workers. Through a job order, Sun Valley promised at least forty hours of work per week for twenty-six weeks of employment.

Consistent with applicable regulations, Sun Valley guaranteed employment for "the hourly equivalent of 3/4" of the hours contemplated by the agreement. App. 203. It offered no-cost housing and free transportation to the worksite. And it promised to "furnish free cooking and kitchen facilities to those workers who are entitled to live in the employers' housing so that workers may prepare their own meals" and to provide "free transportation" to the closest grocery store. App. 193.

According to DOL, Sun Valley did not keep those promises. After spending time at the farm in 2015, agency investigators identified several job order violations. DOL confirmed those violations in a letter to Sun Valley, assessing hundreds of thousands of dollars in civil penalties and back wages.

DOL first identified violations concerning housing. Sun Valley's job order had promised its employees no-cost housing satisfying "the full set of DOL Occupational Safety and Health Administration (OSHA) standards." App. 193; *see also* 20 C.F.R. § 655.122(d)(1). But the investigation found that "the housing facility provided for workers was missing window screens and had screen doors not in good repair," which contributed to an "insect infestation throughout the camp." App. 154. The investigation also revealed that "[s]everal bathroom sinks did not have hot water, refuse containers throughout [the] facility were missing fly tight lids and multiple mattresses used by occupants for sleeping purposes were directly on the floor without a bed frame." *Id.* DOL assessed $3,600 in civil penalties for these alleged violations.

DOL also found violations related to Sun Valley's meal plan. Sun Valley's job order had not mentioned a meal plan, instead promising to "furnish free cooking and kitchen facilities ... so that workers may prepare their own meals" and to provide "free transportation" to nearby grocery stores. App. 193. The investigation revealed, however, that Sun Valley had failed to provide meaningful kitchen access in violation of the job order, instead deciding to charge workers for meals without notice. The investigator also found that a supervisor regularly charged workers for drinks. Because Sun Valley did not provide kitchen access, failed to give notice of its alternative meal plan, and sold drinks at a profit, DOL assessed $198,450 in penalties and $234,079.28 in back wages.

DOL identified a violation related to transportation, as well. H-2A employers must provide workers with transportation to

the job site that "compl[ies] with all applicable local, State, or Federal laws and regulations," including those governing "transportation safety standards, driver's licensure, and vehicle insurance." 20 C.F.R. § 655.122(h)(4)(i). Consistent with that requirement, Sun Valley promised its employees "free transportation" from the "housing facility both to and from the daily work site." App. 205. But DOL's investigation revealed that "three of the five vehicles used to transport workers had insufficient tread on the tires for safe operation and one had a non-functioning rear directional." App. 154–55. The investigation also revealed that "the five vehicles used to transport H-2A and corresponding [domestic] workers were operated by drivers who failed to possess valid, unexpired driver's licenses." App. 155. DOL assessed $7,500 in civil penalties for this violation.

**\*3** Finally, DOL claimed that Sun Valley violated the "three-fourths guarantee." *Id.* Consistent with regulations, Sun Valley had guaranteed employment for "the hourly equivalent of 3/4" of the workdays contemplated by the job order. App. 203; *see also* 20 C.F.R. § 655.122(i). But DOL's investigation revealed that, following a dispute between workers and management, Sun Valley "constructively forced [some employees] to return home prior to the end of the contract period," coercing them to "sign a form ... stating that they were leaving early for 'personal reasons.' " App. 155–56. This action, DOL alleged, violated both Sun Valley's job order and a regulation prohibiting employers from "seek[ing] to have an H-2A worker ... waive any rights conferred under" laws and regulations governing the program. 29 C.F.R. § 501.5. DOL assessed $2,700 in penalties and $135,623.94 in back wages for these violations.

All told, Sun Valley was assessed $212,250 in civil penalties and $369,703.22 in back wages, payable directly to DOL. DOL notified Sun Valley of its "right to request a hearing" before an ALJ to contest the assessment. App. 150; *see also* 29 C.F.R. § 501.33. But if the farm failed to request a hearing within thirty days, DOL's findings would become "the final and unappealable Order of the Secretary." App. 150.

## C

Sun Valley timely requested a hearing before an ALJ. The ALJ affirmed in part and modified in part DOL's findings. In a lengthy written opinion, the ALJ agreed with DOL that Sun Valley violated a host of job order provisions. The ALJ

parted with DOL's view only as to the amount of civil penalties and back wages owed, modifying those figures to $211,800 and $344,945.80, respectively. Sun Valley petitioned the Administrative Review Board for review, which affirmed the ALJ's decision in its entirety.

Sun Valley challenged DOL's decision in the District Court, seeking declaratory and injunctive relief under the Administrative Procedure Act. It alleged several statutory and constitutional defects in DOL's order, including that: (1) it adjudicated private rights in violation of Article III of the Constitution, (2) the ALJ presiding over the case was appointed and insulated from removal in violation of Article II of the Constitution, (3) the penalties and back wages assessed by the order were excessive in violation of the Eighth Amendment, and (4) DOL lacked statutory authority to impose civil penalties and back wages through administrative proceedings.[2] DOL moved to dismiss, and both parties cross-moved for summary judgment.

The District Court granted DOL's motion to dismiss all of Sun Valley's claims. The Court first addressed Sun Valley's Article III claim, holding that agency adjudication was appropriate because DOL's action fit within the "public-rights doctrine." *Sun Valley Orchards, LLC v. Dep't of Lab.*, 2023 WL 4784204, at *6 (D.N.J. July 27, 2023). The Court next rejected Sun Valley's claim that DOL lacked statutory authority to impose civil penalties and award back wages in-house, reasoning that the "clear language of the statute" vested DOL with that authority. *Id.* at *7, 10–11. As for its Article II claims, the Court concluded that Sun Valley failed to exhaust the issue before the agency and dismissed on that basis. But it also explained that ratification cured any Appointments Clause defect, and that ALJs are shielded from removal by only one level of good-cause protection. Finally, the Court held that the civil penalty award did not violate the Excessive Fines Clause, explaining that it was "not grossly disproportionate to Sun Valley's offenses." *Id.* at *11. Sun Valley filed this appeal.

## II

**\*4** **[1]** The District Court had jurisdiction under 28 U.S.C. § 1331, and we have jurisdiction under 28 U.S.C. § 1291. "A district court's order dismissing a complaint is subject to plenary review." *Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1197 (3d Cir. 1993). Under the Administrative Procedure Act, we must "hold unlawful and

set aside" DOL's action if we find it to be, among other things, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; "contrary to constitutional right, power, privilege, or immunity"; or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2).

### III

[2] We begin and end with Sun Valley's Article III argument. The Constitution vests "[t]he judicial Power of the United States ... in one supreme [C]ourt, and in such inferior Courts as the Congress may from time to time ordain and establish." U.S. Const. art. 3, § 1. The judges of those courts enjoy life tenure and salary protection, attributes that preserve an "independent spirit" that is "essential to the faithful performance" of their duty. The Federalist No. 78, p. 469 (C. Rossiter ed. 1961) (A. Hamilton). Because non-Article III tribunals lack these important qualities, Congress may not "withdraw from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law, or in equity, or admiralty." *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. (18 How.) 272, 284, 15 L.Ed. 372 (1855).

[3] On top of that rule, the Supreme Court has explained that certain "public rights" cases may be adjudicated outside Article III. *Id.* Because the public rights exception "has no textual basis in the Constitution," it must "derive instead from background legal principles." *Jarkesy*, 603 U.S. at 131, 144 S.Ct. 2117. History therefore looms large in the public rights analysis, requiring courts to pay "close attention to the basis for each asserted application of the doctrine." *Id.* In evaluating whether a given case fits within the public rights exception, we look for "a serious and unbroken" history of non-Article-III resolution. *Id.* at 153, 144 S.Ct. 2117 (Gorsuch, J., concurring).

With these principles in mind, we turn to Sun Valley's Article III challenge. The farm contends that DOL violated Article III by adjudicating its private rights through in-house proceedings. To resolve this claim, we must decide (1) whether DOL's action concerns private rights (that is, whether it is in the nature of a common law suit), (2) whether DOL's action fits within the public rights exception, and (3) whether Sun Valley waived its right to Article III adjudication.[3]

### A

[4]   [5] We first consider whether DOL's enforcement concerns private rights, asking if it "is made of the stuff of the traditional actions at common law tried by the courts at Westminster in 1789." *Id.* at 128, 144 S.Ct. 2117 (majority opinion) (citation modified). As the Supreme Court's recent decision in *Jarkesy* explains, a party challenging enforcement under Article III need not match the agency's action to an exact historical comparator. *Id.* at 134, 144 S.Ct. 2117. *Jarkesy* considered whether the SEC could, consistent with Article III and the Seventh Amendment, enforce federal antifraud statutes through in-house civil penalty proceedings. *Id.* at 120, 144 S.Ct. 2117. The Court said no. *Id.* at 121, 144 S.Ct. 2117. The SEC sought civil penalties, which traditionally "could only be enforced in courts of law." *Id.* at 134, 144 S.Ct. 2117 (citation modified). And its action, though based on federal law, "target[ed] the same basic conduct as common law fraud, employ[ed] the same terms of art, and operate[d] pursuant to similar legal principles." *Id.* Because both the action and the remedies that the SEC pursued could be traced to English common law, Jarkesy's case presumptively "involve[d] a matter of private rather than public right." *Id.* (citation modified).

**\*5** Those same considerations require Article III adjudication here. Start with the nature of DOL's claim. While regulations require H-2A employers to provide housing, meals, transportation, and guaranteed work, employee benefits are formalized in an employer's "job order." *See generally* 20 C.F.R. § 655.122. Where, as here, the employer does not pen another agreement with its employees, the job order functions as a "work contract" between them. *Id.* § 655.122(q). It is the violation of the terms of that work contract, rather than the regulations that shape it, that supports H-2A enforcement actions. *See* 29 C.F.R. § 501.0 (authorizing "the enforcement of all *contractual obligations* ... applicable to the employment of H-2A workers and workers in corresponding employment").[4]

Consistent with that scheme, DOL framed its enforcement action against Sun Valley in contractual terms. For instance, DOL told the ALJ that "Sun Valley's assurances formed part of the farm's contract with H-2A workers." A.R. 145. It then alleged that Sun Valley "violat[ed]" those "contractual obligations." *Id.* The ALJ's decision, too, sounded partially in contract. For example, the decision found that Sun Valley

"breached a material term of the job order" when it failed to provide employees with kitchen access. App. 83–84. And it ordered penalties and back wages for Sun Valley's decision to terminate workers "before they worked the guaranteed three-fourths of the hours promised in their contracts." App. 92. DOL's action was therefore litigated like a suit for breach of contract, which have traditionally been heard in common law courts. *See N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 90, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982) (Rehnquist, J., concurring in the judgment) (recognizing "breach of contract" as "the stuff of the traditional actions at common law tried by the courts at Westminster in 1789").

