IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| HDH GROUP, INC.,<br>*Plaintiff,*<br>v.<br>UNITED STATES OF AMERICA,<br>*Defendant.* | Civil Action No. 2:24-cv-988<br>Hon. William S. Stickman IV |

**OPINION**

WILLIAM S. STICKMAN IV, United States District Judge

Plaintiff HDH Group, Inc. ("HDH") filed this action against Defendant United States of America ("the Government") objecting to the Internal Revenue Service's ("IRS") determination that it violated the tax code and seeking a refund of its partial payment of penalties assessed against it for tax years 2013—2018 pursuant to the promoter penalty provisions at 26 U.S.C. § 6700 ("IRC § 6700"). (ECF No. 1). HDH asserts six counts against the Government seeking such refund. (*Id.* ¶¶ 75—110). The Government filed a counterclaim against HDH seeking to reduce to judgment the unpaid balance of the penalties assessed against HDH under IRC § 6700. (ECF No. 19). HDH then filed a motion to dismiss the counterclaim (ECF No. 25) and a motion for summary judgment with respect to its six claims against the Government. (ECF No. 26). Both motions hinged on the same issue—whether the administrative assessment of the penalties in IRC § 6700 violate the Seventh Amendment. The Court denied HDH's motions. (ECF Nos. 49, 50). It held that the statutory scheme of IRC § 6700 implicates the Seventh Amendment because the assessment of the IRC § 6700 penalty is analogous to a traditional common-law action sounding in fraud. (ECF No. 49, pp. 22—23). However, the Court held that the statutory

scheme did not violate the Seventh Amendment because it does not deprive HDH of the right to a *de novo* jury trial. (*Id.* at pp. 23—25).

HDH later moved for reconsideration of the Court's decision, arguing that the Court's analysis overlooked—and did not decide—whether the statutory requirement to pay fifteen percent of the assessed penalty under IRC § 6700, itself, violates the Seventh Amendment. The Court denied the motion for reconsideration. It held that HDH expressly abandoned the issue of the prepayment requirement in its briefing. (ECF No. 57, pp. 2—3).

Now before the Court is HDH's second motion to dismiss (ECF No. 60), and second motion for summary judgment (ECF No. 61). Both motions raise the same issues. In part, HDH asks the Court to reconsider its previous decision that IRC § 6700 does not violate the Seventh Amendment because of the possibility of a *de novo* jury trial. It argues that "[r]ecent case law has developed in the Fifth Circuit which further supports Plaintiff's interpretation of the United States Supreme Court's ruling in *SEC v. Jarkesy*, 603 U.S. 109 (2024)." (ECF Nos. 60, 61 (referencing *AT&T, Inc. v. Fed. Commc'ns Comm'n*, 149 F.4th 491 (5th Cir. 2025), *rev'd*, 608 U.S. 531, 548 (2026))). HDH's instant motions also focus on its theory that the fifteen percent prepayment requirement violates the Seventh Amendment. (ECF No. 60, p. 2, ¶ 9; ECF No. 61, p. 2, ¶ 9).

The Court, again, rejects HDH's interpretation of the Seventh Amendment's implications on IRC § 6700. The Supreme Court's decision in *FCC v. AT&T*, *supra* (reversing the 5th Circuit decision relied upon by HDH), essentially affirms the Court's earlier decision on the general question of whether IRC § 6700 violates the Seventh Amendment. As the Court previously held, the Seventh Amendment has not been violated because HDH has the right to a *de novo* jury trial.

The Court also rejects the contention that the prepayment requirement effectuates a Seventh Amendment violation. As explained below, a historical examination of the right to a jury trial at and around the time of the Seventh Amendment's ratification demonstrates that it was common for the party, whose assets were at risk in a civil action, to be required to post security before trial. This historical analogue informs the Court's determination that the requirement that HDH pay fifteen percent of the potential penalty before securing a trial does not violate the right to a jury trial as codified in the Seventh Amendment.

## I. STATUTORY FRAMEWORK

The analysis of any constitutional challenge to a statute should start by examining the statute itself. The Court notes that it previously undertook a thorough examination of the provisions of IRC § 6700. Nevertheless, because this is a stand-alone opinion on new, albeit largely duplicative, motions, the Court will again begin its analysis with an examination of the relevant statutory provisions.

26 U.S.C. § 6201 authorizes and requires the Secretary of the Treasury ("the Secretary") to "make the inquiries, determinations, and assessments of all taxes (including interest, additional amounts, additions to the tax, and assessable penalties) imposed by [Title 26]." 26 U.S.C. § 6201(a). The tax penalties at issue in this case are imposed by IRC § 6700—a statute that penalizes abusive tax structures. IRC § 6700 allows the Government to impose a penalty on any person who:

> (1)(A) organizes (or assists in the organization of):
> (i) a partnership or other entity,
> (ii) any investment plan or arrangement, or
> (iii) any other plan or arrangement, or
> (B) participates (directly or indirectly) in the sale of any interest in an entity or plan or arrangement referred to in subparagraph (A), and
> (2) makes or furnishes or causes another person to make or furnish (in connection with such organization or sale) –

> (A) a statement with respect to the allowability of any deduction or credit, the excludability of any income, or the securing of any other tax benefit by reason of holding an interest in the entity or participating in the plan or arrangement which the person knows or has reason to know is false or fraudulent as to any material matter, or
> (B) a gross valuation overstatement as to any material matter….

IRC § 6700.

Thus, in order to establish a violation of IRC § 6700, the Government must prove "(1) that the defendant was involved in an abusive tax shelter, and (2) that the defendant made statements about the tax benefits investors would receive if they participated in the shelter which the defendant knew or had reason to know were false or fraudulent." *United States v. Kaun*, 827 F.2d 1144, 1147 (7th Cir. 1987). The amount of the penalty under IRC § 6700 "shall be equal to 50 percent of the gross income derived (or to be derived) from such activity by the person on which the penalty is imposed." IRC § 6700(a)(2)(B). This penalty may be challenged pursuant to 26 U.S.C. § 6703.

The focus of HDH's challenge in the pending motions is the prepayment requirement. Under section 6703(c)(1), if, within thirty days after the day on which notice and demand of any penalty under IRC § 6700 is made against an individual, they pay not less than fifteen percent of the amount of the penalty, the individual may file a claim for refund of the amount paid. 26 U.S.C. § 6703(c)(1). This is an administrative process that is conducted within the IRS. Under section 6703(c)(2), the individual may pay fifteen percent of the penalty, file a claim for refund of the penalty paid (as permitted in IRC § 6700(c)(1)), and, if the claim is denied, file an action in the United States District Court for refund within thirty days of the claim denial. 26 U.S.C. § 6703(c)(2).