[6] We also think it significant that DOL sought common law remedies: civil penalties and back wages. The Supreme Court has long maintained that "[a] civil penalty was a type of remedy at common law that could only be enforced in courts of law." *Tull v. United States*, 481 U.S. 412, 422, 107 S.Ct. 1831, 95 L.Ed.2d 365 (1987); *see also Jarkesy*, 603 U.S. at 123, 144 S.Ct. 2117. And to the extent that back wages are designed "to punish or deter the wrongdoer," they, too, are legal in nature. *Jarkesy*, 603 U.S. at 123, 144 S.Ct. 2117 (citation omitted). The ALJ here assessed back wages at least in part "[t]o deter such harm from occurring in the future." App. 88. The Administrative Review Board likewise cited the need to "deter other H-2A employers" when upholding the award.[5] App. 42. That DOL sought punitive remedies therefore only confirms that its action was "made of the stuff of the traditional actions at common law," presumptively entitling Sun Valley to adjudication before an Article III court. *Jarkesy*, 603 U.S. at 128, 144 S.Ct. 2117 (citation modified).

B

**\*6** [7] DOL resists this conclusion. Despite the appearance of a common law contract action, it contends that this case is really about immigration. And because immigration is traditionally a matter of public rights, DOL insists that Sun Valley was not entitled to adjudication by an Article III court. We are unpersuaded. While history does sanction non-Article III adjudication for certain immigration-related matters, this case falls well outside the heartland of that tradition.

The political branches have long asserted control over the Nation's borders. While the President has possessed some

authority to remove aliens since the founding, *see Dep't of State v. Munoz*, 602 U.S. 899, 912, 144 S.Ct. 1812, 219 L.Ed.2d 507 (2024), Congress first enacted general restrictions on immigration during the late nineteenth century, *see Kleindienst v. Mandel*, 408 U.S. 753, 761, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972). From the beginning, these statutes empowered executive branch officials to adjudicate issues surrounding admission and exclusion. *See Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 129–30, 140 S.Ct. 1959, 207 L.Ed.2d 427 (2020) (collecting statutes).

Recognizing the political branches' "plenary power" over immigration, the Supreme Court largely endorsed this regime of administrative enforcement. *See Castro v. United States Dep't of Homeland Sec.*, 835 F.3d 422, 439–41 (3d Cir. 2016) (citing *Chae Chan Ping v. United States*, 130 U.S. 581, 9 S.Ct. 623, 32 L.Ed. 1068 (1889); *Nishimura Ekiu v. United States*, 142 U.S. 651, 12 S.Ct. 336, 35 L.Ed. 1146 (1892); *Fong Yue Ting v. United States*, 149 U.S. 698, 13 S.Ct. 1016, 37 L.Ed. 905 (1893)). The Court observed long ago that exclusion was an "incident of sovereignty belonging to the government," so that issue was generally not appropriate "for judicial determination." *Chae Chan Ping*, 130 U.S. at 609, 9 S.Ct. 623. The "plenary power" doctrine has undergone changes since then, *see Castro*, 835 F.3d at 441–44, but the Supreme Court has consistently "recognized that the admission and exclusion of foreign nationals is a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control," *Trump v. Hawaii*, 585 U.S. 667, 702, 138 S.Ct. 2392, 201 L.Ed.2d 775 (2018) (citation modified).

This history provides the foundation for an immigration exception to Article III adjudication. *See Jarkesy*, 603 U.S. at 128–30, 144 S.Ct. 2117 (listing "immigration" as an example of "public rights"). But it also suggests limitations. The public rights exception captures only matters that "historically could have been determined exclusively by the executive and legislative branches." *Id.* at 128, 144 S.Ct. 2117 (citation modified). And the above historical discussion suggests that non-Article III adjudication was traditionally appropriate in cases closely related to the admission and exclusion of aliens.

The Supreme Court's decision in *Oceanic Steam Navigation Co. v. Stranahan* exemplifies this limitation. 214 U.S. 320, 29 S.Ct. 671, 53 L.Ed. 1013 (1909). The plaintiff there, a steamship operator, was sanctioned under a statute

authorizing the Secretaries of Labor and Commerce to impose penalties for "bringing into the United States alien immigrants afflicted with 'loathsome or dangerous contagious diseases.' " *Id.* at 332, 29 S.Ct. 671. The operator claimed that this order violated Article III, but the Court disagreed. Congress had "plenary power ... as to the admission of aliens," so it could authorize executive branch officials to impose a penalty without Article III adjudication. *Id.* at 343, 29 S.Ct. 671. *Oceanic Steam,* the Court would later explain, stands for the proposition that Congress may "prohibit immigration by certain classes of persons and enforce those prohibitions with administrative penalties assessed without" an independent judge or jury. *Jarkesy,* 603 U.S. at 129, 144 S.Ct. 2117. So *Oceanic Steam* related closely to the admission and exclusion of aliens. *See Lloyd Sabaudo Societa Anonima Per Azioni v. Elting,* 287 U.S. 329, 335, 53 S.Ct. 167, 77 L.Ed. 341 (1932) (observing that *Oceanic Steam* concerned the federal government's "plenary power to control the admission of aliens").

**\*7** Sun Valley's case falls outside the immigration exception and the tradition that shaped it. Although the H-2A program facilitates temporary migration, its labor certification regulations do not directly address the admission and exclusion of aliens. Instead, the labor certification process is designed to vindicate the domestic national policy goal of preserving "the wages and working conditions of workers in the United States." 8 U.S.C. § 1188(a)(1)(B). Rules about worker hours, housing, cooking, and transportation regard employment law, not "Congress' plenary authority to control immigration." Dep't Br. 36. This is especially true considering that H-2A labor certification rules apply to foreign and domestic workers alike. *See* 29 C.F.R. § 501.0. So while H-2A labor certification regulations may ultimately serve immigration-related goals, extending *Oceanic Steam* to reach this case would allow "the exception [to] swallow the rule." *Jarkesy,* 603 U.S. at 131, 144 S.Ct. 2117.

DOL disagrees. In its view, the H-2A program implicates "a variety of foreign-policy concerns" that situate it comfortably within the public rights exception. Dep't Br. 33. For example, the Secretaries of State and Homeland Security "determine which countries are eligible to participate in the program," using participation as leverage to achieve foreign and domestic policy objectives. Dep't Br. 8. Because of these quintessentially public interests, it says, adjudications under the H-2A program need not take place in an Article III court.

This argument proves too much. It is true that portions of the sprawling H-2A program implicate the President's unique power over foreign affairs. But at best, that shows that *some* H-2A-related actions may proceed in agency tribunals. For example, DOL could use agency proceedings to bar Sun Valley from the program or to remove ineligible foreign workers from its employ. *See* 20 C.F.R. § 655.182. Those actions, to the extent they vindicate the federal government's critical interest in border control, likely fall within the immigration exception. But the fact that DOL has *some* authority to proceed in a non-Article III tribunal does not give it carte blanche to do so for *all* violations. Such a rule would eviscerate *Jarkesy*'s instruction that we "evaluate[ ] the legal basis for [DOL's] assertion [of the public rights] doctrine with care." 603 U.S. at 131, 144 S.Ct. 2117.

In short, because the H-2A labor certification regulations mainly concern the federal government's local interest in domestic wages, DOL's action does not fit within the public rights exception to Article III adjudication.

C

[8] DOL's last-ditch argument is that Sun Valley did not preserve its Article III objection during administrative proceedings. By failing to raise this issue before the ALJ, DOL says, Sun Valley "either waived any Article III claim [ ] or failed to exhaust it." Dep't Br. 41. We disagree.

For its waiver argument, DOL relies on *Wellness International Network, Ltd. v. Sharif,* 575 U.S. 665, 135 S.Ct. 1932, 191 L.Ed.2d 911 (2015). That case addressed whether Article III permitted bankruptcy courts to hear non-core proceedings "with the consent of all the parties to the proceeding." *Id.* at 671, 135 S.Ct. 1932 (quoting 28 U.S.C. § 157(c)(2)). The Supreme Court answered yes, holding that "Article III is not violated when the parties knowingly and voluntarily consent to adjudication by a bankruptcy judge." *Id.* at 669, 135 S.Ct. 1932. Although knowing and voluntary consent could be implied, the Court explained, "the key inquiry [was] whether the litigant or counsel was made aware of the need for consent and the right to refuse it, and still voluntarily appeared to try the case before the non-Article III adjudicator." *Id.* at 685, 135 S.Ct. 1932 (citation modified).

These preconditions for implied consent are not present here. DOL points to no evidence that Sun Valley "was made aware

of the need for consent and the right to refuse it." *Id.* (citation modified). To the contrary, DOL's letter assessing civil penalties provided that "the determination of the Administrator shall become the final and unappealable Order of the Secretary" if "a request for a hearing [before an ALJ] is not received within the time specified." App. 150. So Sun Valley lacked any real choice about where it could challenge DOL's action, meaning that it "did not truly consent to" adjudication before an ALJ. *Wellness Int'l Network*, 575 U.S. at 681, 135 S.Ct. 1932 (citation modified).

**\*8** [9] [10] We also reject DOL's exhaustion argument. It is true that a party sometimes must exhaust issues it intends to raise during administrative, and later, judicial proceedings. *See Carr v. Saul*, 593 U.S. 83, 88, 141 S.Ct. 1352, 209 L.Ed.2d 376 (2021). But even assuming Sun Valley failed to exhaust its Article III claim before the agency, we may still consider it here. That's because a "nonjurisdictional, mandatory exhaustion requirement functions as an affirmative defense, and thus can be waived or forfeited by the government's failure to raise it." *Fleming v. United States Dep't of Agric.*, 987 F.3d 1093, 1099 (D.C. Cir. 2021); *see also Santos-Zacaria v. Garland*, 598 U.S. 411, 417, 143 S.Ct. 1103, 215 L.Ed.2d 375 (2023) (explaining that "[e]xhaustion is typically nonjurisdictional"). Because DOL did not raise a failure-to-exhaust defense before the District Court, we will "treat that argument as forfeited." *Simko v. United States Steel Corp.*, 992 F.3d 198, 205 (3d Cir. 2021). DOL has not offered any exceptional circumstances to excuse this forfeiture, so we will not address its exhaustion argument. *Cf. Freeman v. Pittsburgh Glass Works, LLC*, 709 F.3d 240, 250 (3d Cir. 2013) ("The doctrine of appellate waiver is not somehow exempt from itself. This means that a party can waive a waiver argument by not making the argument below or in its briefs." (citation omitted)).[6]

\* \* \*

An administrative tribunal ordered Sun Valley to pay civil penalties and back wages for breaching contractual obligations under the H-2A nonimmigrant visa program. Because Article III required the Department of Labor to instead proceed before a federal district court, we will reverse and remand with instruction to enter judgment in favor of Sun Valley.