If a penalized individual files an action in a district court challenging the assessment of the IRC § 6700 penalty, the burden of proof is placed upon the government to establish liability

for the penalty. 26 U.S.C. § 6703(a). The issue of liability is reviewed under a *de novo* standard by a district court. *See Samango v. United States*, Civ. Action No. 17-2484, 2019 WL 2525741, at *7 (E.D. Pa. June 18, 2019) ("Taxpayer refund suits are de novo proceedings." (citation omitted)), *aff'd*, 833 F. App'x 941 (3d Cir. 2020). A district court owes no deference to the IRS in making its determination of liability. *Id.* at *7. A jury trial is available in a challenge under section 6703.

## II. Factual Background

The facts have not changed since the Court decided HDH's initial motions to dismiss and for summary judgment. On September 28, 2015, the Government, through the IRS, notified HDH of an audit of HDH's captive insurance program. (ECF No. 62, ¶ 1); (ECF No. 68, ¶ 1). On November 13, 2023, the IRS assessed penalties imposed by IRC § 6700 against HDH for the 2013—2018 tax years and mailed notices of assessment and demands for payment to HDH. (ECF No. 62, ¶ 4); (ECF No. 68, ¶ 4). The IRS assessed penalties imposed by IRC § 6700 against HDH due to HDH's alleged conduct in relation to its purported captive insurance program. (ECF No. 62, ¶ 3); (ECF No. 68, ¶ 3). HDH paid the IRS at least fifteen percent of the total assessed fraud penalties. (ECF No. 62, ¶ 6); (ECF No. 68, ¶ 6). HDH filed claims for refund of to the amounts it paid toward the IRC § 6700 penalties. (ECF No. 62, ¶ 7); (ECF No. 68, ¶ 7). The IRS disallowed HDH's claims for refund by letter dated June 10, 2024. (ECF No. 62 ¶ 8); (ECF No. 68, ¶ 8).

On July 9, 2024, HDH filed this action under IRC § 6700 seeking recovery of $989,000 ($166,000, $229,000, $215,000, $229,000, $106,000, and $44,000 for tax years 2013, 2014, 2015, 2016, 2017, and 2018, respectively) in total penalties paid by HDH and collected by the Government pursuant to the assessment of the IRC § 6700 penalty for each of those tax years.

(ECF No. 1, ¶ 14). HDH is also seeking a finding that the total penalties of $6,564,449 were improperly imposed against it in violation of its right to a jury trial under the Seventh Amendment. (*Id.* at 1). The Government filed a counterclaim seeking to reduce to judgment the unpaid balance of the penalties assessed against HDH under IRC § 6700. (ECF No. 19, p. 30, ¶ 1).

## III. STANDARD OF REVIEW

### A. Motion to Dismiss - Rule 12(b)(6)

A motion to dismiss filed under Federal Rule of Civil Procedure ("Rule") 12(b)(6) tests the legal sufficiency of the complaint. *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993). A plaintiff must allege sufficient facts that, if accepted as true, state a claim for relief plausible on its face. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A court must accept all well-pleaded factual allegations as true and view them in the light most favorable to a plaintiff. *See Doe v. Princeton Univ.*, 30 F.4th 335, 340 (3d Cir. 2022); *see also Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). Although a court must accept the allegations in the complaint as true, it is "not compelled to accept unsupported conclusions and unwarranted inferences, or a legal conclusion couched as a factual allegation." *Baraka v. McGreevey*, 481 F.3d 187, 195 (3d Cir. 2007) (internal citations omitted).

The "plausibility" standard required for a complaint to survive a motion to dismiss is not akin to a "probability" requirement but asks for more than sheer "possibility." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). In other words, the complaint's factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations are true even if doubtful in fact. *Twombly*, 550 U.S. at 555. Facial plausibility is

present when a plaintiff pleads factual content that allows the court to draw the reasonable inference that a defendant is liable for the misconduct alleged. *Iqbal*, 556 U.S. at 678. Even if the complaint's well-pleaded facts lead to a plausible inference, that inference alone will not entitle a plaintiff to relief. *Id.* at 682. The complaint must support the inference with facts to plausibly justify that inferential leap. *Id.*

### B. Motion for Summary Judgment - Rule 56

Summary judgment is warranted if the Court is satisfied that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material if it must be decided to resolve the substantive claim or defense to which the motion is directed. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). There is a genuine dispute of material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The Court must view the evidence presented in the light most favorable to the nonmoving party. *Id.* at 255. It refrains from making credibility determinations or weighing the evidence. *Id.* "[R]eal questions about credibility, gaps in the evidence, and doubts as to the sufficiency of the movant's proof[]" will defeat a motion for summary judgment. *El v. Se. Pa. Transp. Auth.*, 479 F.3d 232, 238 (3d Cir. 2007).

## IV. ANALYSIS

The Government argues that the Court should decline to address the substance of HDH's motions and deny them on procedural grounds. It argues that the motion to dismiss violates Rule 12(g)(2), in that it only raises arguments that were available at the time of its first motion to dismiss. Likewise, the Government asks the Court to exercise its discretion and deny the motion

for summary judgment which, it contends, is merely a reassertion of the previously raised issues without any new factual development.

The Court agrees that HDH's instant motions appear to rehash issues that it previously raised. There has been no factual development. There is no question that the arguments raised by HDH in the current motions were available to HDH at the time it filed its previous motions. In fact, they formed the basis of HDH's previous submissions, even though HDH chose not to pursue the issue of whether the fifteen percent prepayment requirement violates the Seventh Amendment. Nevertheless, the Court rejects the Government's argument under Rule 12(g)(2) and it will decide the motions on the merits.

First, the Court notes that HDH brings motions under both Rule 12(b)(6) and Rule 56, which are not limited by Rule 12(g)(2). "Because a denial of a motion for summary judgment is generally a non-final order, a district court has the discretion to review renewed motions for summary judgment." *Doe v. Luzerne Cnty.*, Civ. Action No. 3:08–1155, 2012 WL 1183716, at *2 (M.D. Pa. April 9, 2012) (internal citations omitted). A district court has the discretion, therefore, to consider a renewed motion for summary judgment. *Id.* at *1 (citing *Ingram v. S.C.I. Camp Hill*, 448 F. App'x 275, 278 (3d Cir. 2011)). The Court recognizes that the issues presented by HDH have been in a state of rapid development since the Supreme Court's decision in *Jarkesy*. HDH's motions were based on development of the law in the circuit courts. During the pendency of the motions, the Supreme Court decided the *FCC* matter, which squarely addresses the impact of the Seventh Amendment on cases, such as this one, where a party may be afforded a *de novo* jury trial. To address these developments, and in light of the strong "policy of favoring decisions on the merits," *see Hillebrand v. Allegheny Cnty.*, 923 F.3d 128, 136 (3d Cir. 2019), the Court will address the substance of HDH's motions.