**All Citations**

--- F.4th ----, 2025 WL 2112927

### Footnotes

1     DOL may enforce contractual obligations on behalf of both H-2A workers and workers in "corresponding employment," which can include U.S. workers. 29 C.F.R. § 501.0; *see also* 20 C.F.R. § 655.103(b) (defining "corresponding employment"). This "ensure[s] that foreign workers will not appear more attractive to the 'employer' than domestic workers, thus avoiding any adverse effects for domestic workers." *Garcia-Celestino v. Ruiz Harvesting, Inc.*, 843 F.3d 1276, 1285 (11th Cir. 2016).

2     Sun Valley also alleged that DOL's order was "not supported by substantial evidence," "an abuse of discretion," or "otherwise not in accordance with law." App. 136. The District Court dismissed that claim as well, but Sun Valley does not raise it on appeal.

3     Sun Valley argues on appeal that DOL's adjudication violates "Article III and, by extension, the Seventh Amendment." Sun Valley Br. 3. The Supreme Court has long recognized the close relationship between Article III and the Seventh Amendment. *See Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 53–54, 109 S.Ct. 2782, 106 L.Ed.2d 26 (1989). And in *Jarkesy*, the Court appeared to confirm their analytical similarity. *See* 603 U.S. at 134, 144 S.Ct. 2117. But because Sun Valley's complaint did not allege a violation of the Seventh Amendment, we consider only its challenge under Article III.

4     This contractual framing distinguishes the enforcement action here from the one we recently considered in *Axalta Coating Systems LLC v. FAA*, —— F.4th ——, 2025 WL 1934352 (3d Cir. July 15, 2025). That case considered whether the Seventh Amendment permitted the Federal Aviation Administration to seek civil penalties from a paint supplier through in-house proceedings. *Id.* at ——, 2025 WL 1934352 at *1. The action there involved "technical" hazardous materials regulations with no common law origins, which made it relevantly similar to the Supreme Court's decision in *Atlas Roofing Co. v. Occupational Safety & Health Review Commission*, 430 U.S. 442, 97 S.Ct. 1261, 51 L.Ed.2d 464 (1977). *Axalta*, —— F.4th at ——, 2025 WL 1934352, at *5. The enforcement action in this case, by contrast, resembles common law breach of contract, so *Atlas Roofing* does not control.

5     In a different context, we recently described back wages as an equitable remedy. *See NLRB v. Starbucks Corp.*, 125 F.4th 78, 96 (3d Cir. 2024). But because the back wages here were imposed to deter wrongdoers, rather than solely to provide restitution, they are properly characterized as legal. *See Jarkesy*, 603 U.S. at 123, 144 S.Ct. 2117.

6     Because we hold that DOL's enforcement action violated Article III, we need not reach Sun Valley's alternative statutory, Article II, and Eighth Amendment arguments.

---

**End of Document**                                              © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2025 WL 2200923
Only the Westlaw citation is currently available.
United States District Court, N.D. Texas, Fort Worth
Division.

WULFERIC, LLC, Plaintiff,

v.

U.S. FOOD AND DRUG ADMINISTRATION, et al.,
Defendants.

Civil Action No. 4:24-cv-01183-O
|
Signed August 1, 2025

**West Codenotes**

**Held Unconstitutional**

21 U.S.C.A. § 333(f)(9)

**Attorneys and Law Firms**

Emily Felix, McDowell Hetherington LLP, Arlington, TX;
Eric Heyer, James Christopher Fraser, Thompson Hine LLP,
Washington, DC, for Plaintiff.

James W. Harlow, Department of Justice, Washington, DC,
for Defendants.

__MEMORANDUM OPINION & ORDER__

Reed O'Connor, UNITED STATES DISTRICT JUDGE

**\*1** Before the Court are Plaintiff's Motion for a Preliminary
Injunction, Brief, and Appendix in Support (ECF Nos. 3–5);
Defendants' Response (ECF No. 13); and Plaintiff's Reply
(ECF No. 22). Also before the Court are Defendants' Motion
for Summary Judgment, Brief, and Appendix in Support
(ECF Nos. 14–16); Plaintiff's Response (ECF No. 21); and
Defendants' Reply (ECF No. 24). Additionally, before the
Court are Plaintiff's Cross-Motion for Summary Judgment
and Brief in Support (ECF Nos. 20–21) and Defendants'
Response (ECF No. 25). Finally, before the Court are
Defendants' Notice of Subsequent Authority (ECF No. 26)
and Plaintiff's Responses (ECF Nos. 27–28).

At Plaintiff's consent, the Court consolidates Plaintiff's
Motion for a Preliminary Injunction with the parties'
summary judgment briefing to issue a final decision.
Accordingly, for the reasons stated in this opinion, the Court
**GRANTS** Plaintiff's Cross-Motion for Summary Judgment
(ECF No. 20) and **DENIES** Defendants' Motion for
Summary Judgment (ECF No. 14).

**I. BACKGROUND**

Plaintiff Wulferic, LLC makes and sells tobacco products
under the trade name Vapor Lab ("Vapor Lab").[1] It is
therefore subject to the Food, Drug, and Cosmetic Act
("FDCA"), 21 U.S.C. § 301, *et seq.*, as amended by the
Family Smoking Prevention and Tobacco Control Act
("TCA"), Pub. L. No. 111–31, 123 Stat. 1776 (2009)
(codified at 21 U.S.C. § 387, *et seq.*).[2] In the FDCA,
Congress authorized the imposition of civil money penalties
through an administrative process for certain violations of
the law. *See* 21 U.S.C. § 333(f). The TCA extended this
administrative authority to violations relating to tobacco
products. *See id.* § 333(f)(9). Pursuant to that authority, the
FDA initiated an administrative proceeding against Vapor
Lab. Vapor Lab in turn filed this lawsuit as a collateral attack
on that proceeding, arguing that the FDCA's civil money
penalty provision—and, by extension, the proceeding
itself—violates Vapor Lab's Seventh Amendment right to a
jury trial.

**A. The Regulatory Regime**

In accordance with its power to regulate interstate
commerce, Congress passed the FDCA in 1938. *See* 75 Pub.
L. No. 717, 52 Stat. 1040 (describing the Act as one "[t]o
prohibit the movement in interstate commerce of adulterated
and misbranded food, drugs, devices, and cosmetics").
Finding that previous efforts to regulate the marketing of
tobacco products "failed adequately to curb tobacco use by
adolescents," Congress amended the FDCA in 2009 to
provide more "comprehensive restrictions on the sale,
promotion, and distribution of such products."[3]

Tobacco manufacturers must apply for and receive approval
from the Food and Drug Administration ("FDA") before
marketing any "new tobacco product." 21 U.S.C. § 387j. If a
new tobacco product has not undergone premarket review
and received authorization, it is deemed "adulterated." *Id.* §
387b(6). The FDCA makes it unlawful to cause a tobacco

Wulferic, LLC v. U.S. Food and Drug Administration, --- F.Supp.3d ---- (2025)
Case 2:24-cv-00988-WSS    Document 47    Filed 09/16/25    Page 14 of 27

2025 WL 2200923

product to become adulterated or misbranded after it or its components moved in interstate commerce and while it is held for sale. *Id.* § 331(k).

**\*2** The FDA is the agency tasked with enforcing this regime. The FDA's Center for Tobacco Products ("CTP") investigates violations of tobacco-product requirements and commences enforcement proceedings within the Departmental Appeals Board ("DAB").[4] Both the FDA and DAB are divisions of the U.S. Department of Health and Human Services ("HHS").[5] Administrative law judges ("ALJs") within the Civil Remedies Division of the DAB preside over the FDA's enforcement proceedings.[6]

The FDA's Commissioner of Food and Drugs is authorized to assess a "civil penalty" or impose a "no-tobacco-sale order" for violations of the premarket requirements.[7] *Id.* § 333(f)(5), (9). "In determining the amount of a civil penalty," the following factors shall be considered: "the nature, circumstances, extent, and gravity of the violation or violations and, with respect to the violator, ability to pay, effect on ability to continue to do business, any history of prior such violations, the degree of culpability, and such other matters as justice may require." *Id.* § 333(f)(5)(B).

The FDCA provides a twofold appeals process if a civil money penalty is assessed against a tobacco company. First, the tobacco company may appeal to a panel of three ALJs within the Appellate Division of DAB.[8] After exhausting this administrative process, the tobacco company may seek judicial review in the United States Court of Appeals for the District of Columbia Circuit or in any other circuit in which the company conducts business. *Id.* § 333(f)(6).