### A. The Supreme Court's decision in *FCC* confirms that IRC § 6700 does not violate the Seventh Amendment because HDH has the right to a *de novo* jury trial.

As explained in the Court's Memorandum Order denying HDH's motion for reconsideration, HDH abandoned the issue of whether the prepayment requirement of IRC § 6700 runs afoul of the Seventh Amendment. (ECF No. 57). The Court only addressed the general issue of whether the statutory scheme violates the Seventh Amendment because the IRS could assess the amount of the penalty owed by HDH in administrative proceedings before HDH could access a jury. In examining the Supreme Court's decision in *Jarkesy*, its earlier decisions in *Atlas Roofing Co. v. Occupational Safety & Health Review Commission*, 430 U.S. 442 (1977), and *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33 (1989), and post-*Jarkesy* decisions of the United States Court of Appeals for the Third Circuit, the Court held that while the statutory scheme *implicates* the Seventh Amendment, it does not *violate* it because HDH had access to a *de novo* jury trial where the Government would have had the burden of proof. (ECF No. 49, p. 24).

In June 2026, the Supreme Court decided *FCC*, which confirms the Court's interpretation of the Seventh Amendment and its application in this case. *FCC* involved a challenge to Section 503 of the Communications Act of 1934. That section authorizes the FCC to seek monetary forfeitures for violations of the communications laws. 47 U.S.C. § 503. Specifically, an entity which the FCC "determine[s]" has "willfully or repeatedly failed to comply" with those laws or the FCC's rules "shall be liable to the United States for a forfeiture penalty." *FCC*, 608 U.S. at 536 (quoting 47 U.S.C. § 503(b)). The Supreme Court summarized the statutory framework by which the FCC may seek forfeiture under the Act:

> The first path is a formal adjudication. See § 503(b)(3); 5 U.S.C. § 554. An administrative law judge (or the Commission itself) holds a hearing and may

> impose a penalty, with limited judicial review in the court of appeals only. 47 U.S.C. § 503(b)(3)(A). In practice, the Commission does not use this process.
>
> The second path—the one relevant here—is a more informal proceeding. See § 503(b)(4). The Commission first issues a "notice of apparent liability." § 503(b)(4)(A). The notice must specify the laws or regulations the Commission suspects the recipient to have violated, and the factual basis for those allegations. § 503(b)(4). The Commission must give the recipient the chance to "show, in writing," "why no such forfeiture penalty should be imposed." § 503(b)(4)(C). After reviewing the recipient's response, the Commission then issues an order that "determine[s]" whether the recipient is liable and, if so, "assesse[s]" a penalty. §§ 503(b)(1), (b)(2)(E).

*Id.* at 536—37 (alterations in original).

Likewise, for a person found liable for a penalty, there are two paths to challenge the determination:

> Once the Commission issues an order, the recipient has two options. First, it may seek review in the court of appeals under the Hobbs Act. See 28 U.S.C. § 2342(1). The court of appeals, sitting without a jury, then reviews the order on the administrative record under the standards set forth in the Administrative Procedure Act. 47 U.S.C. § 402(a); 28 U.S.C. § 2347(a); 5 U.S.C. § 551 *et seq.*, and § 701 *et seq.*
>
> The recipient's other option is to do nothing. See *Action for Children's Television v. FCC*, 59 F.3d 1249, 1261 (CADC 1995). In the event of nonpayment of a forfeiture penalty "determined under [§ 503(b)(4)]," the penalty "shall be recoverable ... in a civil suit in the name of the United States." 47 U.S.C. § 504(a). The Commission thus may refer the matter to the Department of Justice, which then may—but need not—bring a civil suit within five years of the issuance of the order. *See ibid.*; 28 U.S.C. § 2462. That suit "shall be a trial de novo." 47 U.S.C. § 504(a).
>
> Absent a successful enforcement suit (and resulting court order), the statute provides no other mechanism for the Commission to collect the forfeiture. The regulated party may, of course, pay the forfeiture voluntarily. But until it does, or the court in a § 504 enforcement action orders payment, the Commission may not use the "notice of apparent liability ... to the prejudice of" the party in other Commission proceedings. § 504(c).

*Id.* at 537 (alterations in original).

The Supreme Court held that the statutory framework governing the FCC penalties did not violate the Seventh Amendment: "Forfeiture orders issued under § 503(b)(4) do not definitively resolve the parties' legal obligations. And the Commission's factual findings are not conclusive. It thus does not offend the Constitution for the Commission to issue forfeiture orders without the involvement of a jury." *Id.* at 540. The Supreme Court explained that as long as there is a right to a trial jury, it does not matter—for Seventh Amendment purposes—when the trial occurs:

> The Seventh Amendment "preserve[s]" the right to trial by jury in "Suits at common law." It applies in all proceedings, whatever their "peculiar form," in which "legal rights" are to be "settle[d]." *Parsons v. Bedford*, 3 Pet. 433, 447, 28 U.S. 433, 7 L.Ed. 732 (1830). It does not, however, "prescribe at what stage" of a legal dispute "a trial by jury must, if demanded, be had." *Capital Traction Co. v. Hof*, 174 U.S. 1, 23, 19 S.Ct. 580, 43 L.Ed. 873 (1899). The Amendment requires only that, before legal rights and obligations are conclusively "ascertained and determined," *Parsons*, 3 Pet. at 447, a party has the chance to insist that a jury make the "ultimate determination of issues of fact," *Ex parte Peterson*, 253 U.S. 300, 310, 40 S.Ct. 543, 64 L.Ed. 919 (1920).

*Id.* (alterations in original).

The Supreme Court then examined cases, dating back over a century, where it had affirmed against Seventh Amendment challenges where fact finding and/or assessment of damages was made without a jury—provided that a jury would ultimately have a chance to make final fact findings unbound by the earlier findings. *Id.* at 540—41 (examining *Meeker v. Lehigh Valley R. Co.*, 236 U.S. 412 (1915); *Ex parte Peterson*, 253 U.S. 300 (1920)). It concluded that Section 503 of the Communications Act of 1934 did not violate the Seventh Amendment because the penalty orders did not finally settle AT&T's legal obligations. *Id.* at 541. Specifically, the orders "did not reflect the ultimate determination of any fact because, before the carriers could have been made to pay, the Government was required to prove its case to a jury." *Id.* Further, the Supreme Court held that "the Commission's factual findings have no effect in a subsequent

enforcement suit. The statute provides that forfeitures under § 503(b)(4) 'shall be recoverable,' exclusively, in a 'trial de novo.' And 'trial de novo' means a proceeding 'in which the whole case is gone into *as if no trial whatever had been had*' in the initial tribunal." *Id.* at 542 (internal citations omitted) (emphasis in original).