### B. The Underlying Administrative Proceeding Against Vapor Lab

On September 16, 2024, the FDA's CTP filed an administrative complaint for a civil money penalty of $20,678 against Vapor Lab in the Civil Remedies Division of the DAB.[9] CTP's administrative complaint alleges that Vapor Lab sells "adulterated" and "misbranded" tobacco products—e-liquids that have not been authorized for sale by the FDA.[10]

On October 21, 2024, Vapor Lab filed its answer to the administrative complaint.[11] In its answer, Vapor Lab stated that it does not waive its Seventh Amendment right to a jury

trial and therefore the Seventh Amendment prohibits the DAB from adjudicating its case.[12] The case was assigned to a DAB ALJ for hearing and decision.[13]

On March 10, 2025, CTP moved for summary decision, the administrative equivalent of summary judgment.[14] On March 26, 2025, the ALJ adjudicating the case stayed the hearing pending a ruling on CTP's motion for summary decision.[15] As of June 9, 2025, the ALJ had not yet ruled on CTP's motion for summary decision, and no hearing date had been set.[16]

### C. This Lawsuit

On December 3, 2024, Vapor Lab filed this lawsuit against HHS, the Secretary of HHS, the FDA, and the FDA Commissioner (collectively, "FDA").[17] Vapor Lab's Complaint alleges that "[u]nder the Supreme Court's ruling in *SEC v. Jarkesy*, ... Defendants' administrative proceeding violates Plaintiff's right to a jury trial under the Seventh Amendment."[18]

**\*3** Vapor Lab seeks a declaration that both "the FDCA's civil money penalty *provisions* for tobacco products" and "the FDA's civil money penalty *proceeding* against [Vapor Lab]" violate the Seventh Amendment.[19] Vapor Lab also seeks an injunction: (1) requiring the DAB to dismiss with prejudice the administrative complaint against Vapor Lab; (2) prohibiting HHS and the FDA from adjudicating civil money penalties in the administrative proceeding against Vapor Lab; and (3) prohibiting HHS and the FDA from adjudicating civil money penalties in administrative proceedings entirely.[20]

The parties filed Motions for Summary Judgment.[21] Vapor Lab initially filed a Motion for a Preliminary Injunction, but "consents to the Court consolidating the preliminary injunction motion with the parties' summary judgment briefing to reach a final decision on [Vapor Lab's] claim in accordance with Federal Rule of Civil Procedure 65(a)(2)."[22]

## II. LEGAL STANDARDS

### A. Subject Matter Jurisdiction

Federal district courts have jurisdiction over cases "arising under" federal law. U.S. Const. art. III, § 2, cl. 1. With respect to federal agencies, however, Congress can "divest[ ] district courts of their ordinary jurisdiction" by substituting "an alternative scheme of review" within an agency—where

the agency's final decision is reviewable by an Article III court of appeals. *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 185, 143 S.Ct. 890, 215 L.Ed.2d 1273 (2023). Sometimes Congress does so in explicit terms, "providing in so many words that district court jurisdiction will yield." *Id.* Other times, it does so implicitly, leaving open the question whether the statutory review scheme is exclusive. *Id.*

In the latter case, when a party to an administrative proceeding seeks collateral review in district court, the district court must ask whether the statute precludes its jurisdiction. *Id.* If "the particular claims brought [are] 'of the type Congress intended to be reviewed within this statutory structure,' " the district court should decline to hear the case. *Id.* at 186, 143 S.Ct. 890 (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 212, 114 S.Ct. 771, 127 L.Ed.2d 29 (1994)).

To guide this inquiry—and prevent courts from engaging in guesswork about Congress's intent—the Supreme Court in *Thunder Basin* presented three questions: "First, could precluding district court jurisdiction 'foreclose all meaningful judicial review' of the claim?" *Id.* (quoting *Thunder Basin*, 510 U.S. at 212–13, 114 S.Ct. 771). "Next, is the claim 'wholly collateral to [the] statute's review provisions?' " *Id.* (quoting *Thunder Basin*, 510 U.S. at 212, 114 S.Ct. 771 (alteration in original)). "And last, is the claim 'outside the agency's expertise?' " *Id.* (quoting *Thunder Basin*, 510 U.S. at 212–13, 114 S.Ct. 771). "When the answer to all three questions is yes, '[courts] presume that Congress does not intend to limit [the district court's] jurisdiction.' " *Id.* (quoting *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 489, 130 S.Ct. 3138, 177 L.Ed.2d 706 (2010)).

Because at issue is the district court's jurisdiction—its very power to hear the case—there is substantial authority that the district court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case. *Williamson v. Tucker*, 645 F.2d 404, 412–13 (5th Cir. 1981). In short, no presumptive truthfulness attaches to a plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims. *Id.* at 413.

**B. Summary Judgment**

*4 A movant is entitled to summary judgment if by the pleadings and evidence it can show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[S]ummary judgment is appropriate where the only issue before the court is a pure question of law." *Sheline v. Dun & Bradstreet Corp.*, 948 F.2d 174, 176 (5th Cir. 1991).

**III. ANALYSIS**

Although the FDCA provides for an internal review process followed by review in a U.S. Court of Appeals *after* a final order has been issued—which does not involve the district courts—Vapor Lab seeks to establish the jurisdiction of this Court to hear its challenge *before* a final order has been issued. The parties agree the statutory review scheme raises a question of implicit, rather than explicit preclusion; therefore, this Court applies the *Thunder Basin* factors to assess its jurisdiction. As the Court will explain, the FDCA does not preclude this Court's jurisdiction over Vapor Lab's challenge. Therefore, the Court proceeds to the merits.

To that end, the Court asks first whether the administrative action against Vapor Lab implicates the Seventh Amendment—an analysis rooted in the text, history, and tradition of the Seventh Amendment. If the action implicates the Seventh Amendment, the Court next asks whether a narrow exception applies. Namely, if the action concerns "public rights," then the matter may be assigned to an agency for adjudication without offending the Seventh Amendment. The Court concludes in turn that the administrative adjudication implicates the Seventh Amendment, and the public rights exception does not apply. Therefore, Vapor Lab is entitled to declaratory and injunctive relief.

**A. Jurisdiction**

*Axon Enterprises v. FTC* presents the classic type of challenge that district courts can review on collateral attack, despite the agency's provision of a direct review process after a final order. *See* 598 U.S. at 180, 143 S.Ct. 890 (charging "that the agencies, as currently structured, are unconstitutional in much of their work"). Vapor Lab therefore seeks to align itself with *Axon* to establish this Court's jurisdiction, while the FDA attacks Vapor Lab for its "inapt analogy between this case and *Axon.*"[23]

The Court begins with the question whether Vapor Lab's challenge is indeed analogous to *Axon*, or whether it is more like the cases *Axon* distinguished. *See id.* at 186–89, 143 S.Ct. 890. Indeed, before applying the *Thunder Basin* factors, the Supreme Court in *Axon* undertook a "30,000-foot view of the issue" by situating its challenge in relation to others that have been analyzed under *Thunder Basin*. *Id.* at 189, 143 S.Ct. 890. This Court's jurisdictional analysis therefore proceeds in the same manner as *Axon's*.

### 1. The "30,000-foot view of the issue"

One way of distilling the implicit-preclusion analysis is to compare Vapor Lab's Seventh Amendment claim to other constitutional claims that have been analyzed under *Thunder Basin.* Two sets of Supreme Court precedent are relevant. In one set of cases—*Thunder Basin* itself and *Elgin v. Department of Treasury*—the Supreme Court concluded that the constitutional claims were subject to the statutory review schemes and thus the district courts lacked jurisdiction. *Thunder Basin*, 510 U.S. at 216, 114 S.Ct. 771; *Elgin v. Dep't of Treasury*, 567 U.S. 1, 23, 132 S.Ct. 2126, 183 L.Ed.2d 1 (2012). In the other—*Axon* and *Free Enterprise*—the Supreme Court decided the constitutional claims stood outside the statutory review schemes because they were challenges to "the structure or very existence of an agency." *Axon*, 598 U.S. at 189, 143 S.Ct. 890; *Free Enterprise*, 561 U.S. at 491, 130 S.Ct. 3138. The Court addresses the latter cases first.

#### i. *Axon and Free Enterprise*

**\*5** The constitutional challenges in *Axon* and *Free Enterprise* charge that "some fundamental aspect of the [agency's] structure violates the Constitution." *Axon*, 598 U.S. at 182, 143 S.Ct. 890 (double-for-cause removal protections, in violation of Article II's Vesting Clause; and combination of prosecutorial and adjudicatory functions in a single agency, in violation of separation-of-powers principles); *Free Enterprise*, 561 U.S. at 484, 130 S.Ct. 3138 (double-for-cause removal protections, in violation of Article II's Vesting Clause).

The challenges are "structural" in two senses. First, they are structural with respect to the *agency*. *Axon* expressly delineates challenges to a "substantive decision" within the agency or to the "commonplace procedures agencies use to

make such a decision" from challenges to the "structure or very existence of an agency." *Axon*, 598 U.S. at 189, 143 S.Ct. 890. Second, they are structural with respect to the *Constitution*, as they implicate the division of power between branches. Together, "[t]hey charge that an agency is wielding authority unconstitutionally in all or a broad swath of its work." *Id.*

As *Axon* and *Free Enterprise* show, structural defects present a "fruit-of-the-poisonous-tree" problem. Because part of the agency is tainted, all work carried out under that (unconstitutional) authority is tainted as well. For example, in *Free Enterprise*, the Board's " 'freedom from Presidential oversight' rendered unconstitutional 'all power and authority [the Board] exercised.' " *Id.* (quoting *Free Enterprise*, 561 U.S. at 508, 130 S.Ct. 3138). "The Article II challenges in [*Axon*] would likewise prevent ALJs—through whom the Commissions do much of their work—from exercising any power, unless they lose their double-for-cause tenure protection." *Id.*

Finally, "being subjected to unconstitutional agency authority" in an administrative proceeding is a "here-and-now injury." *Id.* at 191, 143 S.Ct. 890 (internal quotation marks and citation omitted). Because "[a] proceeding that has already happened cannot be undone," an agency's direct review scheme should pose no independent bar to district court jurisdiction. *Id.* In other words, a person subject to such proceedings has a "right[ ] not to undergo the complained-of agency proceedings" and should be able to assert that right on collateral review in district courts. *Id.* at 192, 143 S.Ct. 890.

#### ii. *Thunder Basin and Elgin*

Not all constitutional challenges involving federal agencies are reviewable by district courts. Take *Thunder Basin*, for example, where a coal company brought a pre-enforcement challenge to its statutory obligations under the Mine Act. *Thunder Basin*, 510 U.S. at 204–05, 114 S.Ct. 771. Although the Mine Act funneled challenges through the Federal Mine Safety and Health Review Commission, the coal company sought to challenge the Mine Act first in federal district court. *Id.* The coal company's primary contention was that its obligations under the Mine Act conflicted with its rights under the National Labor Relations Act. *Id.* But it also argued that the Mine Act's "comply-or-incur-penalties" requirement violated the Due Process Clause of the Fifth

Amendment because it deprived the coal company of a hearing. *Id.* at 205, 114 S.Ct. 771; *see also Axon*, 598 U.S. at 187, 143 S.Ct. 890.

The Supreme Court held that both claims could be meaningfully reviewed through the statutory review process and thus the district court lacked jurisdiction. *Thunder Basin*, 510 U.S. at 218, 114 S.Ct. 771. The due process challenge was not the only claim raised, nor was it the central claim; rather, "[t]he crux of the dispute" was the alleged conflict between federal labor laws. *Axon*, 598 U.S. at 186, 143 S.Ct. 890. And the "Commission ... had 'extensive experience' in addressing the statutory issues raised, and could resolve them in ways that 'brought to bear' its 'expertise' over the mining industry." *Id.* at 187, 143 S.Ct. 890. "All that was less so, ... of the company's constitutional challenge; but that claim could be 'meaningfully addressed in the Court of Appeals.' " *Id.* The Supreme Court also considered, as a mitigating factor in precluding district court review, that the reviewing court was an "independent commission," rather than "the agency itself." *Thunder Basin*, 510 U.S. at 215, 114 S.Ct. 771.