The Supreme Court's analysis of Section 503 of the Communications Act covers the statutory framework of the IRC § 6700 penalty. There is no question that the IRS's determination that a penalty is due does not finally resolve any obligation of HDH. Because of the right to a trial *de novo*, the IRS's findings are not final. They can be nullified by the filing of an action by the individual or entity assessed a penalty. A court conducting the statutorily provided *de novo* trial owes the administrative findings no deference. Moreover, under section 6703, the burden of proof in the *de novo* trial is on the Government, It has to prove to a jury that HDH is liable for the IRC § 6700 penalty. It is immaterial that the jury trial is available only after the initial assessment of the IRC § 6700 penalty by the IRS and the initiation of the action in court by HDH.

In conclusion, the IRS's assessment of the IRC § 6700 penalty did "not definitively resolve the parties' legal obligations." *Id.* at 540. The IRS's fact findings have been rendered irrelevant by HDH's filing of this action, and they have no bearing on these proceedings. It is as though they never existed. The Government is now obligated to prove every element of its claims under IRC § 6700 to a jury, and the jury will make the ultimate factual determination of whether HDH is liable for the penalty. This is consistent with the Seventh Amendment as interpreted by *Jarkesy*[1] and *FCC*.

---

[1] The Court incorporates by reference its previous examination of the statutory framework of sections 6700 and 6703. (ECF No. 49).

**B. The prepayment requirement to initiate a refund action does not violate the Seventh Amendment.**

HDH asserts that, even if the provisions of the IRC § 6700 penalty do not, per se, violate the Seventh Amendment because of the availability of a *de novo* trial, the prepayment requirement does. The Government counters that the prepayment requirement does not bar HDH's right to a jury trial and, therefore, does not impact the general analysis of the Seventh Amendment offered by the Supreme Court's *FCC* decision and the Court's previous ruling. For the reasons that follow, the Court holds that the prepayment requirement does not violate the Seventh Amendment.

**1. Flora v. United States *does not apply to the issues in this case.***

As an initial matter, the Government argues that the Supreme Court's decision in *Flora v. United States*, 362 U.S. 145 (1960), *aff'g on reh'g*, 357 U.S. 63 (1958), found the prepayment requirements in the IRC to be permissible. The Court did not undertake an extensive review of the *Flora* issue in its prior denial of HDH's motions because HDH abandoned the issue of whether the prepayment requirement violated the Seventh Amendment.[2] Now that the issue is squarely before the Court, it holds that *Flora* never addressed the implications, if any, of the Seventh Amendment on the prepayment requirement. Therefore, it is not binding in this case.

In *Flora*, the Supreme Court addressed the issue of whether section 1346(a)(1) of the IRC required a taxpayer to make full—as opposed to partial—payment of an assessed tax as a jurisdictional prerequisite to a refund suit in federal district court. *Id.* at 146. In concluding that full payment was a prerequisite to suit, the Supreme Court considered both the legislative history

---

[2] The Court recognizes that its order denying reconsideration suggested that *Flora* might dictate the result of a challenge to the prepayment requirement. Again, because HDH had abandoned the issue, it was not before the Court and the Court's observation, in dicta, about the possible implications of *Flora* was, upon further examination, incorrect.

of section 1346(a)(1) and the policy rationale behind Congress's system for challenging tax assessments. *See id.* at 151—77. *Flora* did not touch on the Seventh Amendment, let alone on whether section 1346(a)(1)'s prepayment requirement unconstitutionally deprived a taxpayer-plaintiff of their right to a jury trial.

The Seventh Amendment was not before the Supreme Court in *Flora* and it was not discussed in the opinion. The Court cannot interpret the Supreme Court's silence on the Seventh Amendment issue as a tacit acknowledgment that prepayment requirements like IRC § 6703 satisfy scrutiny under the Seventh Amendment. *See, e.g.*, *Webster v. Fall*, 266 U.S. 507, 511 (1925) ("Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." (citations omitted)).

**2. *The prepayment requirement under IRC § 6703 does not infringe upon the right to a jury trial as understood at the time of the ratification of the Seventh Amendment.***

The Court will now address the substance of HDH's motions—that the prepayment requirement of IRC § 6703 violates the Seventh Amendment. This appears to be an issue of first impression.

The Seventh Amendment provides in relevant part: "In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved." U.S. Const. amend. VII. In interpreting the Seventh Amendment—as with other provisions of the Constitution—the Court must examine what the relevant terms meant at the time of ratification. "The Constitution is a written instrument. As such its meaning does not alter. That which it meant when adopted, it means now." *South Carolina v. United States*, 199 U.S. 437,

448 (1905).[3] "In order to ascertain the scope and meaning of the Seventh Amendment, resort must be had to the appropriate rules of the common law established at the time of the adoption of that constitutional provision in 1791." *Dimick v. Schiedt*, 293 U.S. 474, 476 (1935). "The right of trial by jury thus preserved is the right which existed under the English common law when the amendment was adopted." *Balt. & Carolina Line v. Redman*, 295 U.S. 654, 656—57 (1935).

It is necessary, then, to look to the history and tradition of civil jury trials at the time of the founding to determine whether the prepayment requirement would be viewed by the ratifying generation as violating the right guaranteed by the Seventh Amendment. *See D.C. v. Heller*, 554 U.S. 570, 576—77 (2008) ("[T]he Constitution was written to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning." (quoting *United States v. Sprague*, 282 U.S. 716, 731 (1931))). In this case, a determination of the issue before the Court requires an exploration of the contours of "suits at common law" in the Anglo-American common-law tradition. *See South Carolina*, 199 U.S. at 450 (stating that "[t]he interpretation of the Constitution of the United States in [sic] necessarily influenced by the fact that its provisions are framed in the language of the English common law,

---

[3] More recently, Justice Amy Coney Barrett summarized the basic principles of originalism:

> Because the Court has taken an originalist approach to the Second Amendment, it is worth pausing to identify the basic premises of originalism. The theory is built on two core principles: that the meaning of constitutional text is fixed at the time of its ratification and that the "discoverable historical meaning ... has legal significance and is authoritative in most circumstances." K. Whittington, Originalism: A Critical Introduction, 82 Ford. L. Rev. 375, 378 (2013) (Whittington). Ratification is a democratic act that renders constitutional text part of our fundamental law, see Arts. V, VII, and that text "remains law until lawfully altered," S. Sachs, Originalism: Standard and Procedure, 135 Harv. L. Rev. 777, 782 (2022). So for an originalist, the history that matters most is the history surrounding the ratification of the text; that backdrop illuminates the meaning of the enacted law.