**\*6** In *Elgin*, a federal employee was discharged from his employment for failing to register for the draft in accord with federal law. *Elgin*, 567 U.S. at 6–7, 132 S.Ct. 2126. He sued in federal district court, arguing that the draft law violated the Equal Protection Clause by excluding women. *Id.* at 7, 132 S.Ct. 2126; *see also Axon*, 598 U.S. at 187, 143 S.Ct. 890. The Supreme Court held that the Merit Systems Protection Board ("MSPB") was the exclusive gateway "for reviewing personnel action taken against federal employees" and thus the district court lacked jurisdiction over his claim. *Id.* at 5, 132 S.Ct. 2126 (quoting *United States v. Fausto*, 484 U.S. 439, 455, 108 S.Ct. 668, 98 L.Ed.2d 830 (1988)). The Supreme Court characterized Elgin's constitutional claim as merely the "vehicle" by which he sought to be reinstated and receive backpay—"precisely the type of personnel action regularly adjudicated by the MSPB." *Id.* at 22, 132 S.Ct. 2126.

\* \* \*

The Supreme Court in *Axon* framed the challenge in *Elgin* as a challenge to a "substantive decision" of the agency ("firing an employee"). *Axon*, 598 U.S. at 189, 143 S.Ct. 890. Likewise, the Court framed *Thunder Basin*'s due process claim as a challenge to a "substantive decision" of the agency ("fining a company") or to "the commonplace

procedures" used by the agency. *Id.* The question, according to *Axon*, is whether the "agency is wielding authority unconstitutionally in all or a broad swath of its work." *Id.* So, if a constitutional challenge implicates the agency's authority, and if the constitutional violation would taint "all or a broad swath of [an agency's] work," then the claim would be like those in *Axon* and *Free Enterprise. Id.*

With this context, the Court explains why Vapor Lab's Seventh Amendment challenge is more like *Axon* and *Free Enterprise*, and less like the others.

### iii. Vapor Lab's Challenge

The Seventh Amendment provides that "[i]n [s]uits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise re-examined in any court of the United States, than according to the rules of the common law." U.S. Const. amend. VII. At first glance, Vapor Lab's Seventh Amendment challenge looks a lot like the due process challenge in *Thunder Basin*—both could be framed as alleging that the agency's enabling statute is void of a procedural protection. Indeed, that is how the FDA characterizes Vapor Lab's challenge.[24] But Vapor Lab's claim is not actually about the procedures the FDA uses; it is about the FDA's *power* to adjudicate the action within an administrative tribunal.

Even though Vapor Lab does not bring an Article III challenge per se, a Seventh Amendment challenge to administrative proceedings necessarily raises an Article III challenge. *See SEC v. Jarkesy*, 603 U.S. 109, 120–40, 144 S.Ct. 2117, 219 L.Ed.2d 650 (2024); *see also Gaudet v. United States*, 517 F.2d 1034, 1035 (5th Cir. 1975) ("It is the substance of the claim and not the language used in stating it which controls."). That is because the Seventh Amendment applies to "[s]uits at common law," and "[t]he Constitution prohibits Congress from 'withdraw[ing] from judicial cognizance [i.e., Article III] any matter which, from its nature, is the subject of a suit at the common law.' " U.S. Const. amend. VII; *Jarkesy*, 603 U.S. at 127, 144 S.Ct. 2117 (quoting *Murray's Lessee v. Hoboken Land & Improvement Co.*, 18 How. 272, 284, 15 L.Ed. 372 (1856)). So, if the agency's action qualifies as a suit at common law, then the Seventh Amendment right to a jury trial is triggered *and* adjudication by an Article III court is mandatory.

Case 2:24-cv-00988-WSS    Document 47    Filed 09/16/25    Page 18 of 27
Wulferic, LLC v. U.S. Food and Drug Administration, --- F.Supp.3d ---- (2025)
2025 WL 2200923

**\*7** The Supreme Court's recent decision in *SEC v. Jarkesy* illustrates this point. There, the Supreme Court held that when the Securities and Exchange Commission ("SEC") brings an enforcement action seeking civil penalties for fraud, it implicates the Seventh Amendment right to a jury trial. *Jarkesy*, 603 U.S. at 121–26, 144 S.Ct. 2117. Because the SEC adjudicated the dispute in its own tribunal,[25] the Court also asked "whether the 'public rights' exception to Article III jurisdiction applies."[26] *Id.* at 120, 127–40, 144 S.Ct. 2117. The public rights "exception has been held to permit Congress to assign certain matters to agencies for adjudication even though such proceedings would not afford the right to a jury trial." *Id.* at 120, 144 S.Ct. 2117. The Supreme Court decided no such exception to Article III adjudication applied; therefore, the petitioners were "entitled to a jury trial *in an Article III court.*" *Id.* at 140, 144 S.Ct. 2117 (emphasis added).

Although *Jarkesy* was a Seventh Amendment case, Article III was also a focal point in the Supreme Court's analysis. *All* Justices agreed on why that was. "The Seventh Amendment's jury-trial right does not work alone," Justice Gorsuch explained in his and Justice Thomas's concurrence. *Id.* at 141, 144 S.Ct. 2117 (Gorsuch, J., concurring). It works in concert with Article III and the Due Process Clause of the Fifth Amendment to "vindicate the Constitution's promise of a 'fair trial in a fair tribunal.' " *Id.* The majority likewise explained:

> A defendant facing a fraud suit has the right to be tried by a jury of his peers before a neutral adjudicator. Rather than recognize that right, the dissent would permit Congress to concentrate the roles of prosecutor, judge, and jury in the hands of the Executive Branch. That is the very opposite of the separation of powers that the Constitution demands.

*Id.* at 140, 144 S.Ct. 2117 (majority opinion).

The dissenting Justices decided the SEC's action concerned public rights, and thus the action could be adjudicated outside of Article III. *Id.* at 197, 144 S.Ct. 2117 (Sotomayor, J., dissenting). But despite reaching a different conclusion on that issue, Justice Sotomayor agreed with the remaining Justices on the import of Article III to the analysis. "Although this case involves a Seventh Amendment challenge," Justice Sotomayor explained, "the principal question at issue is one rooted in Article III and the

separation of powers." *Id.* at 171, 144 S.Ct. 2117. "[A]s the majority rightly acknowledges, the Seventh Amendment's jury-trial right 'applies' only in 'an Article III court.' " *Id.* So, a Seventh Amendment challenge is necessarily a challenge to the *forum* in which the action is being adjudicated. And a conclusion that the forum is appropriate, i.e., "that Congress properly assigned a matter to an agency for adjudication," she explained, "necessarily 'resolves [any] Seventh Amendment challenge.' " *Id.* at 172, 144 S.Ct. 2117 (quoting *Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*, 584 U.S. 325, 345, 138 S.Ct. 1365, 200 L.Ed.2d 671 (2018) (alteration in original)).

Because a Seventh Amendment challenge to an agency proceeding is so closely intertwined with Article III, Vapor Lab necessarily presents a structural constitutional challenge, like those in *Axon* and *Free Enterprise* that attack how the agency is wielding its authority. There are no jury trials in administrative tribunals. So, either Vapor Lab *is* entitled to a jury trial and the FDA's administrative proceeding must cease, or Vapor Lab is *not* entitled to a jury trial and the FDA's action can proceed. Either way, because Vapor Lab's claim implicates the FDA's power to proceed at all, Vapor Lab may assert the *Axon* and *Free Enterprise* "here-and-now injury" of subjection to an "illegitimate proceeding." *Axon*, 598 U.S. at 191, 143 S.Ct. 890. That is so even when the defect is found in the forum rather than the decisionmaker.

**\*8** Here, too, the difference between Vapor Lab's claim and *Thunder Basin*'s due process challenge becomes clearer. There were no proceedings to challenge in *Thunder Basin.* Indeed, the whole point of the due process challenge to the statute was that it permitted the agency to impose a fine *without* process. The coal company thus could not claim the *Axon* and *Free Enterprise* here-and-now injury of subjection to an illegitimate proceeding. Nor had the coal company been fined yet. *Thunder Basin*, 510 U.S. at 216, 114 S.Ct. 771. The coal company tried to frame its injury as a Hobson's Choice between complying with the statute and suffering hardship, or not complying and getting fined. *Id.* at 205, 114 S.Ct. 771. But the Supreme Court found the factual record did not support such an injury. *Id.* at 216–18, 114 S.Ct. 771. Therefore, the agency would have to make the substantive decision of imposing a fine first.

By contrast, Vapor Lab does not have to wait until the agency takes some concrete action—engaging in factfinding or imposing a fine—before it can be heard on its constitutional challenge. "What makes the difference here is

the nature of the claims and accompanying harms that [Vapor Lab is] asserting." *Axon*, 598 U.S. at 192, 143 S.Ct. 890. Vapor Lab's claim is that the underlying adjudication is occurring in a forum that deprives Vapor Lab of its right to a jury trial.[27] Its corresponding injury is subjection to a potentially illegitimate proceeding, based on a potentially illegitimate forum. Under *Axon* and the precedents *Axon* relied on, this is a legally cognizable injury. *See id.* at 191, 143 S.Ct. 890.

It should be evident, then, why Vapor Lab's challenge is more like the constitutional challenges in *Axon* and *Free Enterprise*, and less like those in *Thunder Basin* and *Elgin*.[28] Nonetheless, one difference is worth mentioning: The constitutional violations occur at different levels of the agencies. In *Axon* and *Free Enterprise*, the "taint" spawned from unconstitutional tenure protections for officials at the highest level of the agencies. *See Free Enterprise*, 561 U.S. at 508, 130 S.Ct. 3138 (the Board); *Axon*, 598 U.S. at 189, 143 S.Ct. 890 (ALJs, "through whom the Commissions do much of their work"). By contrast, here, the taint would appear in a more particular sense; that is, in every proceeding seeking civil money penalties. But the Court sees no reason why this difference is material.