*United States v. Rahimi*, 602 U.S. 680, 737—38 (2024) (Barrett, J., concurring) (alteration in original).

and are to be read in the light of its history." (citation omitted)). The provisions of IRC § 6703 do not impact the conduct of the trial itself—it will proceed like every civil trial in this court. The gravamen of HDH's argument is that the prepayment requirement imposes a hindrance on its right to *access* a jury trial. To determine whether it passes Seventh Amendment scrutiny, the Court must examine the experience of "suits at common law" as understood by the framers of the Seventh Amendment to determine whether HDH's argument is substantiated—in other words, would a person in the founding generation, with their experience of a jury trial in the context of a suit at common law, believe that the prepayment requirement offends that right?

As the Court has previously held, the IRC promoter penalty implicates the Seventh Amendment because it is analogous in substance to actions that would have been deemed a suit at common law at the time of the founding. (ECF No. 49, pp. 22—23 ("As with the SEC claim in *Jarkesy*, the penalty in IRC § 6700 'target[s] the same basic conduct' as common-law fraud—misrepresenting…material facts.'" (alterations in original) (quoting *Jarkesy*, 603 U.S. at 111))). In doing so, the Court followed the lead of the Supreme Court in *Jarkesy* by looking to historical analogues of the substantive claim underlying the statutory action. The Court will employ the same type of analysis below in determining whether the prepayment requirement violates the Seventh Amendment. It must examine historical procedural analogues in the pretrial litigation process. In other words, the Court must determine whether, at the time the Seventh Amendment was ratified, there were provisions requiring a party to pay a portion of the amount at issue before trial.

*a. Litigation of actions in English common-law courts.*

When William the Conqueror obtained the English Crown in 1066, he took the reins of a kingdom with a deeply rooted legal culture. The laws of England were a tapestry woven from

local Anglo-Saxon customary law, borough and shire customs, village bylaws, and other local sources supplemented by royal law codes.[4] These sources—in time—would be synthesized by the royal courts to form the basis of the substantive common law.

While substantive English common law evolved from local customary law and, rarely, royal statutes, the procedures governing suits at common law originated in the royal courts—primarily the Courts of King's Bench and Common Pleas under the Norman, and later, Angevin dynasties. Unlike the relatively informal procedure in local courts, procedure before the royal courts was written and highly structured. In time, legal process came to play as important a role as substance in the suits at common law.

Blackstone describes the litigation process in suits at common law as having eight stages:

> The general therefore and orderly parts of a suit are these; 1. The original writ: 2. The process: 3. The pleadings: 4. The issue or demurrer: 5. The trial: 6. The judgment, and its incidents: 7. The proceedings in the nature of appeals: 8. The execution.

3 William Blackstone, *Commentaries* *272.

As a general matter, a suit at common law was commenced when the plaintiff obtained the appropriate original writ from Chancery. Sir John Baker, *An Introduction to English Legal History* 60—62 (5th ed. 2019); F. W. Maitland, *The Forms of Action at Common Law* 4 (A. H. Chaytor & W. J. Whittaker eds., Cambridge Univ. Press 2006). The original writ was "the beginning or foundation of the suit." Blackstone, *supra*, at *272. Unlike the flexibility of modern pleading under the various rules of civil procedure employed by courts, the cause of

---

[4] For a magisterial study of the history of English law, including from the Anglo-Saxon period, see 1 Sir Frederick Pollock & Frederic William Maitland, *The History of English Law* 25—63 (The Legal Classics Libr. spec. ed. 1982) (1899). A more accessible overview is provided by Harry Potter, *Law, Liberty and the Constitution: A Brief History of the Common Law* 10—32 (2020).

action and subsequent procedure were determined by the original writ chosen by the plaintiff.[5] Baker, *supra*, at 63 ("The choice of original writ governed the whole course of litigation from beginning to end, since the procedures and methods of trial available in an action commenced by one kind of writ were not necessarily available in another."). Critically, the original writ not only framed the issues for the subsequent litigation, but it vested the court with subject-matter jurisdiction over the case.[6]

Originally, a plaintiff was required to post security upon obtaining the original writ.[7] The purpose of the security requirement "was to answer for the plaintiff; who in case he brought an

---

[5] Frederic Maitland, the great English historian of the common law, explained that the trajectory of the action was fixed by the original writ:

> Let it be granted that one man has been wronged by another; the first thing that he or his advisers have to consider is what form of action he shall bring. It is not enough that in some way or another he should compel his adversary to appear in court and should then state in the words that naturally occur to him the facts on which he relies and the remedy to which he thinks himself entitled. No, English law knows a certain number of forms of action, each with its own uncouth name, a writ of right, an assize of novel disseisin or of *mort d'ancestor*, a writ of entry *sur disseisin* in the *per* and *cui*, a writ of *besaiel*, of *quare impedit*, an action of covenant, debt, detinue, replevin, trespass, assumpsit, ejectment, case. This choice is not merely between a number of queer technical terms, it is a choice between methods of procedure adapted to cases of different kinds.

Maitland, *supra*, at 1—2.

[6] To use modern terminology, the Royal Courts (King's Bench, Common Pleas, and Exchequer) were originally courts of limited jurisdiction. The action-appropriate original writ was, in a sense, the "ticket" to proceed before the King's courts with its distinct procedures and means of proof. The default, for those who did not or could not obtain an original writ, was to proceed before the local hundred, shire, or manor courts.

[7] Blackstone provides a form writ that includes the language about the plaintiff's security:

> GEORGE the second by the grace of God of Great Britain, France and Ireland King, defender of the faith, and so forth; to the sheriff of Oxfordshire, greeting. Command Charles Long, late of Burford, gentleman, that justly and without delay he render to William Burton two hundred pounds, which he owes him and unjustly detains, as he saith. And unless he shall do so, ***and if the said William shall make you secure of prosecuting his claim***, then summon by good summoners the aforesaid Charles, that he be before our justices at Westminster,

action without cause, or failed in the prosecution of it when brought, was liable to an amercement from the crown for raising a false accusation." Blackstone, *supra*, at *275. In other words, the security required of the plaintiff was to cover damages for which the plaintiff might be liable if it was determined that the action was baseless. By Blackstone's day, plaintiff's security had fallen out of use. He explains that the requirement had "at present become a mere matter of form; and John Doe and Richard Roe are always returned as the standing pledges for this purpose." *Id.* at *275. In practice, the requirement that the plaintiff post security had fallen out of use in England even before the American colonial period.[8]

After initiating the action by obtaining the writ, the next step was to bring the defendant under the jurisdiction of the court. As Blackstone explains, "[t]he next step for carrying on the suit, after suing out the original, is called process; being the means of compelling the defendant to appear in court." *Id.* at *279. Originally, a defendant could be called into court simply by being notified of the action by summoners employed by the sheriff of the defendant's locale.[9] *Id.* Having been so notified, if a defendant failed to appear before the court, a writ of attachment

---

> on the octave of saint Hilary, to shew wherefore he hath not done it. And have you there then the summoners, and this writ. WITNESS ourself at Westminster, the twenty fourth day of December, in the twenty eighth year of our reign.
> ***Pledges of prosecution {John Doe. Richard Roe***
> Summoners of the within named Charles Long {Roger Morris. Henry Johnson

Blackstone, *supra*, app. at *xiii (emphasis added).