For a claim to implicate *Axon* and *Free Enterprise*, it must only charge that an agency is wielding unconstitutional authority in "all or a broad swath of [an agency's] work." *Axon*, 598 U.S. at 189, 143 S.Ct. 890. By the FDA's own admission, it does. The FDA explains that "[c]ivil money penalties are one of CTP's most impactful enforcement tools."[29] Specifically, "[t]hrough November 30, 2024, CTP has brought 35,883 total civil money penalty actions."[30] Given the sheer volume of civil money penalties the FDA says it brings, a claim that those proceedings are illegitimate indeed strikes at "a broad swath of its work." *Id.*

All of this is to say: Vapor Lab's challenge is like those in *Axon* and *Free Enterprise*, over which the district courts had jurisdiction. And this "30,000-foot view" should "end[ ] up a good proxy" for the analysis under *Thunder Basin*. *Id.*

### 2. *Thunder Basin* Factors

**\*9** Indeed, application of the *Thunder Basin* factors produces the same result as the "30,000-foot view." *Axon*, 598 U.S. at 189, 143 S.Ct. 890. "Each of the three *Thunder Basin* factors

signals that a district court has jurisdiction to adjudicate" Vapor Lab's claim. *Id.*

### i. Whether Precluding District Court Jurisdiction Could Foreclose All Meaningful Judicial Review

"The first *Thunder Basin* factor recognizes that Congress rarely allows claims about agency action to escape effective judicial review." *Axon*, 598 U.S. at 186, 143 S.Ct. 890. On this point, the FDA argues that *Jarkesy* is demonstrative.[31] Unlike this case, "the Seventh Amendment claim [in *Jarkesy*] reached the Supreme Court *after* direct review by the Fifth Circuit of the [SEC's] final order."[32] Because the FDA's direct review process is similar to the SEC's, the FDA argues that Vapor Lab could seek judicial review of its Seventh Amendment claim in the same manner that *Jarkesy* petitioners did.[33] In other words, precluding district court jurisdiction now would not "foreclose all meaningful judicial review." *Thunder Basin*, 510 U.S. at 212–13, 114 S.Ct. 771.

The FDA's argument is too presumptuous. Because the FDCA conditions review on an *adverse* final order, the FDA assumes it will prevail in its action against Vapor Lab. *See* 21 U.S.C. § 333(f)(6) ("Any person ... who is *aggrieved by* an order assessing a civil penalty ... may file a petition for judicial review of such order." (emphasis added)). But if Vapor Lab prevails, it will be estopped from ever asserting its Seventh Amendment challenge. Collateral review guarantees Vapor Lab that opportunity.

Even if the FDA does prevail and Vapor Lab appeals the adverse final order, "[j]udicial review ... would come too late to be meaningful." *Axon*, 598 U.S. at 191, 143 S.Ct. 890. That is because, as *Axon* acknowledges, "[a] proceeding that has already happened cannot be undone." *Id.* Nothing, short of enjoining the proceedings entirely, would redress Vapor Lab's injury of subjection to illegitimate proceedings, if indeed they are illegitimate.[34]

In any event, the first *Thunder Basin* factor is not concerned with whether a plaintiff could obtain meaningful *relief* through the statutory review scheme, but whether the plaintiff could obtain meaningful *review*. *Thunder Basin*, 510 U.S. at 212–13, 114 S.Ct. 771. Because there is some possibility that judicial review of Vapor Lab's claim could be foreclosed if not heard now, the first *Thunder Basin* factor weighs in favor of this Court's jurisdiction.

#### ii. Whether the Claim is Wholly Collateral

**\*10** *Axon* holds that a challenge is necessarily "collateral" if it challenges the agency's power to proceed at all. 598 U.S. at 192–93, 143 S.Ct. 890. So, here, where Vapor Lab's challenge is to the FDA's power to proceed, it is collateral.

The FDA nonetheless asserts that Vapor Lab's claim "is entirely contingent upon" how the underlying proceedings unfold.[35] According to the FDA, Vapor Lab's Seventh Amendment claim is "only" about "the resolution of factual disputes by an administrative decisionmaker."[36] Therefore, the right to a jury trial can only be infringed upon a specific event—factfinding—and not as soon as the proceeding commences, as in *Axon*.[37] Indeed, the FDA argues the right may never "accrue" if the case is decided on the agency's equivalent of summary judgment (i.e., without any factfinding).[38]

The Seventh Amendment may operate like this in an Article III court, but not in an administrative tribunal, where there are no jury trials. If Vapor Lab is entitled to a jury trial, then Vapor Lab is necessarily entitled to an Article III adjudication, and the agency adjudication must cease. So, the collateral factor favors Vapor Lab for the same reason as in *Axon*, where the plaintiffs were "challenging the Commissions' power to proceed at all, rather than actions taken in the agency proceedings." *Id.* at 192, 143 S.Ct. 890.

#### iii. Whether the Claim is Outside the Agency's Expertise

"The second and third [*Thunder Basin* factors] reflect in related ways the point of special review provisions—to give the agency a heightened role in the matters it customarily handles, and can apply distinctive knowledge to." *Axon*, 598 U.S. at 186, 143 S.Ct. 890. Here, because this challenge raises complex "questions of administrative and constitutional law, detached from considerations of agency policy," it falls outside the FDA's expertise. *Id.* at 194, 143 S.Ct. 890 (internal quotation marks omitted).

\* \* \*

For the foregoing reasons, the Court concludes that Vapor Lab's Seventh Amendment challenge is not "the type" that Congress intended to be reviewed within the statutory scheme. *Thunder Basin*, 510 U.S. at 212, 114 S.Ct. 771. Thus, the Court has jurisdiction to review the challenge now.

#### B. Summary Judgment

Having established this Court's jurisdiction, the Court turns to the merits: whether the FDCA's civil money penalty provision, 21 U.S.C. § 333(f)(9), and the FDA's proceeding against Vapor Lab violate the Seventh Amendment.[39] The analysis is twofold. "The threshold issue is whether this action implicates the Seventh Amendment." *Jarkesy*, 603 U.S. at 120, 144 S.Ct. 2117. If the action "does implicate the Seventh Amendment, [the Court] next consider[s] whether the 'public rights' exception to Article III jurisdiction applies." *Id.* If the public rights exception applies, the Seventh Amendment is not offended.

#### 1. The Seventh Amendment

The first question is whether the FDA's enforcement proceeding qualifies as a "[s]uit at common law" such that the Seventh Amendment is implicated. U.S. Const. amend. VII. "[A] jury trial was customary in suits brought in the English law courts," but "cases tried in courts of equity or admiralty [did] not require a jury trial." *Tull v. United States*, 481 U.S. 412, 417, 107 S.Ct. 1831, 95 L.Ed.2d 365 (1987). Thus, the Seventh Amendment applies to suits traditionally decided in English law courts. *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 42, 109 S.Ct. 2782, 106 L.Ed.2d 26 (1989).

**\*11** On this question, courts have been instructed to decide whether the cause of action and the remedy it provides have common law analogues. *Id.* "First, we compare the statutory action to 18th-century actions brought in the courts of England prior to the merger of the courts of law and equity. Second, we examine the remedy sought and determine whether it is legal or equitable in nature." *Tull*, 481 U.S. at 417–18, 107 S.Ct. 1831. Because some causes of action sound in both law and equity, the remedy is the "more important" consideration. *Jarkesy*, 603 U.S. at 123, 144 S.Ct. 2117 (citation omitted).

In *Jarkesy* and a recent Fifth Circuit case involving a Seventh Amendment challenge to the Federal Communications Commission's civil money penalty proceedings, the remedy was "all but dispositive." *See id.* at

123, 144 S.Ct. 2117 ("[C]ivil penalt[ies are] a type of remedy at common law that could only be enforced in courts of law." (citation omitted) (second alteration in original)); *AT&T, Inc. v. FCC*, 135 F.4th 230, 236 (5th Cir. 2025) ("The Commission's civil penalties 'are the prototypical common law remedy.' "). There is no reason to suppose that this civil penalty remedy should be any different.

Indeed, the civil money penalty scheme here shares the same features as that in *Jarkesy.* First, the penalty is "designed to punish or deter the wrongdoer" by requiring consideration of such factors as the "gravity of the violation ... history of prior such violations, [and] the degree of culpability." *Jarkesy*, 603 U.S. at 123, 144 S.Ct. 2117; 21 U.S.C. § 333(f)(5)(B). Second, there are "enhanced" penalties for certain intentional violations. *See Jarkesy*, 603 U.S. at 124, 144 S.Ct. 2117; 21 U.S.C. § 333(f)(9)(B). Third, this scheme is not intended to "restore the status quo" by returning money to victims; rather, the collections are "deposited as miscellaneous receipts in the Treasury of the United States." *Jarkesy*, 603 U.S. at 124, 144 S.Ct. 2117; 21 C.F.R. § 17.54. Thus, the FDCA's civil money penalty remedy is legal in nature, like those in *Jarkesy* and *AT&T.*

In both of those cases, too, the cause of action had a clear common law analogue. *See Jarkesy*, 603 U.S. at 125–26, 144 S.Ct. 2117 (fraud); *AT&T*, 135 F.4th at 237–38 (negligence). But here, Vapor Lab struggles to identify common law roots for the FDA's cause of action. In essence, the FDA's cause of action is a licensing requirement. Tobacco manufacturers must apply for and receive approval from the FDA before marketing any "new tobacco product." 21 U.S.C. § 387j. If a new tobacco product has not undergone premarket review and received authorization, it is deemed "adulterated." *Id.* § 387b(6). The FDA in turn has a cause of action against a company that causes a tobacco product to become adulterated (i.e., fails to obtain a license) while it is held for sale after shipment of one or more of its components in interstate commerce. *Id.* § 331(k).

Vapor Lab does not argue that garden-variety common law causes of action like fraud or negligence are analogous to this scheme. *Cf. Jarkesy*, 603 U.S. at 125–26, 144 S.Ct. 2117 (fraud); *AT&T*, 135 F.4th at 237–38 (negligence). Instead, Vapor Lab cites: (1) a 1785 Massachusetts statute authorizing criminal penalties for selling any "diseased, corrupted, contagious, or unwholesome provisions"; (2) a 1787 South Carolina case concerning a person criminally charged with selling liquor without a license; and (3) a 1787

Pennsylvania case of a ship owner who transported goods without paying taxes and thus faced statutory forfeiture of his ship.[40]

Whether the statutes referenced in these examples "target the same basic conduct" as the FDA's cause of action, they are deficient as an evidentiary matter. *Jarkesy*, 603 U.S. at 125, 144 S.Ct. 2117. The Seventh Amendment recognizes the right to a jury trial in civil "[s]uits at common law," but Vapor Lab's examples involve cases of criminal and admiralty jurisdiction. U.S. Const. amend. VII. Moreover, Vapor Lab offers no evidence of *English* causes of action decided in courts of law. *See Tull*, 481 U.S. at 417, 107 S.Ct. 1831 ("First, we compare the statutory action to 18th-century actions brought in the courts of England prior to the merger of the courts of law and equity."); *Capital Traction Co. v. Hof*, 174 U.S. 1, 7–8, 19 S.Ct. 580, 43 L.Ed. 873 (1899) ("[T]he seventh amendment, ... had in view the rules of the common law of England, and not the rules of that law as modified by local statute or usage in any of the states.").