[8] It is likely that the requirement that the plaintiff post security or name pledges passed out of use by the fifteenth century: "These pledges may have come to be fictitious by the fifteenth century. The names found on the dorse of writs are pairs like 'R. Dere' and 'W. Est,' or 'Ino Man' and 'Johannes Robert.' Margaret Hastings, *The Court of Common Pleas in Fifteenth Century England: A Study of Legal Administration and Procedure* 159 (1947).

[9] The summoners could orally inform the defendant of the action or, in his absence, signify that an action had been initiated "by erecting a white stick or wand on the defendant's grounds." Blackstone, *supra*, at *280.

would issue, whereby the sheriff would be empowered to seize "certain of [the defendant's] goods, which he shall forfeit if he doth not appear." *Id.* at *280. Blackstone notes, however, that attachment is the "first and immediate process, without any previous summons, upon actions of trespass *vi et armis*, or for other injuries, which though not forcible are yet trespasses against the peace, as deceit and conspiracy." *Id.*

The oral summons eventually fell into disuse, being replaced by the use of writs designed to immediately seize the defendant and/or his property. These writs were referred to as the mense process. Baker, *supra*, at 71. "The principal forms of mense process were the writ or precept of attachment (under which the sheriff either seized goods or took personal sureties from the defendant for his appearance), the *distringas* (under which the defendant was distrained by seizure of his property),[10] and the *capias ad respondendum* (under which the defendant was arrested)."[11] *Id.* at 72 (footnotes omitted). As Baker recounts, because the *capias ad*

---

[10] An example of a *distringas* is as follows:

> George the second by the grace of God of Great Britain, France, and Ireland, king, defender of the faith, and so forth; to the sheriff of Oxfordshire, greeting. We command you that you distrein Charles Long, late of Buford, gentleman, by all his lands and chattels within your bailiwick, so that neither he nor anyone one through him may lay hands upon the same, until you shall receive from us another command thereupon; and that you answer to us the issues of the same; and that you have his body before our justices at Westminster from the day of Easter in fifteen days, to answer to William Burton of a please, that he render to him two hundred pounds which he owes him and unjustly detains, as he saith and to hear his judgment of his may defaults. Witness sir John Willes, knight, at Westminster, the twelfth day of February, in the twenty eighth year of our reign.

Blackstone, *supra*, app. at *xiv.

[11] An example of a *capias* is as follows:

> George the second by the grace of God of Great Britain, France, and Ireland, king, defender of the faith, and so forth; to the sheriff of Berkshire, greeting. We command you, that you take Charles Long, late of Burford, gentleman, if he may be found in bailiwick at Westminster, on the morrow of the holy Trinity, to answer to William Burton, gentleman, of a plea, that he render to him two hundred pounds, which he owes him and unjustly detains, as he saith: and

*respondendum* was the most effective, it was gradually extended by statute to a broad array of actions at common law. *Id.* Blackstone describes the extension of the use of the *capias* for a number of common-law original writs, including account, debt and detinue, and trespass on the case. Blackstone, *supra*, at *281. By the time of Blackstone's writing, the use of the *capias ad respondendum* to secure jurisdiction over the defendant was "usual in practice." *Id.* at *282.[12]

The *capias ad respondendum* empowered the sheriff to arrest the person of the defendant and hold him pending suit. In practice, however, the defendant would be released if he posted security. Upon arrest, the defendant "must either go to prison … or put in special bail to the sheriff. For, the intent of the arrest being only to compel an appearance in court at the return of the writ, that purpose is equally answered, whether the sheriff detains his person, or takes sufficient security for his appearance, called bail because the defendant is bailed, or delivered to his sureties, upon their giving security for his appearance." *Id.* at *290. The amount of security required of a defendant is "no other sum than such as is sworn to by the plaintiff, and endorsed on the back of the writ." *Id.*

In summary, the English experience preceding and during the founding era recognized that the defendant—the party whose assets were at risk in the litigation—was required to post security at the inception of the action against him or risk arrest and the deprivation of his liberty.

---

> whereupon our sheriff of Oxfordshire hath made a return to our justices at Westminster, at a certain day now past, that the aforesaid Charles is not found in his bailiwick; and thereupon it is testified in our said court, that the aforementioned Charles lurks, wanders, and runs about in your county. And have you there then this writ. Witness sir John Willes, knight, at Westminster, the seventh day of May, in the twenty eighth year of our reign.

Blackstone, *supra*, app. at *xiv.

[12] For a discussion of how the use of the *capias ad respondendum* was extended to a broad array of suits at common law, see Hastings, *supra*, 169—70.

This was not seen as an impediment to the right to a trial by jury. Rather, it was an ordinary part of the litigation process for suits at common law that led to a jury trial.

*b) Litigation in American courts of the early republic followed English models with respect to the requirement of security.*

The earliest colonial tribunals used relatively informal proceedings. By the time the Constitution was ratified, practice in state courts had developed a level of procedural complexity that mirrored English models. *See* Peter Charles Hoffer, *Law and People in Colonial America* 67 (1993) ("In general, pleading in the colonies in the eighteenth century followed enough of the English model to be recognizable to a lawyer from the mother country ...."). Indeed, in both substance and procedure, suits at common law in American courts were governed by adopted English writs and adapted English process.

The Seventh Amendment was ratified on December 15, 1791. By that time, the lower federal courts had already been created by the Judiciary Act of 1789, and were hearing cases. Thus, at the time the Seventh Amendment was ratified, "suits at common law" were being tried in federal courts, as well as in the courts of the several states. As to procedure, early legislation ensured that federal courts applied the same procedures as were employed by the states in which those courts sat. The Process Act of September 29, 1789, provided:

> And be it further enacted, that until further provision shall be made, and except where by this act or other statutes of the United States is otherwise provided, the forms of writs and executions, except their style and modes of process and rates of fees, except fees to judges in the circuit and district courts, in suits at common law, shall be the same in each state respectively as are now used or allowed in the supreme courts of the same.