**\*12** In any event, because "the relief sought is '[m]ore important' than finding a precisely analogous common-law cause of action," the Court determines that the FDCA's civil money penalty provision implicates the Seventh Amendment. *Tull*, 481 U.S. at 421, 107 S.Ct. 1831 (quoting *Curtis v. Loether*, 415 U.S. 189, 196, 94 S.Ct. 1005, 39 L.Ed.2d 260 (1974)). Vapor Lab has the right to a jury trial unless the public rights exception applies.

### 2. The Public Rights Exception

To say that the Seventh Amendment is "implicated" is not to say the Seventh Amendment is violated. Perhaps it creates a *presumption* that the Seventh Amendment is violated, but that presumption can be defeated if a narrow exception applies. Under the "public rights" exception, "Congress may assign the matter for decision to an agency without a jury, consistent with the Seventh Amendment." *Jarkesy*, 603 U.S. at 127, 144 S.Ct. 2117. The FDA argues that its action against Vapor Lab concerns public rights and therefore may be assigned to an agency without a jury.[41] The Court disagrees.

The public rights doctrine is, at its core, an exception to the Article III judicial power. *See Murray's Lessee*, 18 How. at 284. "Under 'the basic concept of separation of powers ...,' 'the judicial Power of the United States' cannot be shared

with the other branches." *Jarkesy*, 603 U.S. at 127, 144 S.Ct. 2117 (quoting *Stern v. Marshall*, 564 U.S. 462, 483, 131 S.Ct. 2594, 180 L.Ed.2d 475 (2011)). But if the matter concerns public rights, an administrative tribunal may adjudicate it without infringing on Article III's judicial power. *Id.* at 128, 144 S.Ct. 2117. These are matters that "historically could have been determined exclusively by [the executive and legislative] branches." *Id.* (alteration in original) (quoting *Stern*, 564 U.S. at 493, 131 S.Ct. 2594). Categories include "revenue collection, foreign commerce, immigration, tariffs, tribal relations, public lands, public benefits, and patents." *AT&T*, 135 F.4th at 238.

Supreme Court Justices have offered different explanations for the public rights exception. The majority in *Jarkesy* instructed that the doctrine "has no textual basis in the Constitution and must therefore derive instead from background legal principles." *Jarkesy*, 603 U.S. at 131, 144 S.Ct. 2117. The majority described *Murray's Lessee*—the Supreme Court's first recognition of the doctrine—as the ideal case to invoke the exception. *Id.* The Court there "took pains to justify the application of the exception in that particular instance by explaining that it flowed from centuries-old rules concerning revenue collection by a sovereign." *Id.* (citing *Murray's Lessee*, 18 How. at 281–85). That is, "there was an unbroken tradition—long predating the founding—of using these kinds of proceedings to 'enforce payment of balances due from receivers of the revenue.' " *Id.* at 128–29, 144 S.Ct. 2117 (citing *Murray's Lessee*, 18 How. at 278, 281).

Relying on *Atlas Roofing v. Occupational Safety and Health Review Commission*, 430 U.S. 442, 97 S.Ct. 1261, 51 L.Ed.2d 464 (1977), the dissent in *Jarkesy* took the opposite view, in which Congress's creation of a new regulatory scheme justifies non-Article III adjudication. *Id.* at 181–82, 144 S.Ct. 2117 (Sotomayor, J., dissenting). But the majority's opinion disfavors *Atlas Roofing*, and perhaps even suggests that the Supreme Court "long ago abandoned [*Atlas Roofing*] and its [new regulatory scheme] offshoot." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 534, 142 S.Ct. 2407, 213 L.Ed.2d 755 (2022); *see Jarkesy*, 603 U.S. at 138, n.4, 144 S.Ct. 2117. Under the majority's history and tradition approach, a new regulatory scheme is precisely a reason *not* to extend the public rights exception. And the majority's opinion in *Jarkesy*—not the dissent's—is the law that binds this Court. After *Jarkesy*, the mandate is clear: "[T]he doctrine is a narrow and extra-textual '*exception*' to presumptively mandatory Article III jurisdiction." *AT&T*,

135 F.4th at 239 (quoting *Jarkesy*, 603 U.S. at 131, 144 S.Ct. 2117).

**\*13** As far as Vapor Lab's Seventh Amendment challenge is concerned, a conclusion that the public rights exception applies necessarily "resolves its Seventh Amendment challenge." *Oil States*, 584 U.S. at 345, 138 S.Ct. 1365. That is because "if Congress may assign the adjudication of a statutory cause of action to a non-Article III tribunal, then the Seventh Amendment poses no independent bar to the adjudication of that action by a nonjury factfinder." *Granfinanciera*, 492 U.S. at 53–54, 109 S.Ct. 2782. Effectively, "Congress does not violate Article III *or* the Seventh Amendment by authorizing a nonjury factfinder to adjudicate the dispute." *Jarkesy*, 603 U.S. at 172–73, 144 S.Ct. 2117 (Sotomayor, J., dissenting) (emphasis added).

The FDA advances several arguments to invoke the public rights exception, but none hold water. First, as a general matter, the FDA argues that the public rights exception applies because the TCA serves a "public-health purpose."[42] The Fifth Circuit made clear in *AT&T*, however, that it is the substance of the enforcement action, and not the object of the regulations that matters. 135 F.4th at 239–41. Otherwise, "[m]yriad enterprises" could be said to promote public health, which "would blow a hole in what is meant to be a narrow exception to Article III." *Id.* at 239.

Additionally, the Supreme Court precedents relied on by the FDA weakly, if at all, support a "public health" category of public rights. The FDA cites *Crowell v. Benson* as a case that included "public health" among "matters that may be assigned to the Executive Branch for determination."[43] 285 U.S. 22, 51, 52 S.Ct. 285, 76 L.Ed. 598 (1932) ("Familiar illustrations of administrative agencies created for the determination of such matters are found in connection with the exercise of the congressional power as to interstate and foreign commerce, taxation, immigration, the public lands, *public health*, the facilities of the post office, pensions, and payments to veterans." (emphasis added)). But *Crowell* itself concerned the administration of public lands, so it did not adopt a public health category of public rights. *See Jarkesy*, 603 U.S. at 130, 144 S.Ct. 2117.

And the case *Crowell* cited, *Houston v. St. Louis Independent Packaging Co.*, which the FDA also relies on, was not about Article III delegation or the Seventh Amendment.[44] 249 U.S. 479, 39 S.Ct. 332, 63 L.Ed. 717 (1919). Indeed, there was no agency enforcement action against anyone. A sausage

manufacturer brought a pre-enforcement challenge, presenting the question whether the Secretary of Agriculture exceeded his authority in making a finding of fact to support his promulgation of a meat-labeling regulation. *Id.* at 480–81, 482–83, 39 S.Ct. 332. *Houston* at most is an example of an executive official exercising delegated legislative authority. *Cf. Big Time Vapes, Inc. v. FDA*, 963 F.3d 436, 443 (5th Cir. 2020) ("In the TCA, Congress delegated to the Secretary the power to 'deem' which tobacco products should be subject to the Act's mandates."). But *Houston* is not about the public rights exception to Article III and, aside from *Crowell*, the Supreme Court has never mentioned it as such a case.

It is telling that the Supreme Court in *Jarkesy* did not revisit any of these so-called "public health" cases when discussing the "historic categories of adjudications fall[ing] within the exception."[45] *Jarkesy*, 603 U.S. at 130, 144 S.Ct. 2117. Likewise, in *AT&T*, the first case in this Circuit to apply *Jarkesy*, the Fifth Circuit did not recite "public health" among the recognized categories of public rights. *AT&T*, 135 F.4th at 238.

**\*14** Indeed, the power to promote public health is a police power retained by the states, through the Tenth Amendment, and has never been a distinctive prerogative of the federal government. *See Lane v. United States*, 612 F. Supp. 3d 659, 665 (N.D. Tex. 2020) ("[T]he Supreme Court in *United States v. Lopez* [514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995)] observed that the Constitution withheld from Congress a plenary police power." (internal quotation marks and citation omitted)). So, here, even though the FDA is a federal agency that serves a "public-health purpose," the agency operates pursuant to Congress's delegation of authority under the Interstate Commerce Clause. *Big Time Vapes*, 963 F.3d at 438. The FDA does not advance any argument based on its delegated authority to regulate interstate commerce, however.[46]

Because this "action does not fall within any of the distinctive areas involving governmental prerogatives where the [Supreme] Court has concluded that a matter may be resolved outside of an Article III court, without a jury," the public rights exception does not apply. *Jarkesy*, 603 U.S. at 120, 144 S.Ct. 2117.

## IV. REMEDIES

### A. Declaratory Judgment

Vapor Lab is entitled to declaratory relief in this case. Under the Declaratory Judgment Act, a federal court "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). "Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such." *Id.* The Declaratory Judgment Act is "an enabling Act, which confers ... discretion on the courts rather than an absolute right upon the litigant." *Wilton v. Seven Falls Co.*, 515 U.S. 277, 287, 115 S.Ct. 2137, 132 L.Ed.2d 214 (1995) (citation omitted).

Vapor Lab successfully establishes that the FDCA's civil money penalty provisions for tobacco products, 21 U.S.C. § 333(f)(9), violate the Seventh Amendment, and, therefore, so do the FDA's proceedings against it. Accordingly, the Court **DECLARES** that the FDCA's civil money penalty provisions for tobacco products, 21 U.S.C. § 333(f)(9), violate the Seventh Amendment to the Constitution. The Court also **DECLARES** that the FDA's civil money penalty proceeding against Vapor Lab violates the Seventh Amendment to the Constitution.

### B. Permanent Injunction

Vapor Lab is entitled to permanent injunctive relief. A permanent injunction is proper when a plaintiff prevails on the merits, there is no adequate remedy at law for the plaintiff's otherwise irreparable injury, the balance of the harms favors the plaintiff, and an injunction would serve the public interest. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391, 126 S.Ct. 1837, 164 L.Ed.2d 641 (2006). When the government is the defendant, the balance of harms and the public interest factors "merge." *Nken v. Holder*, 556 U.S. 418, 435, 129 S.Ct. 1749, 173 L.Ed.2d 550 (2009).