1 Stat. 93. The essential elements of the Process Act of 1789, mandating that suits at common law in federal trial courts[13] use the general procedures in use by the state courts where those federal trial courts sit, was confirmed by the Process Act of May 8, 1792, just months after the ratification of the Seventh Amendment.

The Court examined, as a representative example, sources governing practice in Pennsylvania courts in the early republic. That examination reveals that the Commonwealth followed the English practice of bringing an action and, significantly, bringing a defendant to court and requiring him to post security. Further, Pennsylvania procedure is relevant because it is what was employed by the original District of Pennsylvania, created by the Judiciary Act of 1789, and by the United States District Court for the Western District of Pennsylvania when created in 1818. 3 Stat. 462.

The most comprehensive summary of the law in Pennsylvania's early state courts is offered by Judge John Reed's magisterial *Pennsylvania Blackstone: A Modification of the Commentaries of Sir William Blackstone with Numerous Alterations and Additions Designed to Present an Elementary Exposition of the Entire Laws of Pennsylvania in Three Volumes*, published in 1831. By design, Judge Reed's *Pennsylvania Blackstone* highlights the hermeneutic of continuity, as to private law and procedure, between the then-current law of Pennsylvania and its English roots.

---

[13] In the early republic, the United States district and circuit courts were not originally invested with the scope of jurisdiction they currently possess. The district courts' jurisdiction was focused on minor criminal matters, admiralty cases, and bankruptcy proceedings. The circuit courts, while possessing some appellate jurisdiction, were federal courts of first instance over major criminal matters, as well as civil actions in law and equity. Peter Charles Hoffer, Williamjames Hull Hoffer & N. E. H. Hull, *The Federal Courts: An Essential History* 35—38 (2016); 1 Stat. 11 (1789).

The treatise explains that after the plaintiff initiated an action by obtaining the original writ from the appropriate state court, the defendant could be secured either by "a *summons* or a *capias*." 3 John Reed, *Pennsylvania Blackstone* 198 (The Lawbook Exch., Ltd. 2006) (1831). "A *capias* is served by the sheriff or deputy, or coroner, by arresting the defendant, which is done by actually seizing his person, in which case he either commits him to prison, or takes a bail-bond with sufficient surety, conditioned for his appearance at court, according to the import of the writ, to answer, &c." *Id.* Judge Reed explained that "[t]he object in issuing this writ, is to secure the body of the defendant, ***that it may be liable to execution, if judgment shall be ultimately obtained against him***." *Id.* at 209 (emphasis added). The purpose of the *capias* was not, therefore, limited to ensuring that the defendant appear to defend the plaintiff's claim, but to create security as to any potential judgment. Hoffer, *supra*, at 69 ("[I]n order to ensure that defendants did not disappear or squirrel away their property, plaintiffs could obtain a variety of intermediate writs to attach defendants' property or arrest their flight."). This security was obtained through the bail process—by which the defendant was released upon the posting of security. Reed explained that where the action was for a set amount, bail would issue as a matter of course:

> In actions of debt upon a bond, bill, or note in writing, actions of covenant, and detinue, holding to bail is generally considered as of course, but if required, the plaintiff must exhibit an affidavit, 1 Bro. 33.

Reed, *supra*, at 210. When the action was one that did not specify an exact amount of loss, the plaintiff was required to demonstrate the amount of, and need for, security:

> In actions on the case, and all other actions except those above-mentioned, bail is not of course: and to authorize it there must be an affidavit of a positive subsisting claim to damages actually sustained; that the defendant is about to go beyond the jurisdiction of the court; or some other special ground be laid.

*Id.* Once a defendant was arrested "and given bond to the sheriff for his appearance, it is considered here as in England, that he is delivered to his sureties upon their giving security for his appearance; and he is supposed to continue in their friendly custody, instead of going to jail." *Id.* The relationship of the defendant's sureties is that of effectuating *special bail*. "This kind of bail is effected by a recognizance to the plaintiff in a sum sufficient to cover all matters in controversy, whereby the cognizors undertake, that if the defendant be condemned in the action, he shall pay the costs and condemnation money, or render himself a prisoner, or that they will pay it for him." *Id.*[14]

*c) The requirement that a defendant post security in suits at common law is a historical analogue to the prepayment requirement at issue in this case.*

The historic pretrial litigation procedures for suits at common law in both England and early Pennsylvania reveal that at the time of the ratification of the Seventh Amendment, the fact that a party—the defendant—would have to post security for a potential judgment was an ordinary part of the litigation process. In this case, the question for the Court is whether the pretrial process to secure the defendant and obtain security under the *capias* writ informs whether the prepayment penalty under IRC § 6703 runs afoul of the Seventh Amendment's guarantee of the right to a jury trial in suits at common law.

The Seventh Amendment secured a preexisting right. Therefore, as explained above, the Court must determine whether the prepayment requirement would have been viewed as infringing upon the right to a jury trial *at the time of ratification*. In undertaking that analysis, the Court finds that the common-law pretrial-litigation process wherein a defendant was required

[14] Defendants arrested for security in an action at common law pursuant to a *capias* did not serve hard time. Rather, if not freed on bail, they were generally "given the right to move freely about the jailhouse and its environs." Hoffer, *supra*, at 69.

to post security is an adequate historical analogue. The Court holds that this analogue is sufficient to resolve the question.

There is no question that the prepayment requirement of IRC § 6703 is not identical to practice under a *capias* writ in suits at common law during the early republic. Nevertheless, "analogical reasoning requires only that the government identify a well-established and representative historical *analogue,* not a historical *twin.* So, even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 30 (2022). Further, the fact that a historical precursor is only indirectly similar is not an obstacle to determining that it is a historical *analogue* where the regulations in question foster the same ends by different means. For example, in *United States v. Rahimi*, 602 U.S. 680 (2024), the Supreme Court upheld a law directly disarming an individual subject to a restraining order, finding that the individual represents a credible threat to the physical safety of an intimate partner or child based on the analogy of, *inter alia*, founding-era surety laws where people deemed dangerous to the community would be required to obtain sureties for their good behavior (even though those laws did nothing to directly disarm the individual). The Supreme Court found the modern disarmament statute and the founding-era surety laws to be sufficiently analogous because they fostered the same goal—they were geared toward preventing violence before it occurred. *Id.* at 695.

Here, the Court holds that the founding-era legal process in suits at common law whereby the defendant is subject to arrest and detention until security is posted for the plaintiff's suit is a suitable historical analogue to the prepayment requirement of IRC § 6703 to permit a finding that the requirement is acceptable under the Seventh Amendment.