Vapor Lab satisfies each of these elements. The Court need not reiterate why Vapor Lab succeeds on the merits of its claim[47] or why Vapor Lab's injury is a "here-and-now injury."[48] Because Vapor Lab can claim a "here-and-now injury" like that in *Axon*, it satisfies the irreparable injury requirement.[49] *See Axon*, 598 U.S. at 191, 143 S.Ct. 890 ("[A]s to that grievance, the court of appeals can do nothing: A proceeding that has already happened cannot be undone. Judicial review of ... structural constitutional claims would come too late to be meaningful."). As to the final factor, the FDA asks the Court to consider that its regulatory scheme is

designed to promote the public interest.[50] But that interest is outweighed, if not negated, by the deprivation of Vapor Lab's Seventh Amendment rights. *See Simms v. District of Columbia*, 872 F. Supp. 2d 90, 105 (D.D.C. 2012) ("It is always in the public interest to prevent the violation of a party's constitutional rights."). Therefore, each of the permanent injunction factors favors Vapor Lab.

**\*15** Because Vapor Lab carries its burden as to each of the permanent injunction factors, the Court next addresses the scope of the injunction. When ordering equitable relief, the Court is obligated to state "specifically" and "in reasonable detail ... the act or acts restrained or required" under the injunction. Fed. R. Civ. P. 65(d)(1)(b)–(c). The scope of injunctive relief is "dictated by the extent of the violation established." *Califano v. Yamasaki*, 442 U.S. 682, 702, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979). An injunction "should be crafted to 'provide complete relief to the plaintiffs.' " *Mock v. Garland*, 75 F.4th 563, 587 (5th Cir. 2023) (quoting *Yamasaki*, 442 U.S. at 702, 99 S.Ct. 2545). At the same time, the injunction "should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Yamasaki*, 442 U.S. at 702, 99 S.Ct. 2545. And it must be tailored to "redress the plaintiff's particular injury." *Gill v. Whitford*, 585 U.S. 48, 73, 138 S.Ct. 1916, 201 L.Ed.2d 313 (2018) (citation omitted).

The Court rejects Vapor Lab's request for a nationwide injunction prohibiting HHS and the FDA from adjudicating civil money penalties in administrative proceedings, because it has not shown that relief is "necessary to provide complete relief to [Vapor Lab]." *Trump v. CASA, Inc.*, ––– U.S. ––––, 145 S. Ct. 2540, 2562–63, ––– L.Ed.2d –––– (2025). Vapor Lab is the only plaintiff before the Court. So, to provide Vapor Lab complete relief, the Court need only enjoin the FDA from seeking civil money penalties against Vapor Lab. *See id.* at 2557. Accordingly, the Court **ENJOINS** HHS to dismiss with prejudice the administrative complaint against Vapor Lab. The Court also **ENJOINS** HHS and the FDA from adjudicating civil money penalties against Vapor Lab in an administrative proceeding.

### C. Attorney's Fees and Costs
The Court denies Vapor Lab's request for attorney's fees and costs at this time. It may file a motion for attorney's fees later.

## V. CONCLUSION

Having decided that the Court has jurisdiction to review Vapor Lab's challenge and that Vapor Lab prevails on the merits of its challenge, the Court:

(1) **DECLARES** that the FDCA's civil money penalty provisions for tobacco products, 21 U.S.C. § 333(f)(9), violate the Seventh Amendment to the Constitution;

(2) **DECLARES** that the FDA's civil money penalty proceeding against Vapor Lab violates the Seventh Amendment to the Constitution;

(3) **ENJOINS** HHS to dismiss with prejudice the administrative complaint against Vapor Lab; and

(4) **ENJOINS** HHS and the FDA from adjudicating civil money penalties against Vapor Lab in an administrative proceeding.

The Court shall issue a final judgment separately.

**SO ORDERED** on this **1st day** of **August, 2025.**

### All Citations

--- F.Supp.3d ----, 2025 WL 2200923

## Footnotes

[1]    Br. Supp. FDA's Mot. Summ. J. 1, ECF No. 15.

[2]    *Id.*

[3]    *Id.* at 2 (quoting Pub. L. No. 111–31, § 2(6), (13), 123 Stat. 1777).

[4]    FDA's App. Supp. Mot. Summ. J. (King Dec.), App. 22–23, ECF No. 16.

[5]    Vapor Lab's Compl. for Decl. & Inj. 2, ¶ 8, ECF No. 1; HHS Org. Charts Off. of Sec'y and Divs., https://www.hhs.gov/about/agencies/orgchart/index.html (last visited July 17, 2025).

[6]    FDA's App. Supp. Mot. Summ. J. (King Dec.), App. 23, ECF No. 16.

[7]    Br. Supp. FDA's Mot. Summ. J. 3, ECF No. 15.

[8]    Vapor Lab's Compl. for Decl. & Inj. 8, ¶ 40, ECF No. 1.

[9]    *See* FDA's App. Supp. Mot. Summ. J., App. 1–7, ECF No. 16.

[10]    *Id.* at App. 5.

[11]    *See id.* at App. 8–10.

[12]    *Id.* at App. 9.

[13]    *See id.* at App. 11.

[14]    Joint Status Report 1, ECF No. 30.

[15]    *Id.*

[16]    *Id.*

[17]    *See* Vapor Lab's Compl. for Decl. & Inj., ECF No. 1.

[18]    *Id.* at 1, ¶ 1.

[19]    *Id.* at 12, ¶ 61(a)–(b) (emphasis added). Vapor Lab mistakenly cites 21 U.S.C. § 331(f)(9) as the civil money penalty provision. The correct provision is 21 U.S.C. § 333(f)(9).

[20]    *Id.* at 12–13, ¶ 61(c)–(e).

[21]    *See* FDA's Mot. Summ. J., ECF No. 14; Vapor Lab's Cross-Mot. Summ. J., ECF No. 20.

[22]    Vapor Lab's Combined Br. 1, ECF. No. 21.

[23]    *See* FDA's Reply Supp. Mot. Supp. J. 2, ECF No. 24.

[24]    *See, e.g.,* FDA's Reply Supp. Mot. Supp. J. 2, ECF No. 24 ("On its face, the claim addresses the 'procedures [FDA] use[s] to' determine civil penalty proceedings for TCA violations, a fraction of the agency's work implementing the TCA and a sliver of its overall responsibilities." (quoting *Axon*, 598 U.S. at 189, 143 S.Ct. 890)).

[25]    *See Jarkesy*, 603 U.S. at 116, 144 S.Ct. 2117 ("The SEC may bring an enforcement action in one of two forums. First, the Commission can adjudicate the matter itself. See §§ 77h–1, 78u–2, 78u–3, 80b–3. Alternatively, it can file a

suit in federal court. See §§ 77t, 78u, 80b–9.").

26    The public rights doctrine is discussed *infra* III.B.2.

27    In Vapor Lab's words, its "claim is that Congress violated the Constitution (the Seventh Amendment) by authorizing FDA to levy civil money penalties in an administrative forum"—an allegation "that the administrative proceeding itself is unconstitutional." Vapor Lab's Combined Br. 8, ECF. No. 21.

28    The equal protection challenge in *Elgin* can be summarily disregarded, because it was not an attack on the agency itself. Rather, it was a challenge to the statutory authorization for an employment decision that was within the scope of the agency's review. *Elgin*, 567 U.S. at 23, 132 S.Ct. 2126.

29    Br. Supp. FDA's Mot. Summ. J. 4, ECF No. 15.

30    *Id.*

31    FDA's Resp. Vapor Lab's Mot. Prelim. Inj. 11–12, ECF No. 13.

32    *Id.* at 11(emphasis added).

33    *Id.* at 12.

34    The FDA's argument that a pure Seventh Amendment injury can be remedied by vacatur of a final order and a new jury trial is beside the point, because that is not the precise injury Vapor Lab claims. *See* FDA's Reply Supp. Mot. Summ. J. 3–4, ECF No. 24. But even assuming it were, it is *far* from clear that "an after-the-fact jury trial could ... satisfy the demands of the Constitution." *AT&T, Inc. v. FCC*, 135 F.4th 230, 242 (5th Cir. 2025) (citing a lack of "authority supporting the proposition that the constitutional guarantee of a jury trial is honored by a trial occurring after an agency has already found the facts, interpreted the law, adjudged guilt, and levied punishment").

35    FDA's Reply Supp. Mot. Summ. J. 5, ECF No. 24. The FDA does *not* argue that Vapor Lab lacks standing or that this case is not ripe.

36    *Id.*

37    *Id.* at 4.

38    *Id.*

39    Vapor Lab's Compl. for Decl. & Inj. 12, ¶ 61(a)–(b), ECF No. 1.

40    Vapor Lab's Br. Supp. Mot. Prelim. Inj. 8, ECF No. 4.

41    FDA's Resp. Vapor Lab's Mot. Prelim. Inj. 15–17, ECF No. 13.

42    *Id.* at 15–16 (quoting *Big Time Vapes, Inc. v. FDA*, 963 F.3d 436, 438 (5th Cir. 2020)).

43    *Id.*

44    *Id.*

45    The FDA also cites *Thomas v. Union Carbide Agricultural Products*, apparently because it involves public health, but the FDA does not explain why that case governs. *See* 473 U.S. 568, 105 S.Ct. 3325, 87 L.Ed.2d 409 (1985).

46    Some scholars propose that the public rights exception contemplates a licensing regime. That is, if Congress has the power to regulate interstate commerce, it also can condition trade of certain goods on obtaining a license. *See* Will Baude, *The Seventh Amendment, Private Rights, and Administrative Penalties*, Reason: Volokh Conspiracy (December 8, 2023, at 11:50 AM), https://reason.com/volokh/2023/12/08/the-seventh-amendment-private-rights-and-administrative-penalties/ (citing John Harrison, *Public Rights, Private Privileges, and Article III*, 54 Ga. L. Rev. 143,

196–99 (2019)).

47    *See supra* III.B.

48    *See supra* III.A.1.c.

49    Even if Vapor Lab's sole injury was deprivation of a jury trial, as opposed to subjection to an illegitimate proceeding,
      a Seventh Amendment injury likely is irreparable, too. *See AT&T,* 135 F.4th at 242; *supra* n.34.

50    FDA's Resp. Vapor Lab's Mot. Prelim. Inj. 20, ECF No. 13.

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.