On the surface, there is an obvious difference between the common-law security requirement and IRC § 6703: in the common-law procedure, it is the defendant who is subject to the security requirement, whereas under the statute, the plaintiff filing the *de novo* action in a district court must make the prepayment. Upon deeper examination, that difference falls away. Once an action is filed in a district court, as explained above, the proceedings are *de novo*. No deference is owed to any previous finding on liability or damages. This is inherent in the *de novo* nature of the district court proceedings. To remove any doubt, the statute elucidates that the government bears the burden of proof in the district court. 26 U.S.C. § 6703(a) ("In any proceeding involving the issue of whether or not any person is liable for a penalty under sections 6700, 6701, or 6702, the burden of proof with respect to such issue shall be on the Secretary."). Thus, despite HDH being the nominal plaintiff in this action, it is akin to the defendant in every respect except for the fact that it initiated the proceedings in this court. HDH has no burden of proof. It only has to defend the claims brought by the Government. Most critically for purposes of the analogue, like a traditional defendant, it is HDH's assets that are at risk, not the Government's. Thus, the Court holds that the fact that HDH is the nominal plaintiff in this action does not defeat a finding that the prepayment requirement of IRC § 6703 is an analogue of the requirement that a defendant post security in suits at common law.

The prepayment rule of IRC § 6703 is an analogue to the founding-era requirement that the defendant post security because they foster the same general goals—to ensure that the party whose assets are at risk—HDH in this case—gives security to the opposing party for the action. Judge Reed's *Pennsylvania Blackstone* explained that the bail requirement was that it be "a sum sufficient to cover all matters in controversy." Reed, *supra*, at 210. It not only secured his appearance, but also secured the ability of the plaintiff to recover if successful. The IRC § 6703

prepayment requirement does not require the prepayment of all amounts at issue, but rather, only fifteen percent of the amount the government claims is due pursuant to the administrative findings. As explained above, this is a substantial reduction from the traditional full-payment requirement for district court refund suits under the IRC. As Chief Justice Earl Warren explained in *Flora*, the prepayment rule is geared toward the government's "substantial interest in protecting the public purse." *Flora*, 362 U.S. at 175. The Court holds that the analogy between the common-law requirement of defendant security and the (partial) prepayment requirement of IRC § 6703 is close enough in purpose and means to serve as a reliable indicator that the statute does not violate the Seventh Amendment.

In sum, the critical question that the Court must ask is whether a member of the generation that framed and ratified the Seventh Amendment would view the requirement that HDH pay fifteen percent of the amount the IRS claims it owes as effectively depriving HDH of its right to a jury trial. The answer to this question is no. The Seventh Amendment guaranteed a preexisting right to a jury trial in suits at common law. At the time it was ratified, it was well-established that the procedures governing common-law actions had provisions requiring the party whose assets were at risk to post security in an amount dictated by the plaintiff's action. The Court must interpret the Seventh Amendment's right to a jury trial in suits at common law in the context of the integral fabric of common-law litigation leading up to the jury trial. The Seventh Amendment guaranteed the right to a trial as it was then understood in the context of the process in which it was an inextricable part. That process contemplated that the party whose assets were at risk would have to post security at the beginning of litigation. In light of this contemplation, the Court holds that the prepayment requirement under IRC § 6703 would not be viewed as infringing HDH's right to a jury trial.

**C. The public rights exception does not apply.**

HDH faulted the Court's prior decision for not proceeding to an examination of the public rights exception after holding that the Seventh Amendment was implicated, but not violated. Now, it again argues that the Court must consider the public rights exception as a necessary component of its analysis of the issues presented by this case. The Government, for its part, argues that the public rights exception should apply to uphold the provisions of IRC § 6703. As the Court has previously held, and holds again, the Seventh Amendment is not violated by IRC § 6703 because HDH has the right to a *de novo* jury trial. Further, the fifteen percent prepayment requirement does not offend the Seventh Amendment's guarantee of a jury trial. Because HDH has not been deprived of the right to a jury trial, the Court need not examine whether the public rights exception applies.

By its very nature, the public rights *exception* is just that—an exception to the jury trial requirement of the Seventh Amendment. "Under this ***exception***, Congress may assign the matter for decision to an agency without a jury, consistent with the Seventh Amendment." *Jarkesy*, 603 U.S. at 127 (emphasis added). HDH contends that the public rights exception analysis is required for every Seventh Amendment challenge under *Jarkesy*, pointing to the fact that in both *Jarkesy* and the Third Circuit's decision in *Axalta Coating Sys. LLC v. Fed. Aviation Admin.*, 144 F.4th 467 (3d Cir. 2025), the courts undertook the inquiry as an essential element of those decisions. But there is a major difference. In both *Jarkesy* and *Axalta,* the statutory provisions at issue deprived the challenger of the right to a jury trial. Thus, the courts were required to determine whether that deprivation of a jury trial, nevertheless, was acceptable because of the public rights exception.

It is axiomatic that when the general rule applies, there is no need to find recourse in an exception. Here, HDH is not deprived of a jury trial. The statute at issue expressly provides for a *de novo* jury trial. This satisfies the Seventh Amendment as the Supreme Court held in *FCC*. Further, the prepayment requirement does not unconstitutionally hinder HDH's ability to avail itself of the *de novo* jury trial. As such, the general rule applies—the jury trial guaranteed by the Seventh Amendment is afforded to HDH. There is no need, therefore, for the Court to determine whether the public rights exception applies.[15]

## V. Conclusion

For the reasons set forth above, HDH's motions will be denied by Order of Court to follow.

BY THE COURT:

WILLIAM S. STICKMAN IV
UNITED STATES DISTRICT JUDGE

Dated: 9/28/26

[15] The Government argues that there would be no need to afford HDH a jury trial because the public rights exception applies as the statute at issue relates to revenue collection, a quintessential public right. The Court only notes that, if it were required to examine the issue, the Government's position may not be as strong as it has presented it. Just because something falls within the internal revenue code does not make it a public right. Here, for example, the promoter penalty does not target taxpayers and does not seek to collect money due from taxpayers. Rather, it imposes a statutory penalty for those who, *inter alia*, make "false or fraudulent" representations with respect to tax shelters. As the Court in *Jarkesy* explained, actions targeting false or fraudulent conduct between private citizens are private, not public rights. *Jarkesy*, 603 U.S. at 128 ("If a suit is in the nature of an action at common law, then the matter presumptively concerns private rights, and adjudication by an Article III court is mandatory."). In any event, because the Seventh Amendment right to a jury trial is not violated, the exception for public rights need not be examined.